# SEMINOLE TRIBE OF FLORIDA *v.* FLORIDA ET AL.

No. 94–12.   Argued October 11, 1995—Decided March 27, 1996

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 76. SOUTER, J., filed a dissenting opinion, in which GINSBURG and BREYER, JJ., joined, *post*, p. 100.

*Bruce S. Rogow* argued the cause for petitioner. With him on the briefs were *Beverly A. Pohl, Jerry C. Straus, Michael L. Roy, Judith A. Shapiro, Eugene Gressman,* and *John J. Gibbons.*

*Solicitor General Days* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, Irving L. Gornstein, Edward J. Shawaker,* and *Anne S. Almy.*

*Jonathan A. Glogau,* Assistant Attorney General of Florida, argued the cause for respondents. With him on the brief was *Robert A. Butterworth,* Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed for the Miccosukee Tribe of Indians of Florida by *Sonia Escobio O'Donnell;* for the National Indian Gaming Association et al. by *Jerome L. Levine, Frank R. Lawrence,* and *Kurt V. BlueDog;* for the Poarch Band of Creek Indians et al. by *William R. Perry, Donald J. Simon,* and *Gary Pitchlynn;* for the San Manuel Band of Mission Indians et al. by *Howard L. Dickstein, Jerome L. Levine,* and *Frank R. Lawrence;* for the Spokane Tribe of Indians et al. by *Michael J. Wahoske;* and for the Tohono O'Odham Nation et al. by *Eric N. Dahlstrom* and *Robert C. Brauchli.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *Manuel M. Medeiros,* Deputy Attorney General, and *Thomas F. Gede,* Special Assistant Attorney General, *Christine O. Gregoire,* Attorney General of Washington, and *Jonathan Tate McCoy,* Assistant Attorney General, joined by the Attorneys General for their respective jurisdictions as

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The Indian Gaming Regulatory Act provides that an Indian tribe may conduct certain gaming activities only in conformance with a valid compact between the tribe and the State in which the gaming activities are located. 102 Stat. 2475, 25 U. S. C. § 2710(d)(1)(C). The Act, passed by Congress under the Indian Commerce Clause, U. S. Const., Art. I, § 8, cl. 3, imposes upon the States a duty to negotiate in good faith with an Indian tribe toward the formation of a compact, § 2710(d)(3)(A), and authorizes a tribe to bring suit in federal court against a State in order to compel performance of that duty, § 2710(d)(7). We hold that notwithstanding Congress' clear intent to abrogate the States' sovereign immunity, the Indian Commerce Clause does not grant Congress that power, and therefore § 2710(d)(7) cannot grant jurisdiction over a State that does not consent to be sued. We further hold that the doctrine of *Ex parte Young*, 209 U. S. 123 (1908), may not be used to enforce § 2710(d)(3) against a state official.

---

follows: *Jeff Sessions* of Alabama, *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Gale A. Norton* of Colorado, *Richard Blumenthal* of Connecticut, *Margery S. Bronster* of Hawaii, *Alan Lance* of Idaho, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Mike Moore* of Mississippi, *Jeremiah W. Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Jeffrey R. Howard* of New Hampshire, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Betty D. Montgomery* of Ohio, *Drew Edmondson* of Oklahoma, *Ernest D. Preate, Jr.,* of Pennsylvania, *Jeffrey B. Pine* of Rhode Island, *Mark Barnett* of South Dakota, *Dan Morales* of Texas, *Jeffrey L. Amestoy* of Vermont, *James S. Gilmore III* of Virginia, and *Darrell V. McGraw, Jr.,* of West Virginia; and for the National Governors' Association et al. by *Richard Ruda* and *Richard G. Taranto.*

*Richard Dauphinais, Arlinda F. Locklear, Francis R. Skenandore, Curtis G. Berkey,* and *Donald Juneau* filed a brief for the Stockbridge-Munsee Indian Community et al. as *amici curiae.*

48

## I

Congress passed the Indian Gaming Regulatory Act in 1988 in order to provide a statutory basis for the operation and regulation of gaming by Indian tribes. See 25 U. S. C. § 2702. The Act divides gaming on Indian lands into three classes—I, II, and III—and provides a different regulatory scheme for each class. Class III gaming—the type with which we are here concerned—is defined as "all forms of gaming that are not class I gaming or class II gaming," § 2703(8), and includes such things as slot machines, casino games, banking card games, dog racing, and lotteries.[1] It is the most heavily regulated of the three classes. The Act provides that class III gaming is lawful only where it is: (1) authorized by an ordinance or resolution that (a) is adopted by the governing body of the Indian tribe, (b) satisfies certain statutorily prescribed requirements, and (c) is approved by the National Indian Gaming Commission; (2) located in a State that permits such gaming for any purpose by any person, organization, or entity; and (3) "conducted in conformance with a Tribal-State compact entered into by the

---

[1] Class I gaming "means social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations," 25 U. S. C. § 2703(6), and is left by the Act to "the exclusive jurisdiction of the Indian tribes," § 2710(a)(1).

Class II gaming is more extensively defined to include bingo, games similar to bingo, nonbanking card games not illegal under the laws of the State, and card games actually operated in particular States prior to the passage of the Act. See § 2703(7). Banking card games, electronic games of chance, and slot machines are expressly excluded from the scope of class II gaming. § 2703(B). The Act allows class II gaming where the State "permits such gaming for any purpose by any person, organization or entity," and the "governing body of the Indian tribe adopts an ordinance or resolution which is approved by the Chairman" of the National Indian Gaming Commission. § 2710(b)(1). Regulation of class II gaming contemplates a federal role, but places primary emphasis on tribal self-regulation. See §§ 2710(c)(3)–(6).

Indian tribe and the State under paragraph (3) that is in effect." §2710(d)(1).

The "paragraph (3)" to which the last prerequisite of §2710(d)(1) refers is §2710(d)(3), which describes the permissible scope of a Tribal-State compact, see §2710(d)(3)(C), and provides that the compact is effective "only when notice of approval by the Secretary [of the Interior] of such compact has been published by the Secretary in the Federal Register," §2710(d)(3)(B). More significant for our purposes, however, is that §2710(d)(3) describes the process by which a State and an Indian tribe begin negotiations toward a Tribal-State compact:

> "(A) Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact."

The State's obligation to "negotiate with the Indian tribe in good faith" is made judicially enforceable by §§2710(d)(7)(A)(i) and (B)(i):

> "(A) The United States district courts shall have jurisdiction over—
>
> "(i) any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact under paragraph (3) or to conduct such negotiations in good faith . . . .
>
> "(B)(i) An Indian tribe may initiate a cause of action described in subparagraph (A)(i) only after the close of the 180-day period beginning on the date on which the

Indian tribe requested the State to enter into negotiations under paragraph (3)(A)."

Sections 2710(d)(7)(B)(ii)–(vii) describe an elaborate remedial scheme designed to ensure the formation of a Tribal-State compact. A tribe that brings an action under § 2710(d) (7)(A)(i) must show that no Tribal-State compact has been entered and that the State failed to respond in good faith to the tribe's request to negotiate; at that point, the burden then shifts to the State to prove that it did in fact negotiate in good faith. § 2710(d)(7)(B)(ii). If the district court concludes that the State has failed to negotiate in good faith toward the formation of a Tribal-State compact, then it "shall order the State and Indian Tribe to conclude such a compact within a 60-day period." § 2710(d)(7)(B)(iii). If no compact has been concluded 60 days after the court's order, then "the Indian tribe and the State shall each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact." § 2710(d)(7) (B)(iv). The mediator chooses from between the two proposed compacts the one "which best comports with the terms of [the Act] and any other applicable Federal law and with the findings and order of the court," *ibid.*, and submits it to the State and the Indian tribe, § 2710(d)(7)(B)(v). If the State consents to the proposed compact within 60 days of its submission by the mediator, then the proposed compact is "treated as a Tribal-State compact entered into under paragraph (3)." § 2710(d)(7)(B)(vi). If, however, the State does not consent within that 60-day period, then the Act provides that the mediator "shall notify the Secretary [of the Interior]" and that the Secretary "shall prescribe . . . procedures . . . under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction." § 2710(d)(7)(B)(vii).[2]

---

[2] Sections 2710(d)(7)(B)(ii)–(vii) provide in full: .

"(ii) In any action described in subparagraph (A)(i), upon the introduction of evidence by an Indian tribe that—

In September 1991, the Seminole Tribe of Florida, peti-
tioner, sued the State of Florida and its Governor, Lawton
Chiles, respondents.   Invoking jurisdiction under 25 U. S. C.

---

"(I) a Tribal-State compact has not been entered into under paragraph
(3), and

"(II) the State did not respond to the request of the Indian tribe to
negotiate such a compact or did not respond to such request in good faith,
the burden of proof shall be upon the State to prove that the State has
negotiated with the Indian tribe in good faith to conclude a Tribal-State
compact governing the conduct of gaming activities.

"(iii) If, in any action described in subparagraph (A)(i), the court finds
that the State has failed to negotiate in good faith with the Indian tribe
to conclude a Tribal-State compact governing the conduct of gaming ac-
tivities, the court shall order the State and the Indian Tribe to conclude
such a compact within a 60-day period.   In determining in such an action
whether a State has negotiated in good faith, the court—

"(I) may take into account the public interest, public safety, criminality,
financial integrity, and adverse economic impacts on existing gaming activ-
ities, and

"(II) shall consider any demand by the State for direct taxation of the
Indian tribe or of any Indian lands as evidence that the State has not
negotiated in good faith.

"(iv) If a State and an Indian tribe fail to conclude a Tribal-State com-
pact . . . within the 60-day period provided in the order of a court issued
under clause (iii), the Indian tribe and the State shall each submit to a
mediator appointed by the court a proposed compact that represents their
last best offer for a compact.  The mediator shall select from the two
proposed compacts the one which best comports with the terms of this
chapter and any other applicable Federal law and with the findings and
order of the court.

"(v) The mediator appointed by the court under clause (iv) shall submit
to the State and the Indian tribe the compact selected by the mediator
under clause (iv).

"(vi) If a State consents to a proposed compact during the 60-day period
beginning on the date on which the proposed compact is submitted by the
mediator to the State under clause (v), the proposed compact shall be
treated as a Tribal-State compact entered into under paragraph (3).

"(vii) If the State does not consent during the 60-day period described
in clause (vi) to a proposed compact submitted by a mediator under clause
(v), the mediator shall notify the Secretary and the Secretary shall pre-
scribe, in consultation with the Indian tribe, procedures—

§ 2710(d)(7)(A), as well as 28 U. S. C. §§ 1331 and 1362, petitioner alleged that respondents had "refused to enter into any negotiation for inclusion of [certain gaming activities] in a tribal-state compact," thereby violating the "requirement of good faith negotiation" contained in § 2710(d)(3). Petitioner's Complaint ¶ 24, see App. 18. Respondents moved to dismiss the complaint, arguing that the suit violated the State's sovereign immunity from suit in federal court. The District Court denied respondents' motion, 801 F. Supp. 655 (SD Fla. 1992), and respondents took an interlocutory appeal of that decision. See *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.*, 506 U. S. 139 (1993) (collateral order doctrine allows immediate appellate review of order denying claim of Eleventh Amendment immunity).

The Court of Appeals for the Eleventh Circuit reversed the decision of the District Court, holding that the Eleventh Amendment barred petitioner's suit against respondents.[3] 11 F. 3d 1016 (1994). The court agreed with the District Court that Congress in § 2710(d)(7) intended to abrogate the States' sovereign immunity, and also agreed that the Act had been passed pursuant to Congress' power under the Indian Commerce Clause, U. S. Const., Art. I, § 8, cl. 3. The court disagreed with the District Court, however, that the Indian

---

"(I) which are consistent with the proposed compact selected by the mediator under clause (iv), the provisions of this chapter, and the relevant provisions of the laws of the State, and

"(II) under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction."

[3] The Eleventh Circuit consolidated petitioner's appeal with an appeal from another suit brought under § 2710(d)(7)(A)(i) by a different Indian tribe. Although the District Court in that case had granted the defendants' motions to dismiss, the legal issues presented by the two appeals were virtually identical. See *Poarch Band of Creek Indians* v. *Alabama*, 776 F. Supp. 550 (SD Ala. 1991) (Eleventh Amendment bars suit against State), and 784 F. Supp. 1549 (SD Ala. 1992) (Eleventh Amendment bars suit against Governor).

Commerce Clause grants Congress the power to abrogate a State's Eleventh Amendment immunity from suit, and concluded therefore that it had no jurisdiction over petitioner's suit against Florida. The court further held that *Ex parte Young,* 209 U. S. 123 (1908), does not permit an Indian tribe to force good-faith negotiations by suing the Governor of a State. Finding that it lacked subject-matter jurisdiction, the Eleventh Circuit remanded to the District Court with directions to dismiss petitioner's suit.[4]

Petitioner sought our review of the Eleventh Circuit's decision,[5] and we granted certiorari, 513 U. S. 1125 (1995), in order to consider two questions: (1) Does the Eleventh Amendment prevent Congress from authorizing suits by Indian tribes against States for prospective injunctive relief to enforce legislation enacted pursuant to the Indian Commerce Clause?; and (2) Does the doctrine of *Ex parte Young* permit suits against a State's Governor for prospective injunctive relief to enforce the good-faith bargaining requirement of the Act? We answer the first question in the affirmative, the second in the negative, and we therefore affirm the Eleventh Circuit's dismissal of petitioner's suit.[6]

---

[4] Following its conclusion that petitioner's suit should be dismissed, the Court of Appeals went on to consider how § 2710(d)(7) would operate in the wake of its decision. The court decided that those provisions of § 2710(d)(7) that were problematic could be severed from the rest of the section, and read the surviving provisions of § 2710(d)(7) to provide an Indian tribe with immediate recourse to the Secretary of the Interior from the dismissal of a suit against a State. 11 F. 3d 1016, 1029 (1994).

[5] Respondents filed a cross-petition, No. 94–219, challenging only the Eleventh Circuit's modification of § 2710(d)(7), see n. 4, *supra.* That petition is still pending.

[6] While the appeal was pending before the Eleventh Circuit, the District Court granted respondents' earlier filed summary judgment motion, finding that Florida had fulfilled its obligation under the Act to negotiate in good faith. The Eleventh Circuit has stayed its review of that decision pending the disposition of this case.

The Eleventh Amendment provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Although the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, "we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms." *Blatchford* v. *Native Village of Noatak,* 501 U. S. 775, 779 (1991). That presupposition, first observed over a century ago in *Hans* v. *Louisiana,* 134 U. S. 1 (1890), has two parts: first, that each State is a sovereign entity in our federal system; and second, that " '[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent,' " *id.,* at 13 (emphasis deleted), quoting The Federalist No. 81, p. 487 (C. Rossiter ed. 1961) (A. Hamilton). See also *Puerto Rico Aqueduct and Sewer Authority, supra,* at 146 ("The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity"). For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States "was not contemplated by the Constitution when establishing the judicial power of the United States." *Hans, supra,* at 15.[7]

---

[7] *E. g., North Carolina* v. *Temple,* 134 U. S. 22, 30 (1890); *Fitts* v. *McGhee,* 172 U. S. 516, 524 (1899); *Bell* v. *Mississippi,* 177 U. S. 693 (1900); *Smith* v. *Reeves,* 178 U. S. 436, 446 (1900); *Palmer* v. *Ohio,* 248 U. S. 32, 34 (1918); *Duhne* v. *New Jersey,* 251 U. S. 311, 313 (1920); *Ex parte New York,* 256 U. S. 490, 497 (1921); *Missouri* v. *Fiske,* 290 U. S. 18, 26 (1933); *Great Northern Life Ins. Co.* v. *Read,* 322 U. S. 47, 51 (1944); *Ford Motor Co.* v. *Department of Treasury of Ind.,* 323 U. S. 459, 464 (1945); *Georgia Railroad & Banking Co.* v. *Redwine,* 342 U. S. 299, 304, n. 13 (1952); *Parden* v. *Terminal Railway of Ala. Docks Dept.,* 377 U. S. 184, 186 (1964); *United*

Here, petitioner has sued the State of Florida and it is undisputed that Florida has not consented to the suit. See *Blatchford, supra,* at 782 (States by entering into the Constitution did not consent to suit by Indian tribes). Petitioner nevertheless contends that its suit is not barred by state sovereign immunity. First, it argues that Congress through the Act abrogated the States' sovereign immunity. Alternatively, petitioner maintains that its suit against the Governor may go forward under *Ex parte Young, supra.* We consider each of those arguments in turn.

## II

Petitioner argues that Congress through the Act abrogated the States' immunity from suit. In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has "unequivocally expresse[d] its intent to abrogate the immunity," *Green* v. *Mansour,* 474 U. S. 64, 68 (1985); and second, whether Congress has acted "pursuant to a valid exercise of power," *ibid.*

## A

Congress' intent to abrogate the States' immunity from suit must be obvious from "a clear legislative statement." *Blatchford, supra,* at 786. This rule arises from a recognition of the important role played by the Eleventh Amend-

---

*States* v. *Mississippi,* 380 U. S. 128, 140 (1965); *Employees of Dept. of Public Health and Welfare of Mo.* v. *Department of Public Health and Welfare of Mo.,* 411 U. S. 279, 280 (1973); *Edelman* v. *Jordan,* 415 U. S. 651, 662–663 (1974); *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976); *Cory* v. *White,* 457 U. S. 85 (1982); *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89, 97–100 (1984); *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 237–238 (1985); *Welch* v. *Texas Dept. of Highways and Public Transp.,* 483 U. S. 468, 472–474 (1987) (plurality opinion); *Dellmuth* v. *Muth,* 491 U. S. 223, 227–229, and n. 2 (1989); *Port Authority Trans-Hudson Corp.* v. *Feeney,* 495 U. S. 299, 304 (1990); *Blatchford* v. *Native Village of Noatak,* 501 U. S. 775, 779 (1991); *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.,* 506 U. S. 139, 144 (1993).

ment and the broader principles that it reflects. See *Atas-cadero State Hospital* ·v. *Scanlon*, 473 U. S. 234, 238–239 (1985); *Quern* v. *Jordan*, 440 U. S. 332, 345 (1979). In *Atas-cadero*, we held that "[a] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." 473 U. S., at 246; see also *Blatchford, supra,* at 786, n. 4 ("The fact that Congress grants jurisdiction to hear a claim does not suffice to show Congress has abrogated all defenses to that claim") (emphases deleted). Rather, as we said in *Dellmuth* v. *Muth,* 491 U. S. 223 (1989):

> "To temper Congress' acknowledged powers of abrogation with due concern for the Eleventh Amendment's role as an essential component of our constitutional structure, we have applied a simple but stringent test: 'Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.'" *Id.,* at 227–228.

See also *Welch* v. *Texas Dept. of Highways and Public Transp.,* 483 U. S. 468, 474 (1987) (plurality opinion).

Here, we agree with the parties, with the Eleventh Circuit in the decision below, 11 F. 3d, at 1024, and with virtually every other court that has confronted the question[8] that Congress has in § 2710(d)(7) provided an "unmistakably clear" statement of its intent to abrogate. Section 2710(d)(7)(A)(i)

---

[8] See *Ponca Tribe of Oklahoma* v. *Oklahoma,* 37 F. 3d 1422, 1427–1428 (CA10 1994), cert. pending, No. 94–1029; *Spokane Tribe* v. *Washington,* 28 F. 3d 991, 994–995 (CA9 1994); *Cheyenne River Sioux Tribe* v. *South Dakota,* 3 F. 3d 273, 280–281 (CA8 1993); *Ponca Tribe of Oklahoma* v. *Oklahoma,* 834 F. Supp. 1341, 1345 (WD Okla. 1992); *Maxam* v. *Lower Sioux Indian Community of Minnesota,* 829 F. Supp. 277 (D. Minn. 1993); *Kickapoo Tribe of Indians* v. *Kansas,* 818 F. Supp. 1423, 1427 (D. Kan. 1993); 801 F. Supp. 655, 658 (SD Fla. 1992) (case below); *Sault Ste. Marie Tribe of Chippewa Indians* v. *Michigan,* 800 F. Supp. 1484, 1488–1489 (WD Mich. 1992); *Poarch Band of Creek Indians* v. *Alabama,* 776 F. Supp., at 557–558.

vests jurisdiction in "[t]he United States district courts . . . over any cause of action .·. . arising from the failure of a State to enter into negotiations . . . or to conduct such negotiations in good faith." Any conceivable doubt as to the identity of the defendant in an action under § 2710(d)(7)(A)(i) is dispelled when one looks to the various provisions of § 2710(d)(7)(B), which describe the remedial scheme available to a tribe that files suit under § 2710(d)(7)(A)(i). Section 2710(d)(7)(B)(ii)(II) provides that if a suing tribe meets its burden of proof, then the "burden of proof shall be upon the State . . ."; § 2710(d)(7)(B)(iii) states that if the court "finds that the State has failed to negotiate in good faith . . . , the court shall order the State . . ."; § 2710(d)(7)(B)(iv) provides that "the State shall . . . submit to a mediator appointed by the court" and subsection (B)(v) of § 2710(d)(7) states that the mediator "shall submit to the State." Sections 2710(d) (7)(B)(vi) and (vii) also refer to the "State" in a context that makes it clear that the State is the defendant to the suit brought by an Indian tribe under § 2710(d)(7)(A)(i). In sum, we think that the numerous references to the "State" in the text of § 2710(d)(7)(B) make it indubitable that Congress intended through the Act to abrogate the States' sovereign immunity from suit.[9]

## B

Having concluded that Congress clearly intended to abrogate the States' sovereign immunity through § 2710(d)(7), we

---

[9] JUSTICE SOUTER, in his dissenting opinion, argues that in order to avoid a constitutional question, we should interpret the Act to provide only a suit against state officials rather than a suit against the State itself. *Post*, at 182. But in light of the plain text of § 2710(d)(7)(B), we disagree with the dissent's assertion that the Act can reasonably be read in that way. "We cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question." See *United States v. Locke*, 471 U. S. 84, 96 (1985), quoting *George Moore Ice Cream Co.* v. *Rose*, 289 U. S. 373, 379 (1933) (Cardozo, J.). We already have found the clear statement rule satisfied, and that finding renders the preference for avoiding a constitutional question inapplicable.

turn now to consider whether the Act was passed "pursuant to a valid exercise of power." *Green* v. *Mansour*, 474 U. S., at 68. Before we address that question here, however, we think it necessary first to define the scope of our inquiry.

Petitioner suggests that one consideration weighing in favor of finding the power to abrogate here is that the Act authorizes only prospective injunctive relief rather than retroactive monetary relief. But we have often made it clear that the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment. See, *e. g.*, *Cory* v. *White*, 457 U. S. 85, 90 (1982) ("It would be a novel proposition indeed that the Eleventh Amendment does not bar a suit to enjoin the State itself simply because no money judgment is sought"). We think it follows *a fortiori* from this proposition that the type of relief sought is irrelevant to whether Congress has power to abrogate States' immunity. The Eleventh Amendment does not exist solely in order to "preven[t] federal-court judgments that must be paid out of a State's treasury," *Hess* v. *Port Authority Trans-Hudson Corporation*, 513 U. S. 30, 48 (1994); it also serves to avoid "the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties," *Puerto Rico Aqueduct and Sewer Authority*, 506 U. S., at 146 (internal quotation marks omitted).

Similarly, petitioner argues that the abrogation power is validly exercised here because the Act grants the States a power that they would not otherwise have, viz., some measure of authority over gaming on Indian lands. It is true enough that the Act extends to the States a power withheld from them by the Constitution. See *California* v. *Cabazon Band of Mission Indians*, 480 U. S. 202 (1987). Nevertheless, we do not see how that consideration is relevant to the question whether Congress may abrogate state sovereign immunity. The Eleventh Amendment immunity may not be lifted by Congress unilaterally deciding that it will be re-

placed by grant of some other authority. Cf. *Atascadero*, 473 U. S., at 246–247 ("[T]he mere receipt of federal funds cannot establish that a State has consented to suit in federal court").

Thus our inquiry into whether Congress has the power to abrogate unilaterally the States' immunity from suit is narrowly focused on one question: Was the Act in question passed pursuant to a constitutional provision granting Congress the power to abrogate? See, *e. g., Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 452–456 (1976). Previously, in conducting that inquiry, we have found authority to abrogate under only two provisions of the Constitution. In *Fitzpatrick*, we recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution. *Id.*, at 455. We noted that § 1 of the Fourteenth Amendment contained prohibitions expressly directed at the States and that § 5 of the Amendment expressly provided that "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." See *id.*, at 453 (internal quotation marks omitted). We held that through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that § 5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that Amendment.

In only one other case has congressional abrogation of the States' Eleventh Amendment immunity been upheld. In *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1 (1989), a plurality of the Court found that the Interstate Commerce Clause, Art. I, § 8, cl. 3, granted Congress the power to abrogate state sovereign immunity, stating that the power to regulate interstate commerce would be "incomplete without the authority to render States liable in damages." 491 U. S., at 19–20. Justice White added the fifth vote necessary to the result in that case, but wrote separately in order to express

that he "[did] not agree with much of [the plurality's] reasoning." *Id.*, at 57 (opinion concurring in judgment in part and dissenting in part).

In arguing that Congress through the Act abrogated the States' sovereign immunity, petitioner does not challenge the Eleventh Circuit's conclusion that the Act was passed pursuant to neither the Fourteenth Amendment nor the Interstate Commerce Clause. Instead, accepting the lower court's conclusion that the Act was passed pursuant to Congress' power under the Indian Commerce Clause, petitioner now asks us to consider whether that Clause grants Congress the power to abrogate the States' sovereign immunity.

Petitioner begins with the plurality decision in *Union Gas* and contends that "[t]here is no principled basis for finding that congressional power under the Indian Commerce Clause is less than that conferred by the Interstate Commerce Clause." Brief for Petitioner 17. Noting that the *Union Gas* plurality found the power to abrogate from the "plenary" character of the grant of authority over interstate commerce, petitioner emphasizes that the Interstate Commerce Clause leaves the States with some power to regulate, see, *e. g., West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186 (1994), whereas the Indian Commerce Clause makes "Indian relations . . . the exclusive province of federal law." *County of Oneida* v. *Oneida Indian Nation of N. Y.*, 470 U. S. 226, 234 (1985). Contending that the Indian Commerce Clause vests the Federal Government with "the duty of protect-[ing]" the tribes from "local ill feeling" and "the people of the States," *United States* v. *Kagama*, 118 U. S. 375, 383–384 (1886), petitioner argues that the abrogation power is necessary "to protect the tribes from state action denying federally guaranteed rights." Brief for Petitioner 20.

Respondents dispute petitioner's analogy between the Indian Commerce Clause and the Interstate Commerce Clause. They note that we have recognized that "the Interstate Commerce and Indian Commerce Clauses have very differ-

ent applications," *Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163, 192 (1989), and from that they argue that the two provisions are "wholly dissimilar." Brief for Respondents 21. Respondents contend that the Interstate Commerce Clause grants the power of abrogation only because Congress' authority to regulate interstate commerce would be "incomplete" without that "necessary" power. *Id.*, at 23, citing *Union Gas, supra,* at 19–20. The Indian Commerce Clause is distinguishable, respondents contend, because it gives Congress complete authority over the Indian tribes. Therefore, the abrogation power is not "necessary" to Congress' exercise of its power under the Indian Commerce Clause.[10]

Both parties make their arguments from the plurality decision in *Union Gas,* and we, too, begin there. We think it clear that Justice Brennan's opinion finds Congress' power to abrogate under the Interstate Commerce Clause from the States' cession of their sovereignty when they gave Congress plenary power to regulate interstate commerce. See *Union Gas,* 491 U. S., at 17 ("The important point . . . is that the provision both expands federal power and contracts state power"). Respondents' focus elsewhere is misplaced. While the plurality decision states that Congress' power under the Interstate Commerce Clause would be incomplete without the power to abrogate, that statement is made solely in order to emphasize the broad scope of Congress' authority over interstate commerce. *Id.,* at 19–20. Moreover, respondents' rationale would mean that where Congress has

---

[10] Respondents also contend that the Act mandates state regulation of Indian gaming and therefore violates the Tenth Amendment by allowing federal officials to avoid political accountability for those actions for which they are in fact responsible. See *New York* v. *United States,* 505 U. S. 144 (1992). This argument was not considered below by either the Eleventh Circuit or the District Court, and is not fairly within the question presented. Therefore we do not consider it here. See this Court's Rule 14.1; *Yee* v. *Escondido,* 503 U. S. 519 (1992).

less authority, and the States have more, Congress' means for exercising that power must be greater. We read the plurality opinion to provide just the opposite. Indeed, it was in those circumstances where Congress exercised complete authority that Justice Brennan thought the power to abrogate most necessary. *Id.*, at 20 ("Since the States may not legislate at all in [the aforementioned] situations, a conclusion that Congress may not create a cause of action for money damages against the States would mean that no one could do so. And in many situations, it is only money damages that will carry out Congress' legitimate objectives under the Commerce Clause").

Following the rationale of the *Union Gas* plurality, our inquiry is limited to determining whether the Indian Commerce Clause, like the Interstate Commerce Clause, is a grant of authority to the Federal Government at the expense of the States. The answer to that question is obvious. If anything, the Indian Commerce Clause accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause. This is clear enough from the fact that the States still exercise some authority over interstate trade but have been divested of virtually all authority over Indian commerce and Indian tribes. Under the rationale of *Union Gas*, if the States' partial cession of authority over a particular area includes cession of the immunity from suit, then their virtually total cession of authority over a different area must also include cession of the immunity from suit. See *id.*, at 42 (SCALIA, J., joined by REHNQUIST, C. J., and O'CONNOR and KENNEDY, JJ., dissenting) ("[I]f the Article I commerce power enables abrogation of state sovereign immunity, so do all the other Article I powers"); see *Ponca Tribe of Oklahoma* v. *Oklahoma*, 37 F. 3d 1422, 1428 (CA10 1994) (Indian Commerce Clause grants power to abrogate), cert. pending, No. 94–1029; *Cheyenne River Sioux Tribe* v. *South Dakota*, 3 F. 3d 273, 281 (CA8 1993) (same); cf. *Chavez* v. *Arte Publico*

*Press,* 59 F. 3d 539, 546–547 (CA5 1995) (After *Union Gas,* Copyright Clause, U. S. Const., Art. I, § 8, cl. 8, must grant Congress power to abrogate). We agree with petitioner that the plurality opinion in *Union Gas* allows no principled distinction in favor of the States to be drawn between the Indian Commerce Clause and the Interstate Commerce Clause.

Respondents argue, however, that we need not conclude that the Indian Commerce Clause grants the power to abrogate the States' sovereign immunity. Instead, they contend that if we find the rationale of the *Union Gas* plurality to extend to the Indian Commerce Clause, then "*Union Gas* should be reconsidered and overruled." Brief for Respondents 25. Generally, the principle of *stare decisis,* and the interests that it serves, viz., "the evenhanded, predictable, and consistent development of legal principles, . . . reliance on judicial decisions, and . . . the actual and perceived integrity of the judicial process," *Payne* v. *Tennessee,* 501 U. S. 808, 827 (1991), counsel strongly against reconsideration of our precedent. Nevertheless, we always have treated *stare decisis* as a "principle of policy," *Helvering* v. *Hallock,* 309 U. S. 106, 119 (1940), and not as an "inexorable command," *Payne,* 501 U. S., at 828. "[W]hen governing decisions are unworkable or are badly reasoned, 'this Court has never felt constrained to follow precedent.'" *Id.,* at 827 (quoting *Smith* v. *Allwright,* 321 U. S. 649, 665 (1944)). Our willingness to reconsider our earlier decisions has been "particularly true in constitutional cases, because in such cases 'correction through legislative action is practically impossible.'" *Payne, supra,* at 828 (quoting *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 407 (1932) (Brandeis, J., dissenting)).

The Court in *Union Gas* reached a result without an expressed rationale agreed upon by a majority of the Court. We have already seen that Justice Brennan's opinion received the support of only three other Justices. See *Union Gas,* 491 U. S., at 5 (Marshall, Blackmun, and STEVENS, JJ.,

joined Justice Brennan). Of the other five, Justice White, who provided the fifth vote for the result, wrote separately in order to indicate his disagreement with the plurality's rationale, *id.*, at 57 (opinion concurring in judgment and dissenting in part), and four Justices joined together in a dissent that rejected the plurality's rationale, *id.*, at 35–45 (SCALIA, J., dissenting, joined by REHNQUIST, C. J., and O'CONNOR and KENNEDY, JJ.). Since it was issued, *Union Gas* has created confusion among the lower courts that have sought to understand and apply the deeply fractured decision. See, *e. g.*, *Chavez* v. *Arte Publico Press, supra,* at 543–545 ("Justice White's concurrence must be taken on its face to disavow" the plurality's theory); 11 F. 3d, at 1027 (Justice White's "vague concurrence renders the continuing validity of *Union Gas* in doubt").

The plurality's rationale also deviated sharply from our established federalism jurisprudence and essentially eviscerated our decision in *Hans.* See *Union Gas, supra,* at 36 ("If *Hans* means only that federal-question suits for money damages against the States cannot be brought in federal court unless Congress clearly says so, it means nothing at all") (SCALIA, J., dissenting). It was well established in 1989 when *Union Gas* was decided that the Eleventh Amendment stood for the constitutional principle that state sovereign immunity limited the federal courts' jurisdiction under Article III. The text of the Amendment itself is clear enough on this point: "The Judicial power of the United States shall not be construed to extend to any suit . . . ." And our decisions since *Hans* had been equally clear that the Eleventh Amendment reflects "the fundamental principle of sovereign immunity [that] limits the grant of judicial authority in Art. III," *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89, 97–98 (1984); see *Union Gas, supra,* at 38 ("'[T]he entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given . . . '") (SCALIA,

J., dissenting) (quoting *Ex parte New York,* 256 U. S. 490, 497 (1921)); see also cases cited at n. 7, *supra.* As the dissent in *Union Gas* recognized, the plurality's conclusion—that Congress could under Article I expand the scope of the federal courts' jurisdiction under Article III—"contradict[ed] our unvarying approach to Article III as setting forth the *exclusive* catalog of permissible federal-court jurisdiction." *Union Gas, supra,* at 39.

Never before the decision in *Union Gas* had we suggested that the bounds of Article III could be expanded by Congress operating pursuant to any constitutional provision other than the Fourteenth Amendment. Indeed, it had seemed fundamental that Congress could not expand the jurisdiction of the federal courts beyond the bounds of Article III. *Marbury* v. *Madison,* 1 Cranch 137 (1803). The plurality's citation of prior decisions for support was based upon what we believe to be a misreading of precedent. See *Union Gas,* 491 U. S., at 40–41 (SCALIA, J., dissenting). The plurality claimed support for its decision from a case holding the unremarkable, and completely unrelated, proposition that the States may waive their sovereign immunity, see *id.,* at 14–15 (citing *Parden* v. *Terminal Railway of Ala. Docks Dept.,* 377 U. S. 184 (1964)), and cited as precedent propositions that had been merely assumed for the sake of argument in earlier cases, see 491 U. S., at 15 (citing *Welch* v. *Texas Dept. of Highways and Public Transp.,* 483 U. S., at 475–476, and n. 5, and *County of Oneida* v. *Oneida Indian Nation of N. Y.,* 470 U. S., at 252).

The plurality's extended reliance upon our decision in *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976), that Congress could under the Fourteenth Amendment abrogate the States' sovereign immunity was also, we believe, misplaced. *Fitzpatrick* was based upon a rationale wholly inapplicable to the Interstate Commerce Clause, viz., that the Fourteenth Amendment, adopted well after the adoption of the Eleventh Amendment and the ratification of the Constitution, oper-

ated to alter the pre-existing balance between state and federal power achieved by Article III and the Eleventh Amendment. *Id.*, at 454. As the dissent in *Union Gas* made clear, *Fitzpatrick* cannot be read to justify "limitation of the principle embodied in the Eleventh Amendment through appeal to antecedent provisions of the Constitution." *Union Gas, supra,* at 42 (SCALIA, J., dissenting).

In the five years since it was decided, *Union Gas* has proved to be a solitary departure from established law. See *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.*, 506 U. S. 139 (1993). Reconsidering the decision in *Union Gas*, we conclude that none of the policies underlying *stare decisis* require our continuing adherence to its holding. The decision has, since its issuance, been of questionable precedential value, largely because a majority of the Court expressly disagreed with the rationale of the plurality. See *Nichols* v. *United States*, 511 U. S. 738, 746 (1994) (the "degree of confusion following a splintered decision . . . is itself a reason for reexamining that decision"). The case involved the interpretation of the Constitution and therefore may be altered only by constitutional amendment or revision by this Court. Finally, both the result in *Union Gas* and the plurality's rationale depart from our established understanding of the Eleventh Amendment and undermine the accepted function of Article III. We feel bound to conclude that *Union Gas* was wrongly decided and that it should be, and now is, overruled.

The dissent makes no effort to defend the decision in *Union Gas*, see *post*, at 100, but nonetheless would find congressional power to abrogate in this case.[11] Contending that our decision is a novel extension of the Eleventh Amendment, the dissent chides us for "attend[ing]" to dicta. We adhere in this case, however, not to mere *obiter dicta*, but rather to the well-established rationale upon which the

---

[11] Unless otherwise indicated, all references to the dissent are to the dissenting opinion authored by JUSTICE SOUTER.

Court based the results of its earlier decisions. When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound. Cf. *Burnham* v. *Superior Court of Cal., County of Marin,* 495 U. S. 604, 613 (1990) (exclusive basis of a judgment is not dicta) (plurality); *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 668 (1989) ("As a general rule, the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law") (KENNEDY, J., concurring and dissenting); *Sheet Metal Workers* v. *EEOC,* 478 U. S. 421, 490 (1986) ("Although technically dicta, . . . an important part of the Court's rationale for the result that it reache[s] . . . is entitled to greater weight . . .") (O'CONNOR, J., concurring). For over a century, we have grounded our decisions in the oft-repeated understanding of state sovereign immunity as an essential part of the Eleventh Amendment. In *Principality of Monaco* v. *Mississippi,* 292 U. S. 313 (1934), the Court held that the Eleventh Amendment barred a suit brought against a State by a foreign state. Chief Justice Hughes wrote for a unanimous Court:

> "[N]either the literal sweep of the words of Clause one of § 2 of Article III, nor the absence of restriction in the letter of the Eleventh Amendment, permits the conclusion that in all controversies of the sort described in Clause one, and omitted from the words of the Eleventh Amendment, a State may be sued without her consent. Thus Clause one specifically provides that the judicial Power shall extend 'to *all* Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority.' But, although a case may arise under the Constitution and laws of the United States, the judicial power does not extend to it if the suit is

sought to be prosecuted against a State, without her consent, by one of her own citizens. . . .

"Manifestly, we cannot rest with a mere literal application of the words of §2 of Article III, or assume that the letter of the Eleventh Amendment exhausts the restrictions upon suits against non-consenting States. Behind the words of the constitutional provisions are postulates which limit and control. There is the essential postulate that the controversies, as contemplated, shall be found to be of a justiciable character. There is also the postulate that States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been a 'surrender of this immunity in the plan of the convention.'" *Id.*, at 321–323 (citations and footnote omitted).

See *id.*, at 329–330; see also *Pennhurst*, 465 U. S., at 98 ("In short, the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III"); *Ex parte New York*, 256 U. S., at 497 ("[T]he entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given . . ."). It is true that we have not had occasion previously to apply established Eleventh Amendment principles to the question whether Congress has the power to abrogate state sovereign immunity (save in *Union Gas*). But consideration of that question must proceed with fidelity to this century-old doctrine.

The dissent, to the contrary, disregards our case law in favor of a theory cobbled together from law review articles and its own version of historical events. The dissent cites not a single decision since *Hans* (other than *Union Gas*) that supports its view of state sovereign immunity, instead relying upon the now-discredited decision in *Chisholm* v. *Georgia*, 2 Dall. 419 (1793). See, *e. g.*, *post*, at 152, n. 47. Its undocumented and highly speculative extralegal explanation of

the decision in *Hans* is a disservice to the Court's traditional method of adjudication. See *post*, at 120–123.

The dissent mischaracterizes the *Hans* opinion. That decision found its roots not solely in the common law of England, but in the much more fundamental "'jurisprudence in all civilized nations.'" *Hans*, 134 U. S., at 17, quoting *Beers* v. *Arkansas*, 20 How. 527, 529 (1858); see also The Federalist No. 81, p. 487 (C. Rossiter ed. 1961) (A. Hamilton) (sovereign immunity "is the general sense and the general practice of mankind"). The dissent's proposition that the common law of England, where adopted by the States, was open to change by the Legislature is wholly unexceptionable and largely beside the point: that common law provided the substantive rules of law rather than jurisdiction. Cf. *Monaco, supra,* at 323 (state sovereign immunity, like the requirement that there be a "justiciable" controversy, is a constitutionally grounded limit on federal jurisdiction). It also is noteworthy that the principle of state sovereign immunity stands distinct from other principles of the common law in that only the former prompted a specific constitutional amendment.

*Hans*—with a much closer vantage point than the dissent—recognized that the decision in *Chisholm* was contrary to the well-understood meaning of the Constitution. The dissent's conclusion that the decision in *Chisholm* was "reasonable," *post*, at 106, certainly would have struck the Framers of the Eleventh Amendment as quite odd: That decision created "such a shock of surprise that the Eleventh Amendment was at once proposed and adopted." *Monaco, supra,* at 325. The dissent's lengthy analysis of the text of the Eleventh Amendment is directed at a straw man—we long have recognized that blind reliance upon the text of the Eleventh Amendment is "'to strain the Constitution and the law to a construction never imagined or dreamed of.'" *Monaco, supra,* at 326, quoting *Hans, supra,* at 15. The text dealt in terms only with the problem presented by the decision in *Chisholm;* in light of the fact that the federal courts did not

have federal-question jurisdiction at the time the Amendment was passed (and would not have it until 1875), it seems unlikely that much thought was given to the prospect of federal-question jurisdiction over the States.

That same consideration causes the dissent's criticism of the views of Marshall, Madison, and Hamilton to ring hollow. The dissent cites statements made by those three influential Framers, the most natural reading of which would preclude all federal jurisdiction over an unconsenting State.[12] Struggling against this reading, however, the dissent finds significant the absence of any contention that sovereign immunity would affect the new federal-question jurisdiction. *Post*, at 142–150. But the lack of any statute vesting general federal-question jurisdiction in the federal courts until much later makes the dissent's demand for greater specificity about a then-dormant jurisdiction overly exacting.[13]

---

[12] We note here also that the dissent quotes selectively from the Framers' statements that it references. The dissent cites the following, for instance, as a statement made by Madison: "[T]he Constitution 'give[s] a citizen a right to be heard in the federal courts; and if a state should condescend to be a party, this court may take cognizance of it.'" *Post*, at 143 (opinion of SOUTER, J.). But that statement, perhaps ambiguous when read in isolation, was preceded by the following: "[J]urisdiction in controversies between a state and citizens of another state is much objected to, and perhaps without reason. It is not in the power of individuals to call any state into court. The only operation it can have, is that, if a state should wish to bring a suit against a citizen, it must be brought before the federal courts. It appears to me that this can have no operation but this:" See 3 J. Elliot, Debates on the Federal Constitution 533 (2d ed. 1836).

[13] Although the absence of any discussion dealing with federal-question jurisdiction is therefore unremarkable, what is notably lacking in the Framers' statements is any mention of Congress' power to abrogate the States' immunity. The absence of any discussion of that power is particularly striking in light of the fact that the Framers virtually always were very specific about the exception to state sovereign immunity arising from a State's consent to suit. See, *e. g.*, The Federalist No. 81, pp. 487–488 (C. Rossiter ed. 1961) (A. Hamilton) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *with-*

In putting forward a new theory of state sovereign immunity, the dissent develops its own vision of the political system created by the Framers, concluding with the statement that "[t]he Framers' principal objectives in rejecting English theories of unitary sovereignty . . . would have been impeded if a new concept of sovereign immunity had taken its place in federal-question cases, and would have been substantially thwarted if that new immunity had been held untouchable by any congressional effort to abrogate it." [14] *Post*, at 157. This sweeping statement ignores the fact that the Nation survived for nearly two centuries without the question of the existence of such power ever being presented to this Court. And Congress itself waited nearly a century before even conferring federal-question jurisdiction on the lower federal courts.[15]

---

*out its consent. . . .* Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States and the danger intimated must be merely ideal") (emphasis in the original); 3 Elliot, *supra,* at 533 (J. Madison) ("It is not in the power of individuals to call any state into court. . . . [The Constitution] can have no operation but this: . . . if a state should condescend to be a party, this court may take cognizance of it").

[14] This argument wholly disregards other methods of ensuring the States' compliance with federal law: The Federal Government can bring suit in federal court against a State, see, *e. g., United States* v. *Texas,* 143 U. S. 621, 644–645 (1892) (finding such power necessary to the "permanence of the Union"); an individual can bring suit against a state officer in order to ensure that the officer's conduct is in compliance with federal law, see, *e. g., Ex parte Young,* 209 U. S. 123 (1908); and this Court is empowered to review a question of federal law arising from a state-court decision where a State has consented to suit, see, *e. g., Cohens* v. *Virginia,* 6 Wheat. 264 (1821).

[15] JUSTICE STEVENS, in his dissenting opinion, makes two points that merit separate response. First, he contends that no distinction may be drawn between state sovereign immunity and the immunity enjoyed by state and federal officials. But even assuming that the latter has no constitutional foundation, the distinction is clear: The Constitution specifically recognizes the States as sovereign entities, while government officials enjoy no such constitutional recognition. Second, JUSTICE STEVENS criti-

In overruling *Union Gas* today, we reconfirm that the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area, like the regulation of Indian commerce, that is under the exclusive control of the Federal Government. Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States.[16] The Eleventh Amendment restricts the

---

cizes our prior decisions applying the "clear statement rule," suggesting that they were based upon an understanding that Article I allowed Congress to abrogate state sovereign immunity. His criticism, however, ignores the fact that many of those cases arose in the context of a statute passed under the Fourteenth Amendment, where Congress' authority to abrogate is undisputed. See, *e. g., Quern* v. *Jordan,* 440 U. S. 332 (1979). And a more fundamental flaw of the criticism is its failure to recognize that both the doctrine requiring avoidance of constitutional questions, and principles of federalism, require us always to apply the clear statement rule before we consider the constitutional question whether Congress has the power to abrogate.

[16] JUSTICE STEVENS understands our opinion to prohibit federal jurisdiction over suits to enforce the bankruptcy, copyright, and antitrust laws against the States. He notes that federal jurisdiction over those statutory schemes is exclusive, and therefore concludes that there is "no remedy" for state violations of those federal statutes. *Post,* at 78, n. 1.

That conclusion is exaggerated both in its substance and in its significance. First, JUSTICE STEVENS' statement is misleadingly overbroad. We have already seen that several avenues remain open for ensuring state compliance with federal law. See n. 14, *supra.* Most notably, an individual may obtain injunctive relief under *Ex parte Young* in order to remedy a state officer's ongoing violation of federal law. See n. 14, *supra.* Second, contrary to the implication of JUSTICE STEVENS' conclusion, it has not been widely thought that the federal antitrust, bankruptcy, or copyright statutes abrogated the States' sovereign immunity. This Court never has awarded relief against a State under any of those statutory schemes; in the decision of this Court that JUSTICE STEVENS cites (and somehow labels "incompatible" with our decision here), we specifically reserved the question whether the Eleventh Amendment would allow a suit to enforce the antitrust laws against a State. See *Goldfarb* v. *Virginia State Bar,* 421

judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction. Petitioner's suit against the State of Florida must be dismissed for a lack of jurisdiction.

## III

Petitioner argues that we may exercise jurisdiction over its suit to enforce § 2710(d)(3) against the Governor notwithstanding the jurisdictional bar of the Eleventh Amendment. Petitioner notes that since our decision in *Ex parte Young*, 209 U. S. 123 (1908), we often have found federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to "end a continuing violation of federal law." *Green* v. *Mansour*, 474 U. S., at 68. The situation presented here, however, is sufficiently different from that giving rise to the traditional *Ex parte Young* action so as to preclude the availability of that doctrine.

Here, the "continuing violation of federal law" alleged by petitioner is the Governor's failure to bring the State into compliance with § 2710(d)(3). But the duty to negotiate imposed upon the State by that statutory provision does not stand alone. Rather, as we have seen, *supra*, at 49–50, Congress passed § 2710(d)(3) in conjunction with the care-

U. S. 773, 792, n. 22 (1975). Although the copyright and bankruptcy laws have existed practically since our Nation's inception, and the antitrust laws have been in force for over a century, there is no established tradition in the lower federal courts of allowing enforcement of those federal statutes against the States. Notably, both Court of Appeals decisions cited by JUSTICE STEVENS were issued last year and were based upon *Union Gas*. See *Chavez* v. *Arte Publico Press*, 59 F. 3d 539 (CA5 1995); *Matter of Merchants Grain, Inc.* v. *Mahern*, 59 F. 3d 630 (CA7 1995). Indeed, while the Court of Appeals in *Chavez* allowed the suit against the State to go forward, it expressly recognized that its holding was unprecedented. See *Chavez*, 59 F. 3d, at 546 ("[W]e are aware of no case that specifically holds that laws passed pursuant to the Copyright Clause can abrogate State immunity").

fully crafted and intricate remedial scheme set forth in § 2710(d)(7).

Where Congress has created a remedial scheme for the enforcement of a particular federal right, we have, in suits against federal officers, refused to supplement that scheme with one created by the judiciary. *Schweiker* v. *Chilicky*, 487 U. S. 412, 423 (1988) ("When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional . . . remedies"). Here, of course, the question is not whether a remedy should be created, but instead is whether the Eleventh Amendment bar should be lifted, as it was in *Ex parte Young*, in order to allow a suit against a state officer. Nevertheless, we think that the same general principle applies: Therefore, where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*.

Here, Congress intended § 2710(d)(3) to be enforced against the State in an action brought under § 2710(d)(7); the intricate procedures set forth in that provision show that Congress intended therein not only to define, but also to limit significantly, the duty imposed by § 2710(d)(3). For example, where the court finds that the State has failed to negotiate in good faith, the only remedy prescribed is an order directing the State and the Indian tribe to conclude a compact within 60 days. And if the parties disregard the court's order and fail to conclude a compact within the 60-day period, the only sanction is that each party then must submit a proposed compact to a mediator who selects the one which best embodies the terms of the Act. Finally, if the State fails to accept the compact selected by the mediator, the only sanction against it is that the mediator shall notify the Secre-

tary of the Interior who then must prescribe regulations governing class III gaming on the tribal lands at issue. By contrast with this quite modest set of sanctions, an action brought against a state official under *Ex parte Young* would expose that official to the full remedial powers of a federal court, including, presumably, contempt sanctions. If § 2710(d)(3) could be enforced in a suit under *Ex parte Young*, § 2710(d)(7) would have been superfluous; it is difficult to see why an Indian tribe would suffer through the intricate scheme of § 2710(d)(7) when more complete and more immediate relief would be available under *Ex parte Young*.[17]

Here, of course, we have found that Congress does not have authority under the Constitution to make the State suable in federal court under § 2710(d)(7). Nevertheless, the fact that Congress chose to impose upon the State a liability

---

[17] Contrary to the claims of the dissent, we do not hold that Congress *cannot* authorize federal jurisdiction under *Ex parte Young* over a cause of action with a limited remedial scheme. We find only that Congress did not intend that result in the Indian Gaming Regulatory Act. Although one might argue that the text of § 2710(d)(7)(A)(i), taken alone, is broad enough to encompass both a suit against a State (under an abrogation theory) and a suit against a state official (under an *Ex parte Young* theory), subsection (A)(i) of § 2710(d)(7) cannot be read in isolation from subsections (B)(ii)–(vii), which repeatedly refer exclusively to "the State." See *supra*, at 56–57. In this regard, § 2710(d)(7) stands in contrast to the statutes cited by the dissent as examples where lower courts have found that Congress implicitly authorized suit under *Ex parte Young*. Compare 28 U. S. C. § 2254(e) (federal court authorized to issue an "order directed to an appropriate State official"); 42 U. S. C. § 11001 (1988 ed.) (requiring "the Governor" of a State to perform certain actions and holding "the Governor" responsible for nonperformance); 33 U. S. C. § 1365(a) (authorizing a suit against "any person" who is alleged to be in violation of relevant water pollution laws). Similarly the duty imposed by the Act—to "negotiate . . . in good faith to enter into" a compact with another sovereign—stands distinct in that it is not of the sort likely to be performed by an individual state executive officer or even a group of officers. Cf. *State ex rel. Stephan* v. *Finney*, 836 P. 2d 1169, 251 Kan. 559 (1992) (Governor of Kansas may negotiate but may not enter into compact without grant of power from legislature).

that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young* strongly indicates that Congress had no wish to create the latter under § 2710(d)(3). Nor are we free to rewrite the statutory scheme in order to approximate what we think Congress might have wanted had it known that § 2710(d)(7) was beyond its authority. If that effort is to be made, it should be made by Congress, and not by the federal courts. We hold that *Ex parte Young* is inapplicable to petitioner's suit against the Governor of Florida, and therefore that suit is barred by the Eleventh Amendment and must be dismissed for a lack of jurisdiction.

## IV

The Eleventh Amendment prohibits Congress from making the State of Florida capable of being sued in federal court. The narrow exception to the Eleventh Amendment provided by the *Ex parte Young* doctrine cannot be used to enforce § 2710(d)(3) because Congress enacted a remedial scheme, § 2710(d)(7), specifically designed for the enforcement of that right. The Eleventh Circuit's dismissal of petitioner's suit is hereby affirmed.[18]

*It is so ordered.*

JUSTICE STEVENS, dissenting.

This case is about power—the power of the Congress of the United States to create a private federal cause of action against a State, or its Governor, for the violation of a federal right. In *Chisholm* v. *Georgia,* 2 Dall. 419 (1793), the entire Court—including Justice Iredell whose dissent provided the blueprint for the Eleventh Amendment—assumed that Congress had such power. In *Hans* v. *Louisiana,* 134 U. S. 1 (1890)—a case the Court purports to follow today—the Court

---

[18] We do not here consider, and express no opinion upon, that portion of the decision below that provides a substitute remedy for a tribe bringing suit. See 11 F. 3d, at 1029.

again assumed that Congress had such power. In *Fitz-patrick* v. *Bitzer*, 427 U. S. 445 (1976), and *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1, 24 (1989) (STEVENS, J., concurring), the Court squarely held that Congress has such power. In a series of cases beginning with *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 238–239 (1985), the Court formulated a special "clear statement rule" to determine whether specific Acts of Congress contained an effective exercise of that power. Nevertheless, in a sharp break with the past, today the Court holds that with the narrow and illogical exception of statutes enacted pursuant to the Enforcement Clause of the Fourteenth Amendment, Congress has no such power.

The importance of the majority's decision to overrule the Court's holding in *Pennsylvania* v. *Union Gas Co.* cannot be overstated. The majority's opinion does not simply preclude Congress from establishing the rather curious statutory scheme under which Indian tribes may seek the aid of a federal court to secure a State's good-faith negotiations over gaming regulations. Rather, it prevents Congress from providing a federal forum for a broad range of actions against States, from those sounding in copyright and patent law, to those concerning bankruptcy, environmental law, and the regulation of our vast national economy.[1]

---

[1] See, *e. g.*, *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1 (1989) (holding that a federal court may order a State to pay cleanup costs pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980); *In re Merchants Grain, Inc.*, 59 F. 3d 630 (CA7 1995) (holding that the Eleventh Amendment does not bar a bankruptcy court from issuing a money judgment against a State under the Bankruptcy Code); *Chavez* v. *Arte Publico Press*, 59 F. 3d 539 (CA5 1995) (holding that a state university could be sued in federal court for infringing an author's copyright). The conclusion that suits against States may not be brought in federal court is also incompatible with our cases concluding that state entities may be sued for antitrust violations. See, *e. g.*, *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 791–792 (1975).

As federal courts have exclusive jurisdiction over cases arising under these federal laws, the majority's conclusion that the Eleventh Amend-

There may be room for debate over whether, in light of the Eleventh Amendment, Congress has the power to ensure that such a cause of action may be enforced in federal court by a citizen of another State or a foreign citizen. There can be no serious debate, however, over whether Congress has the power to ensure that such a cause of action may be brought by a citizen of the State being sued. Congress' authority in that regard is clear.

As JUSTICE SOUTER has convincingly demonstrated, the Court's contrary conclusion is profoundly misguided. Despite the thoroughness of his analysis, supported by sound reason, history, precedent, and strikingly uniform scholarly commentary, the shocking character of the majority's affront to a coequal branch of our Government merits additional comment.

I

For the purpose of deciding this case, I can readily assume that Justice Iredell's dissent in *Chisholm* v. *Georgia*, 2 Dall., at 429–450, and the Court's opinion in *Hans* v. *Louisiana*, 134 U. S. 1 (1890), correctly stated the law that should govern our decision today. As I shall explain, both of those opinions relied on an interpretation of an Act of Congress rather than a want of congressional power to authorize a suit against the State.

In concluding that the federal courts could not entertain Chisholm's action against the State of Georgia, Justice Iredell relied on the text of the Judiciary Act of 1789, not the State's assertion that Article III did not extend the judicial power to suits against unconsenting States. Justice Iredell argued that, under Article III, federal courts possessed only

---

ment shields States from being sued under them in federal court suggests that persons harmed by state violations of federal copyright, bankruptcy, and antitrust laws have no remedy. See Harris & Kenny, Eleventh Amendment Jurisprudence After *Atascadero:* The Coming Clash With Antitrust, Copyright, and Other Causes of Action Over Which the Federal Courts Have Exclusive Jurisdiction, 37 Emory L. J. 645 (1988).

such jurisdiction as Congress had provided, and that the Judiciary Act expressly limited federal-court jurisdiction to that which could be exercised in accordance with "'the principles and usages of law.'" *Chisholm* v. *Georgia*, 2 Dall., at 434 (quoting § 14 of the Judiciary Act of 1789). He reasoned that the inclusion of this phrase constituted a command to the federal courts to construe their jurisdiction in light of the prevailing common law, a background legal regime that he believed incorporated the doctrine of sovereign immunity. *Chisholm* v. *Georgia*, 2 Dall., at 434–436 (dissenting opinion).[2]

Because Justice Iredell believed that the expansive text of Article III did not prevent Congress from imposing this common-law limitation on federal-court jurisdiction, he concluded that judges had no authority to entertain a suit against an unconsenting State.[3] At the same time, although he acknowledged that the Constitution might allow Congress to extend federal-court jurisdiction to such an action, he concluded that the terms of the Judiciary Act of 1789 plainly had not done so.

> "[Congress'] direction, I apprehend, we cannot supersede, because it may appear to us not sufficiently extensive. *If it be not, we must wait till other remedies are provided by the same authority.* From this it is plain that the Legislature did not chuse to leave to our own

[2] Because Justice Iredell read the Judiciary Act of 1789 to have incorporated the common law, he did not even conclude that Congress would have to make a clear statement in order to override the common law's recognition of sovereign immunity.

[3] Actually, he limited his conclusion to the narrower question whether an action of assumpsit would lie against a State, which he distinguished from the more general question whether a State can ever be sued. *Chisholm* v. *Georgia*, 2 Dall. 419, 430 (1793). He did so because he recognized "that in *England*, certain judicial proceedings not inconsistent with the sovereignty, may take place against the Crown, but that an action of *assumpsit* will not lie," and because he had "often found a great deal of confusion to arise from taking too large a view at once." *Ibid.*

discretion the path to justice, but has prescribed one of its own. In doing so, it has, I think, wisely, referred us to principles and usages of law already well known, and by their precision calculated to guard against that innovating spirit of Courts of Justice, which the Attorney-General in another case reprobated with so much warmth, and with whose sentiments in that particular, I most cordially join." *Id.*, at 434 (emphasis added).

For Justice Iredell then, it was enough to assume that Article III *permitted* Congress to impose sovereign immunity as a jurisdictional limitation; he did not proceed to resolve the further question whether the Constitution went so far as to *prevent* Congress from withdrawing a State's immunity.[4] Thus, it would be ironic to construe the *Chisholm* dissent as precedent for the conclusion that Article III limits Congress' power to determine the scope of a State's sovereign immunity in federal court.

The precise holding in *Chisholm* is difficult to state because each of the Justices in the majority wrote his own opinion. They seem to have held, however, not that the Judiciary Act of 1789 precluded the defense of sovereign immunity, but that Article III of the Constitution itself required the Supreme Court to entertain original actions

---

[4] In two sentences at the end of his lengthy opinion, Justice Iredell stated that his then-present view was that the Constitution would not permit a "compulsive suit against a State for the recovery of money." *Id.*, at 449. In light of Justice Iredell's express statement that the only question before the Court was the propriety of an individual's action for assumpsit against a State, an action which, of course, results in a money judgment, see n. 2, *supra*, this dicta should not be understood to state the general view that the Constitution bars *all* suits against unconsenting States. Moreover, even as to the limited question whether the Constitution permits actions for money judgments, Justice Iredell took pains to reserve ultimate judgment. *Chisholm* v. *Georgia*, 2 Dall., at 449. Thus, nothing in Justice Iredell's two sentences of dicta provides a basis for concluding that Congress lacks the power to authorize the suit for the nonmonetary relief at issue here.

against unconsenting States.[5]   I agree with Justice Iredell that such a construction of Article III is incorrect; that Article should not then have been construed, and should not now be construed, to prevent Congress from granting States a sovereign immunity defense in such cases.[6]   That reading of Article III, however, explains why the majority's holding in *Chisholm* could not have been reversed by a simple statutory amendment adopting Justice Iredell's interpretation of the Judiciary Act of 1789.   There is a special irony in the fact that the error committed by the *Chisholm* majority was its decision that this Court, rather than Congress, should define the scope of the sovereign immunity defense.   That, of course, is precisely the same error the Court commits today.

In light of the nature of the disagreement between Justice Iredell and his colleagues, *Chisholm*'s holding could have been overturned by simply amending the Constitution to restore to Congress the authority to recognize the doctrine. As it was, the plain text of the Eleventh Amendment would seem to go further and to limit the judicial power itself in a certain class of cases.   In doing so, however, the Amend-

---

[5] In this respect, *Chisholm* v. *Georgia* should be understood to be of a piece with the debate over judicial power famously joined in *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 337 (1816).   There, too, the argument centered on whether Congress had the power to limit the seemingly expansive jurisdictional grant that Article III had conferred, not on whether Article III itself provided the relevant limitation.

[6] The contention that Article III withdrew Georgia's sovereign immunity had special force precisely because *Chisholm* involved an action premised on the Supreme Court's original jurisdiction.   While Article III leaves it to Congress to establish the lower federal courts, and to make exceptions to the Supreme Court's appellate jurisdiction, it specifically mandates that there be a Supreme Court and that it shall be vested with original jurisdiction over those actions in which "a State shall be Party." Art. III, §2.   In light of that language, the *Chisholm* majority's conclusion that the Supreme Court had a constitutional obligation to take jurisdiction of all suits against States was not implausible.

ment's quite explicit text establishes only a partial bar to a federal court's power to entertain a suit against a State.[7]

Justice Brennan has persuasively explained that the Eleventh Amendment's jurisdictional restriction is best understood to apply only to suits premised on diversity jurisdiction, see *Atascadero State Hospital* v. *Scanlon*, 473 U. S., at 247 (dissenting opinion), and JUSTICE SCALIA has agreed that the plain text of the Amendment cannot be read to apply to federal-question cases. See *Pennsylvania* v. *Union Gas*, 491 U. S., at 31 (dissenting opinion).[8] Whatever the precise dimensions of the Amendment, its express terms plainly do *not* apply to all suits brought against unconsenting States.[9]

---

[7] It should be remembered that at the time of *Chisholm*, there was a general fear of what Justice Iredell termed the "innovating spirit" of the Federal Judiciary. See, *e. g.*, 3 A. Beveridge, The Life of John Marshall 19–30 (1919) (discussing the consternation that the federal courts' creation of common-law felonies engendered). Thus, there is good reason to believe that the reaction to *Chisholm* reflected the popular hostility to the Federal Judiciary more than any desire to restrain the National Legislature.

[8] Of course, even if the Eleventh Amendment applies to federal-question cases brought by a citizen of another State, its express terms pose no bar to a federal court assuming jurisdiction in a federal-question case brought by an in-state plaintiff pursuant to Congress' express authorization. As that is precisely the posture of the suit before us, and as it was also precisely the posture of the suit at issue in *Pennsylvania* v. *Union Gas*, there is no need to decide here whether Congress would be barred from authorizing out-of-state plaintiffs to enforce federal rights against States in federal court. In fact, Justice Brennan left open that question in his dissent in *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 288, n. 41 (1985). "When the Court is prepared to embark on a defensible interpretation of the Eleventh Amendment consistent with its history and purposes, the question whether the Amendment bars federal-question or admiralty suits by a noncitizen or alien against a State would be open." *Ibid.*

[9] Under the "plain text" of the Eleventh Amendment, I note that there would appear to be no more basis for the conclusion that States may consent to federal-court jurisdiction in actions brought by out-of-state or foreign citizens than there would be for the view that States should be permitted to consent to the jurisdiction of a federal court in a case that poses no federal question. See, *e. g.*, *Owen Equipment & Erection Co.* v.

The question thus becomes whether the relatively modest jurisdictional bar that the Eleventh Amendment imposes should be understood to reveal that a more general jurisdictional bar implicitly inheres in Article III.

The language of Article III certainly gives no indication that such an implicit bar exists. That provision's text specifically provides for federal-court jurisdiction over *all* cases arising under federal law. Moreover, as I have explained, Justice Iredell's dissent argued that it was the Judiciary Act of 1789, not Article III, that prevented the federal courts from entertaining Chisholm's diversity action against Georgia. Therefore, Justice Iredell's analysis at least suggests that it was by no means a fixed view at the time of the founding that Article III prevented Congress from rendering States suable in federal court by their own citizens. In sum, little more than speculation justifies the conclusion that the Eleventh Amendment's express but partial limitation on the scope of Article III reveals that an implicit but more general one was already in place.

## II

The majority appears to acknowledge that one cannot deduce from either the text of Article III or the plain terms of

---

*Kroger,* 437 U. S. 365, 377, n. 21 (1978); *Sosna* v. *Iowa,* 419 U. S. 393, 398 (1975); *California* v. *LaRue,* 409 U. S. 109, 112–113, n. 3 (1972); *American Fire & Casualty Co.* v. *Finn,* 341 U. S. 6, 17–18, and n. 17 (1951); *Mitchell* v. *Maurer,* 293 U. S. 237, 244 (1934); *Jackson* v. *Ashton,* 8 Pet. 148, 149 (1834). We have, however, construed the Amendment, despite its text, to apply only to unconsenting States. See, *e. g., Clark* v. *Barnard,* 108 U. S. 436, 447 (1883). In so doing, we of course left it for Congress to determine whether federal courts should entertain any claim against a State in federal court. A departure from the text to expand the class of plaintiffs to whom the Eleventh Amendment's bar applies would, however, limit Congress' authority to exercise its considered judgment as to the propriety of federal-court jurisdiction. The absence of a textual warrant for imposing such a broad limitation on the legislative branch counsels against this Court extratextually imposing one.

the Eleventh Amendment that the judicial power does not extend to a congressionally created cause of action against a State brought by one of that State's citizens. Nevertheless, the majority asserts that precedent compels that same conclusion. I disagree. The majority relies first on our decision in *Hans* v. *Louisiana*, 134 U. S. 1 (1890), which involved a suit by a citizen of Louisiana against that State for a claimed violation of the Contracts Clause. The majority suggests that by dismissing the suit, *Hans* effectively held that federal courts have no power to hear federal-question suits brought by same-state plaintiffs.

*Hans* does not hold, however, that the Eleventh Amendment, or any other constitutional provision, precludes federal courts from entertaining actions brought by citizens against their own States in the face of contrary congressional direction. As I have explained before, see *Pennsylvania* v. *Union Gas Co.*, 491 U. S., at 25–26 (STEVENS, J., concurring), and as JUSTICE SOUTER effectively demonstrates, *Hans* instead reflects, at the most, this Court's conclusion that, as a matter of federal common law, federal courts should decline to entertain suits against unconsenting States. Because *Hans* did not announce a constitutionally mandated jurisdictional bar, one need not overrule *Hans*, or even question its reasoning, in order to conclude that Congress may direct the federal courts to reject sovereign immunity in those suits not mentioned by the Eleventh Amendment. Instead, one need only follow it.

Justice Bradley's somewhat cryptic opinion for the Court in *Hans* relied expressly on the reasoning of Justice Iredell's dissent in *Chisholm*, which, of course, was premised on the view that the doctrine of state sovereign immunity was a common-law rule that Congress had directed federal courts to respect, not a constitutional immunity that Congress was powerless to displace. For that reason, Justice Bradley explained that the State's immunity from suit by one of its own

citizens was based not on a constitutional rule but rather on the fact that Congress had not, by legislation, attempted to overcome the common-law presumption of sovereign immunity. His analysis so clearly supports the position rejected by the majority today that it is worth quoting at length.

"But besides the presumption that no anomalous and unheard of proceedings or suits were intended to be raised up by the Constitution—anomalous and unheard of when the Constitution was adopted—an additional reason why the jurisdiction claimed for the Circuit Court does not exist, is the language of the act of Congress by which its jurisdiction is conferred. The words are these: 'The circuit courts of the United States shall have original cognizance, concurrent with the courts of the several States, of all suits of a civil nature at common law or in equity, . . . arising under the Constitution or laws of the United States, or treaties,' etc.—'Concurrent with the courts of the several States.' Does not this qualification show that Congress, in legislating to carry the Constitution into effect, did not intend to invest its courts with any new and strange jurisdictions? The state courts have no power to entertain suits by individuals against a State without its consent. Then how does the Circuit Court, having only concurrent jurisdiction, acquire any such power? It is true that the same qualification existed in the judiciary act of 1789, which was before the court in *Chisholm* v. *Georgia,* and the majority of the court did not think that it was sufficient to limit the jurisdiction of the Circuit Court. Justice Iredell thought differently. In view of the manner in which that decision was received by the country, the adoption of the Eleventh Amendment, the light of history and the reason of the thing, we think we are at liberty to prefer Justice Iredell's views in this regard." *Hans* v. *Louisiana,* 134 U. S., at 18–19.

As this passage demonstrates, *Hans* itself looked to see whether Congress had displaced the presumption that sovereign immunity obtains. Although the opinion did go to great lengths to establish the quite uncontroversial historical proposition that unconsenting States generally were not subject to suit, that entire discussion preceded the opinion's statutory analysis. See *id.*, at 10–18. Thus, the opinion's thorough historical investigation served only to establish a presumption against jurisdiction that Congress must overcome, not an inviolable jurisdictional restriction that inheres in the Constitution itself.

Indeed, the very fact that the Court characterized the doctrine of sovereign immunity as a "presumption" confirms its assumption that it could be displaced. The *Hans* Court's inquiry into congressional intent would have been wholly inappropriate if it had believed that the doctrine of sovereign immunity was a constitutionally inviolable jurisdictional limitation. Thus, *Hans* provides no basis for the majority's conclusion that Congress is powerless to make States suable in cases not mentioned by the text of the Eleventh Amendment. Instead, *Hans* provides affirmative support for the view that Congress may create federal-court jurisdiction over private causes of action against unconsenting States brought by their own citizens.

It is true that the underlying jurisdictional statute involved in this case, 28 U. S. C. § 1331, does not itself purport to direct federal courts to ignore a State's sovereign immunity any more than did the underlying jurisdictional statute discussed in *Hans*, the Judiciary Act of 1875. However, unlike in *Hans*, in this case Congress has, by virtue of the Indian Gaming Regulatory Act, affirmatively manifested its intention to "invest its courts with" jurisdiction beyond the limits set forth in the general jurisdictional statute. 134 U. S., at 18. By contrast, because *Hans* involved only an implied cause of action based directly on the Constitution, the Judiciary Act of 1875 constituted the sole indication as

to whether Congress intended federal-court jurisdiction to extend to a suit against an unconsenting State.[10]

Given the nature of the cause of action involved in *Hans*, as well as the terms of the underlying jurisdictional statute, the Court's decision to apply the common-law doctrine of sovereign immunity in that case clearly should not control the outcome here. The reasons that may support a federal court's hesitancy to construe a judicially crafted constitutional remedy narrowly out of respect for a State's sovereignty do not bear on whether Congress may preclude a State's invocation of such a defense when it expressly establishes a federal remedy for the violation of a federal right.

No one has ever suggested that Congress would be powerless to displace the other common-law immunity doctrines that this Court has recognized as appropriate defenses to certain federal claims such as the judicially fashioned remedy in *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403

---

[10] In his dissent in *Pennsylvania* v. *Union Gas Co.*, 491 U. S., at 36–37, JUSTICE SCALIA contended that the existence of the Judiciary Act of 1875 at the time of *Hans* requires one to accept the "gossamer distinction between cases in which Congress has assertedly sought to eliminate state sovereign immunity pursuant to its powers to create and organize courts, and cases in which it has assertedly sought to do so pursuant to some of its other powers," in order to conclude that, in spite of *Hans*, Congress may authorize federal courts to hear a suit against an unconsenting State. I rely on no such "gossamer distinction" here.

Congress has the authority to withdraw sovereign immunity in cases not covered by the Eleventh Amendment under *all* of its various powers. Nothing in *Hans* is to the contrary. As the passage quoted above demonstrates, *Hans* merely concluded that Congress, in enacting the Judiciary Act of 1875, did not manifest a desire to withdraw state sovereign immunity with sufficient clarity to overcome the countervailing presumption. Therefore, I rely only on the distinction between a statute that clearly directs federal courts to entertain suits against States, such as the one before us here, and a statute that does not, such as the Judiciary Act of 1875. In light of our repeated application of a clear-statement rule in Eleventh Amendment cases, from *Hans* onward, I would be surprised to learn that such a distinction is too thin to be acceptable.

U. S. 388 (1971). See *Mitchell* v. *Forsyth*, 472 U. S. 511 (1985); *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982). Similarly, our cases recognizing qualified officer immunity in 42 U. S. C. § 1983 actions rest on the conclusion that, in passing that statute, Congress did not intend to displace the common-law immunity that officers would have retained under suits premised solely on the general jurisdictional statute. See *Tower* v. *Glover*, 467 U. S. 914, 920 (1984). For that reason, the federal common law of officer immunity that Congress meant to incorporate, not a contrary state immunity, applies in § 1983 cases. See *Martinez* v. *California*, 444 U. S. 277, 284 (1980). There is no reason why Congress' undoubted power to displace those common-law immunities should be either greater or lesser than its power to displace the common-law sovereign immunity defense.

Some of our precedents do state that the sovereign immunity doctrine rests on fundamental constitutional "postulates" and partakes of jurisdictional aspects rooted in Article III. See *ante*, at 67–70. Most notably, that reasoning underlies this Court's holding in *Principality of Monaco* v. *Mississippi*, 292 U. S. 313 (1934).

*Monaco* is a most inapt precedent for the majority's holding today. That case barred a foreign sovereign from suing a State in an equitable state-law action to recover payments due on state bonds. It did not, however, involve a claim based on federal law. Instead, the case concerned a purely state-law question to which the State had interposed a federal defense. *Id.*, at 317. Thus, *Monaco* reveals little about the power of Congress to create a private federal cause of action to remedy a State's violation of federal law.

Moreover, although *Monaco* attributes a quasi-constitutional status to sovereign immunity, even in cases not covered by the Eleventh Amendment's plain text, that characterization does not constitute precedent for the proposition that Congress is powerless to displace a State's immu-

nity. Our abstention doctrines have roots in both the Tenth Amendment and Article III, and thus may be said to rest on constitutional "postulates" or to partake of jurisdictional aspects. Yet it has not been thought that the Constitution would prohibit Congress from barring federal courts from abstaining. The majority offers no reason for making the federal common-law rule of sovereign immunity less susceptible to congressional displacement than any other quasi-jurisdictional common-law rule.

In this regard, I note that *Monaco* itself analogized sovereign immunity to the prudential doctrine that "controversies" identified in Article III must be "justiciable" in order to be heard by federal courts. *Id.*, at 329. The justiciability doctrine is a prudential rather than a jurisdictional one, and thus Congress' clearly expressed intention to create federal jurisdiction over a particular Article III controversy necessarily strips federal courts of the authority to decline jurisdiction on justiciability grounds. See *Allen* v. *Wright*, 468 U. S. 737, 791 (1984) (STEVENS, J., dissenting); *Flast* v. *Cohen*, 392 U. S. 83, 100–101 (1968). For that reason, *Monaco*, by its own terms, fails to resolve the question before us.[11]

More generally, it is quite startling to learn that the *reasoning* of *Hans* and *Monaco* (even assuming that it did not undermine the majority's view) should have a *stare decisis* effect on the question whether Congress possesses the authority to provide a federal forum for the vindication of a federal right by a citizen against its own State. In light of the Court's development of a "clear-statement" line of juris-

---

[11] Indeed, to the extent the reasoning of *Monaco* was premised on the ground that a contrary ruling might permit foreign governments and States indirectly to frustrate Congress' treaty power, 292 U. S., at 331, the opinion suggests that its outcome would have been quite different had Congress expressly authorized suits by foreign governments against individual States as part of its administration of foreign policy.

prudence, see, *e. g., Atascadero State Hospital* v. *Scanlon*, 473 U. S., at 238–239; *Hoffman* v. *Connecticut Dept. of Income Maintenance*, 492 U. S. 96 (1989), I would have thought that *Hans* and *Monaco* had at least left open the question whether Congress could permit the suit we consider here. Our clear-statement cases would have been all but unintelligible if *Hans* and *Monaco* had already established that Congress lacked the constitutional power to make States suable in federal court by individuals no matter how clear its intention to do so.[12]

Finally, the particular nature of the federal question involved in *Hans* renders the majority's reliance upon its rule even less defensible. *Hans* deduced its rebuttable presumption in favor of sovereign immunity largely on the basis of its extensive analysis of cases holding that the sovereign could not be forced to make good on its debts via a private suit. See *Louisiana* v. *Jumel*, 107 U. S. 711 (1883); *Hagood* v. *Southern*, 117 U. S. 52 (1886); *In re Ayers*, 123 U. S. 443 (1887). Because *Hans*, like these other cases, involved a suit that attempted to make a State honor its debt, its holding need not be read to stand even for the relatively limited proposition that there is a *presumption* in favor of sovereign immunity in all federal-question cases.[13]

---

[12] Moreover, they would have most unnecessarily burdened Congress. For example, after deciding that Congress had not made sufficiently explicit its intention to withdraw the state sovereign immunity defense in certain bankruptcy actions, see *Hoffman* v. *Connecticut Dept. of Income Maintenance*, 392 U. S. 96 (1989), Congress understandably concluded that it could correct the confusion by amending the relevant statute to make its intentions to override such a defense unmistakably clear. See *In re Merchants Grain, Inc.*, 59 F. 3d 630 (CA7 1995). Congress will no doubt be surprised to learn that its exercise in legislative clarification, which it undertook for our benefit, was for naught because the Constitution makes it so.

[13] Significantly, Chief Justice Marshall understood the Eleventh Amendment's bar to have been designed primarily to protect States from being sued for their debts. See *Cohens* v. *Virginia*, 6 Wheat. 264, 406 (1821).

In *Hans*, the plaintiff asserted a Contracts Clause claim against his State and thus asserted a federal right. To show that Louisiana had impaired its federal obligation, however, Hans first had to demonstrate that the State had entered into an enforceable contract as a matter of state law. That Hans chose to bring his claim in federal court as a Contract Clause action could not change the fact that he was, at bottom, seeking to enforce a contract with the State. See Burnham, Taming the Eleventh Amendment Without Overruling *Hans* v. *Louisiana*, 40 Case W. Res. L. Rev. 931 (1990).

Because Hans' claimed federal right did not arise independently of state law, sovereign immunity was relevant to the threshold state-law question of whether a valid contract existed.[14] *Hans* expressly pointed out, however, that an individual who could show that he had an *enforceable* contract under state law would not be barred from bringing suit in federal court to prevent the State from impairing it.

> "To avoid misapprehension it may be proper to add that, although the obligations of a State rest for their performance upon its honor and good faith, and cannot be made the subject of judicial cognizance unless the State consents to be sued, or comes itself into court; yet where property or rights are enjoyed under a grant or contract made by a State, they cannot wantonly be invaded. Whilst the State cannot be compelled by suit to perform its contracts, any attempt on its part to violate property or rights acquired under its contracts, may be

---

[14] Significantly, many of the cases decided after *Hans* in which this Court has recognized state sovereign immunity involved claims premised on the breach of rights that were rooted in state law. See *Ford Motor Co.* v. *Department of Treasury of Ind.*, 323 U. S. 459 (1945); *Great Northern Life Ins. Co.* v. *Read*, 322 U. S. 47 (1944); *Smith* v. *Reeves*, 178 U. S. 436 (1900). In such cases, the Court's application of the state-law immunity appears simply to foreshadow (or follow) the rule of *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), not to demark the limits of Article III.

judicially resisted; and any law impairing the obligation of contracts under which such property or rights are held is void and powerless to affect their enjoyment." *Hans* v. *Louisiana*, 134 U. S., at 20–21.

That conclusion casts doubt on the absolutist view that *Hans* definitively establishes that Article III prohibits federal courts from entertaining federal-question suits brought against States by their own citizens. At the very least, *Hans* suggests that such suits may be brought to enjoin States from impairing existing contractual obligations.

The view that the rule of *Hans* is more substantive than jurisdictional comports with Hamilton's famous discussion of sovereign immunity in The Federalist Papers. Hamilton offered his view that the federal judicial power would not extend to suits against unconsenting States only in the context of his contention that no contract with a State could be enforceable against the State's desire. He did not argue that a State's immunity from suit in federal court would be absolute.

"[T]here is no color to pretend that the State governments would, by the adoption of [the plan of convention], be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith. The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force. They confer no right of action independent of the sovereign will." The Federalist No. 81, p. 488 (C. Rossiter ed. 1961).

Here, of course, no question of a State's contractual obligations is presented. The Seminole Tribe's only claim is that the State of Florida has failed to fulfill a duty to negotiate that federal statutory law alone imposes. Neither the Fed-

eralist Papers, nor *Hans*, provides support for the view that such a claim may not be heard in federal court.

## III

In reaching my conclusion that the Constitution does not prevent Congress from making the State of Florida suable in federal court for violating one of its statutes, I emphasize that I agree with the majority that in all cases to which the judicial power does not extend—either because they are not within any category defined in Article III or because they are within the category withdrawn from Article III by the Eleventh Amendment—Congress lacks the power to confer jurisdiction on the federal courts. As I have previously insisted: "A statute cannot amend the Constitution." *Pennsylvania* v. *Union Gas Co.*, 491 U. S., at 24.

It was, therefore, misleading for the Court in *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976), to imply that § 5 of the Fourteenth Amendment authorized Congress to confer jurisdiction over cases that had been withdrawn from Article III by the Eleventh Amendment. Because that action had been brought by Connecticut citizens against officials of the State of Connecticut, jurisdiction was not precluded by the Eleventh Amendment. As Justice Brennan pointed out in his concurrence, the congressional authority to enact the provisions at issue in the case was found in the Commerce Clause and provided a sufficient basis for refusing to allow the State to "avail itself of the nonconstitutional but ancient doctrine of sovereign immunity." *Id.*, at 457 (opinion concurring in judgment).

In confronting the question whether a federal grant of jurisdiction is within the scope of Article III, as limited by the Eleventh Amendment, I see no reason to distinguish among statutes enacted pursuant to the power granted to Congress to regulate commerce among the several States, and with the Indian tribes, Art. I, §8, cl. 3, the power to establish

uniform laws on the subject of bankruptcy, Art. I, §8, cl. 4, the power to promote the progress of science and the arts by granting exclusive rights to authors and inventors, Art. I, §8, cl. 8, the power to enforce the provisions of the Fourteenth Amendment, §5, or indeed any other provision of the Constitution. There is no language anywhere in the constitutional text that authorizes Congress to expand the borders of Article III jurisdiction or to limit the coverage of the Eleventh Amendment.

The Court's *holdings* in *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976), and *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1 (1989), do unquestionably establish, however, that Congress has the power to deny the States and their officials the right to rely on the nonconstitutional defense of sovereign immunity in an action brought by one of their own citizens. As the opinions in the latter case demonstrate, there can be legitimate disagreement about whether Congress intended a particular statute to authorize litigation against a State. Nevertheless, the Court there squarely held that the Commerce Clause was an adequate source of authority for such a private remedy. In a rather novel rejection of the doctrine of *stare decisis,* the Court today demeans that holding by repeatedly describing it as a "plurality decision" because Justice White did not deem it necessary to set forth the reasons for his vote. As JUSTICE SOUTER's opinion today demonstrates, the arguments in support of Justice White's position are so patent and so powerful that his actual vote should be accorded full respect. Indeed, far more significant than the "plurality" character of the three opinions supporting the holding in *Union Gas* is the fact that the issue confronted today has been squarely addressed by a total of 13 Justices, 8 of whom cast their votes with the so-called "plurality." [15]

---

[15] It is significant that JUSTICE SOUTER's opinion makes it perfectly clear that JUSTICE GINSBURG, JUSTICE BREYER, and he did not consider it necessary to rely on the holding in *Union Gas* to support their conclu-

The fundamental error that continues to lead the Court astray is its failure to acknowledge that its modern embodiment of the ancient doctrine of sovereign immunity "has absolutely nothing to do with the limit on judicial power contained in the Eleventh Amendment." *Id.*, at 25 (STEVENS, J., concurring). It rests rather on concerns of federalism and comity that merit respect but are nevertheless, in cases such as the one before us, subordinate to the plenary power of Congress.

## IV

As I noted above, for the purpose of deciding this case, it is not necessary to question the wisdom of the Court's decision in *Hans* v. *Louisiana*. Given the absence of precedent for the Court's dramatic application of the sovereign immunity doctrine today, it is nevertheless appropriate to identify the questionable heritage of the doctrine and to suggest that there are valid reasons for limiting, or even rejecting that doctrine altogether, rather than expanding it.

Except insofar as it has been incorporated into the text of the Eleventh Amendment, the doctrine is entirely the product of judge-made law. Three features of its English ancestry make it particularly unsuitable for incorporation into the law of this democratic Nation.

First, the assumption that it could be supported by a belief that "the King can do no wrong" has always been absurd; the bloody path trod by English monarchs both before and after they reached the throne demonstrated the fictional character of any such assumption. Even if the fiction had been acceptable in Britain, the recitation in the Declaration of Independence of the wrongs committed by George III made that proposition unacceptable on this side of the Atlantic.

---

sion. I find today's decision particularly unfortunate because of its failure to advance an acceptable reason for refusing to adhere to a precedent upon which the Congress, as well as the courts, should be entitled to rely.

Second, centuries ago the belief that the monarch served by divine right made it appropriate to assume that redress for wrongs committed by the sovereign should be the exclusive province of still higher authority.[16]  While such a justification for a rule that immunized the sovereign from suit in a secular tribunal might have been acceptable in a jurisdiction where a particular faith is endorsed by the government, it should give rise to skepticism concerning the legitimacy of comparable rules in a society where a constitutional wall separates the State from the Church.

Third, in a society where noble birth can justify preferential treatment, it might have been unseemly to allow a commoner to hale the monarch into court.  Justice Wilson explained how foreign such a justification is to this Nation's principles.  See *Chisholm* v. *Georgia*, 2 Dall., at 455.  Moreover, Chief Justice Marshall early on laid to rest the view that the purpose of the Eleventh Amendment was to protect a State's dignity.  *Cohens* v. *Virginia*, 6 Wheat. 264, 406–407 (1821).  Its purpose, he explained, was far more practical.

> "That its motive was not to maintain the sovereignty of a State from the degradation supposed to attend a compulsory appearance before the tribunal of the nation, may be inferred from the terms of the amendment. . . . We must ascribe the amendment, then, to some other cause than the dignity of a State.  There is no difficulty in finding this cause.  Those who were inhibited from commencing a suit against a State, or from prosecuting one which might be commenced before the adoption of the amendment, were persons who might probably be its creditors.  There was not much reason to fear that foreign or sister States would be creditors to any considerable amount, and there was reason to retain the juris-

---

[16] See Stevens, Is Justice Irrelevant?, 87 Nw. U. L. Rev. 1121, 1124–1125 (1993).

diction of the Court in those cases, because it might be essential to the preservation of peace." *Ibid.*[17]

Nevertheless, this Court later put forth the interest in preventing "indignity" as the "very object and purpose of the [Eleventh] Amendment." *In re Ayers,* 123 U. S., at 505. That, of course, is an "embarrassingly insufficient" rationale for the rule. See *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.,* 506 U. S. 139, 151 (1993) (STEVENS, J., dissenting).

Moreover, I find unsatisfying Justice Holmes' explanation that "[a] sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." *Kawananakoa* v. *Polyblank,* 205 U. S. 349, 353 (1907). As I have explained before, Justice Holmes' justification fails in at least two respects.

> "First, it is nothing more than a restatement of the obvious proposition that a citizen may not sue the sovereign unless the sovereign has violated the citizen's legal rights. It cannot explain application of the immunity defense in cases like *Chisholm,* in which it is assumed that the plaintiff's rights have in fact been violated—and those cases are, of course, the only ones in which the immunity defense is needed. Second, Holmes's statement does not purport to explain why a general grant of jurisdiction to federal courts should not be treated as an adequate expression of the sovereign's consent to suits against itself as well as to suits against

---

[17] Interestingly, this passage demonstrates that the Court's application of a common-law sovereign immunity defense in *Principality of Monaco* v. *Mississippi,* 292 U. S. 313 (1934), was quite probably justified. There a foreign state sued a State as a substantial creditor, and thus implicated the very purpose of the Eleventh Amendment.

ordinary litigants." Stevens, Is Justice Irrelevant?, 87 Nw. U. L. Rev. 1121, 1126 (1993).

In sum, as far as its common-law ancestry is concerned, there is no better reason for the rule of sovereign immunity "than that so it was laid down in the time of Henry IV." Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897). That "reason" for the perpetuation of this ancient doctrine certainly cannot justify the majority's expansion of it.

In this country the sovereignty of the individual States is subordinate both to the citizenry of each State and to the supreme law of the federal sovereign. For that reason, Justice Holmes' explanation for a rule that allows a State to avoid suit in its own courts does not even speak to the question whether Congress should be able to authorize a federal court to provide a private remedy for a State's violation of federal law. In my view, neither the majority's opinion today, nor any earlier opinion by any Member of the Court, has identified any acceptable reason for concluding that the absence of a State's consent to be sued in federal court should affect the power of Congress to authorize federal courts to remedy violations of federal law by States or their officials in actions not covered by the Eleventh Amendment's explicit text.[18]

While I am persuaded that there is no justification for permanently enshrining the judge-made law of sovereign immunity, I recognize that federalism concerns—and even the in-

---

[18] Because *Hans* v. *Louisiana*, 134 U. S. 1 (1890), was the first case in which the Court held that a State could not be sued in federal court by one of its citizens, this comment is of interest:

"It is not necessary that we should enter upon an examination of the reason or the expediency of the rule which exempts a sovereign State from prosecution in a court of justice at the suit of individuals. This is fully discussed by writers on public law. It is enough for us to declare its existence." *Id.*, at 21.

So it is today.

terest in protecting the solvency of the States that was at work in *Chisholm* and *Hans*—may well justify a grant of immunity from federal litigation in certain classes of cases. Such a grant, however, should be the product of a reasoned decision by the policymaking branch of our Government. For this Court to conclude that timeworn shibboleths iterated and reiterated by judges should take precedence over the deliberations of the Congress of the United States is simply irresponsible.

V

Fortunately, and somewhat fortuitously, a jurisdictional problem that is unmentioned by the Court may deprive its opinion of precedential significance. The Indian Gaming Regulatory Act establishes a unique set of procedures for resolving the dispute between the Tribe and the State. If each adversary adamantly adheres to its understanding of the law, if the District Court determines that the State's inflexibility constitutes a failure to negotiate in good faith, and if the State thereafter continues to insist that it is acting within its rights, the maximum sanction that the Court can impose is an order that refers the controversy to a member of the Executive Branch of the Government for resolution. 25 U. S. C. § 2710(d)(7)(B). As the Court of Appeals interpreted the Act, this final disposition is available even though the action against the State and its Governor may not be maintained. 11 F. 3d 1016, 1029 (CA11 1994). (The Court does not tell us whether it agrees or disagrees with that disposition.) In my judgment, it is extremely doubtful that the obviously dispensable involvement of the judiciary in the intermediate stages of a procedure that begins and ends in the Executive Branch is a proper exercise of judicial power. See *Gordon* v. *United States*, 117 U. S. Appx. 697, 702–703 (1864) (opinion of Taney, C. J.); *United States* v. *Ferreira*, 13 How. 40, 48 (1852). It may well follow that the misguided opinion of today's majority has nothing more than an advisory character. Whether or not that be so, the better rea-

soning in JUSTICE SOUTER's far wiser and far more scholarly opinion will surely be the law one day.

For these reasons, as well as those set forth in JUSTICE SOUTER's opinion, I respectfully dissent.

JUSTICE SOUTER, with whom JUSTICE GINSBURG and JUSTICE BREYER join, dissenting.

In holding the State of Florida immune to suit under the Indian Gaming Regulatory Act, the Court today holds for the first time since the founding of the Republic that Congress has no authority to subject a State to the jurisdiction of a federal court at the behest of an individual asserting a federal right. Although the Court invokes the Eleventh Amendment as authority for this proposition, the only sense in which that amendment might be claimed as pertinent here was tolerantly phrased by JUSTICE STEVENS in his concurring opinion in *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1, 23 (1989). There, he explained how it has come about that we have two Eleventh Amendments, the one ratified in 1795, the other (so-called) invented by the Court nearly a century later in *Hans* v. *Louisiana*, 134 U. S. 1 (1890). JUSTICE STEVENS saw in that second Eleventh Amendment no bar to the exercise of congressional authority under the Commerce Clause in providing for suits on a federal question by individuals against a State, and I can only say that after my own canvass of the matter I believe he was entirely correct in that view, for reasons given below. His position, of course, was also the holding in *Union Gas*, which the Court now overrules and repudiates.

The fault I find with the majority today is not in its decision to reexamine *Union Gas*, for the Court in that case produced no majority for a single rationale supporting congressional authority. Instead, I part company from the Court because I am convinced that its decision is fundamentally mistaken, and for that reason I respectfully dissent.

# I

It is useful to separate three questions: (1) whether the States enjoyed sovereign immunity if sued in their own courts in the period prior to ratification of the National Constitution; (2) if so, whether after ratification the States were entitled to claim some such immunity when sued in a federal court exercising jurisdiction either because the suit was between a State and a nonstate litigant who was not its citizen, or because the issue in the case raised a federal question; and (3) whether any state sovereign immunity recognized in federal court may be abrogated by Congress.

The answer to the first question is not clear, although some of the Framers assumed that States did enjoy immunity in their own courts. The second question was not debated at the time of ratification, except as to citizen-state diversity jurisdiction;[1] there was no unanimity, but in due course the Court in *Chisholm* v. *Georgia,* 2 Dall. 419 (1793), answered that a state defendant enjoyed no such immunity. As to federal-question jurisdiction, state sovereign immunity seems not to have been debated prior to ratification, the silence probably showing a general understanding at the time that the States would have no immunity in such cases.

The adoption of the Eleventh Amendment soon changed the result in *Chisholm,* not by mentioning sovereign immunity, but by eliminating citizen-state diversity jurisdiction over cases with state defendants. I will explain why the

---

[1] The two Citizen-State Diversity Clauses provide as follows: "The judicial Power shall extend . . . to Controversies . . . between a State and Citizens of another State; . . . and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." U. S. Const., Art. III, §2. In his opinion in *Union Gas,* JUSTICE STEVENS referred to these Clauses as the "citizen-state" and "alien-state" Clauses, respectively, *Pennsylvania* v. *Union Gas Co.,* 491 U. S. 1, 24 (1989) (concurring opinion). I have grouped the two as "Citizen-State Diversity Clauses" for ease in frequent repetition here.

Eleventh Amendment did not affect federal-question jurisdiction, a notion that needs to be understood for the light it casts on the soundness of *Hans*'s holding that States did enjoy sovereign immunity in federal-question suits. The *Hans* Court erroneously assumed that a State could plead sovereign immunity against a noncitizen suing under federal-question jurisdiction, and for that reason held that a State must enjoy the same protection in a suit by one of its citizens. The error of *Hans*'s reasoning is underscored by its clear inconsistency with the Founders' hostility to the implicit reception of common-law doctrine as federal law, and with the Founders' conception of sovereign power as divided between the States and the National Government for the sake of very practical objectives.

The Court's answer today to the third question is likewise at odds with the Founders' view that common law, when it was received into the new American legal system, was always subject to legislative amendment. In ignoring the reasons for this pervasive understanding at the time of the ratification, and in holding that a nontextual common-law rule limits a clear grant of congressional power under Article I, the Court follows a course that has brought it to grief before in our history, and promises to do so again.

Beyond this third question that elicits today's holding, there is one further issue. To reach the Court's result, it must not only hold the *Hans* doctrine to be outside the reach of Congress, but must also displace the doctrine of *Ex parte Young*, 209 U. S. 123 (1908), that an officer of the government may be ordered prospectively to follow federal law, in cases in which the government may not itself be sued directly. None of its reasons for displacing *Young*'s jurisdictional doctrine withstand scrutiny.

A

The doctrine of sovereign immunity comprises two distinct rules, which are not always separately recognized. The one rule holds that the King or the Crown, as the font of law, is

not bound by the law's provisions; the other provides that the King or Crown, as the font of justice, is not subject to suit in its own courts. See, *e. g.,* Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 3–4 (1963).[2] The one rule limits the reach of substantive law; the other, the jurisdiction of the courts. We are concerned here only with the latter rule, which took its common-law form in the high Middle Ages. "At least as early as the thirteenth century, during the reign of Henry III (1216–1272), it was recognized that the king could not be sued in his own courts." C. Jacobs, Eleventh Amendment and Sovereign Immunity 5 (1972). See also 3 W. Blackstone, Commentaries *244–*245; Jaffe, *supra,* at 2 ("By the time of Bracton (1268) it was settled doctrine that the King could not be sued *eo nomine* in his own courts").

The significance of this doctrine in the nascent American law is less clear, however, than its early development and steady endurance in England might suggest. While some colonial governments may have enjoyed some such immunity, Jacobs, *supra,* at 6–7, the scope (and even the existence) of this governmental immunity in pre-Revolutionary America remains disputed. See Gibbons, The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum. L. Rev. 1889, 1895–1899 (1983).

---

[2] The first of these notions rests on the ancient maxim that "the King can do no wrong." See, *e. g.,* 1 W. Blackstone, Commentaries *244. Professor Jaffe has argued this expression "originally meant precisely the contrary to what it later came to mean," that is, " 'it meant that the king must not, was not allowed, not entitled, to do wrong.' " Jaffe, 77 Harv. L. Rev., at 4 (quoting L. Ehrlich, Proceedings Against the Crown (1216–1377), p. 42, in 6 Oxford Studies in Social and Legal History (P. Vinogradoff ed. 1921), p. 42); see also 1 Blackstone, *supra,* at *246 (interpreting the maxim to mean that "the prerogative of the crown extends not to do any injury"). In any event, it is clear that the idea of the sovereign, or any part of it, being above the law in this sense has not survived in American law. See, *e. g., Langford* v. *United States,* 101 U. S. 341, 342–343 (1880); *Nevada* v. *Hall,* 440 U. S. 410, 415 (1979).

Whatever the scope of sovereign immunity might have been in the Colonies, however, or during the period of Confederation, the proposal to establish a National Government under the Constitution drafted in 1787 presented a prospect unknown to the common law prior to the American experience: the States would become parts of a system in which sovereignty over even domestic matters would be divided or parcelled out between the States and the Nation, the latter to be invested with its own judicial power and the right to prevail against the States whenever their respective substantive laws might be in conflict. With this prospect in mind, the 1787 Constitution might have addressed state sovereign immunity by eliminating whatever sovereign immunity the States previously had, as to any matter subject to federal law or jurisdiction; by recognizing an analogue to the old immunity in the new context of federal jurisdiction, but subject to abrogation as to any matter within that jurisdiction; or by enshrining a doctrine of inviolable state sovereign immunity in the text, thereby giving it constitutional protection in the new federal jurisdiction. See Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines: Part One, 126 U. Pa. L. Rev. 515, 536–538 (1977).

The 1787 draft in fact said nothing on the subject, and it was this very silence that occasioned some, though apparently not widespread, dispute among the Framers and others over whether ratification of the Constitution would preclude a State sued in federal court from asserting sovereign immunity as it could have done on any matter of nonfederal law litigated in its own courts. As it has come down to us, the discussion gave no attention to congressional power under the proposed Article I but focused entirely on the limits of the judicial power provided in Article III. And although the jurisdictional bases together constituting the judicial power of the national courts under § 2 of Article III included questions arising under federal law and cases between States

and individuals who are not citizens,[3] it was only upon the latter citizen-state diversity provisions that preratification questions about state immunity from suit or liability centered.[4]

Later in my discussion I will canvass the details of the debate among the Framers and other leaders of the time, see *infra*, at 142–150; for now it is enough to say that there was no consensus on the issue. See *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 263–280 (1985) (Brennan, J., dissenting); *Nevada* v. *Hall*, 440 U. S. 410, 419 (1979); Jacobs, *supra*, at 40 ("[T]he legislative history of the Constitution hardly warrants the conclusion drawn by some that there was a general understanding, at the time of ratification, that the states would retain their sovereign immunity"). There was, on the contrary, a clear disagreement, which was left to fester during the ratification period, to be resolved only thereafter. One other point, however, was also clear: the

---

[3] The text reads that "[t]he Judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."

[4] The one statement I have found on the subject of States' immunity in federal-question cases was an opinion that immunity would not be applicable in these cases: James Wilson, in the Pennsylvania ratification debate, stated that the federal-question clause would require States to make good on pre-Revolutionary debt owed to English merchants (the enforcement of which was promised in the Treaty of 1783) and thereby "show the world that we make the faith of treaties a constitutional part of the character of the United States; that we secure its performance no longer nominally, for the judges of the United States will be enabled to carry it into effect, let the legislatures of the different states do what they may." 2 J. Elliot, Debates on the Federal Constitution 490 (2d ed. 1836) (Elliot's Debates).

debate addressed only the question whether ratification of
the Constitution would, in diversity cases and without more,
abrogate the state sovereign immunity or allow it to have
some application. We have no record that anyone argued
for the third option mentioned above, that the Constitution
would affirmatively guarantee state sovereign immunity
against any congressional action to the contrary. Nor would
there have been any apparent justification for any such argu-
ment, since no clause in the proposed (and ratified) Constitu-
tion even so much as suggested such a position. It may have
been reasonable to contend (as we will see that Madison,
Marshall, and Hamilton did) that Article III would not alter
States' pre-existing common-law immunity despite its un-
qualified grant of jurisdiction over diversity suits against
States. But then, as now, there was no textual support for
contending that Article III or any other provision would
"constitutionalize" state sovereign immunity, and no one ut-
tered any such contention.

## B

The argument among the Framers and their friends about
sovereign immunity in federal citizen-state diversity cases,
in any event, was short lived and ended when this Court, in
*Chisholm* v. *Georgia*, 2 Dall. 419 (1793), chose between the
constitutional alternatives of abrogation and recognition of
the immunity enjoyed at common law. The 4-to-1 majority
adopted the reasonable (although not compelled) interpreta-
tion that the first of the two Citizen-State Diversity Clauses
abrogated for purposes of federal jurisdiction any immunity
the States might have enjoyed in their own courts, and Geor-
gia was accordingly held subject to the judicial power in a
common-law assumpsit action by a South Carolina citizen
suing to collect a debt.[5] The case also settled, by implica-

---

[5] This lengthy discussion of the history of the Constitution's ratification,
the Court's opinion in *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), and the
adoption of the Eleventh Amendment is necessary to explain why, in my
view, the contentions in some of our earlier opinions that *Chisholm* cre-

tion, any question there could possibly have been about recognizing state sovereign immunity in actions depending on the federal question (or "arising under") head of jurisdiction

---

ated a great "shock of surprise" misread the history. See *Principality of Monaco* v. *Mississippi*, 292 U. S. 313 (1934). The Court's response to this historical analysis is simply to recite yet again *Monaco*'s erroneous assertion that *Chisholm* created "such a shock of surprise that the Eleventh Amendment was at once proposed and adopted," 292 U. S., at 325. See *ante*, at 69. This response is, with respect, no response at all.

*Monaco*'s *ipse dixit* that *Chisholm* created a "shock of surprise" does not make it so. This Court's opinions frequently make assertions of historical fact, but those assertions are not authoritative as to history in the same way that our interpretations of laws are authoritative as to them. In *Tucker* v. *Alexandroff*, 183 U. S. 424, 434 (1902), which was, like *Monaco*, decided a century after the event it purported to recount, the Court baldly stated that "in September 1790, General Washington, on the advice of Mr. Adams, did refuse to permit British troops to march through the territory of the United States from Detroit to the Mississippi, apparently for the reason that the object of such movement was an attack on New Orleans and the Spanish possessions on the Mississippi." Modern historians agree, however, that there was no such request, see J. Daly, The Use of History in the Decisions of the Supreme Court: 1900–1930, pp. 65–66 (1954); W. Manning, The Nootka Sound Controversy, in Annual Report of the American Historical Association, H. R. Doc. No. 429, 58th Cong., 3d Sess., pp. 415–423 (1905), and it would of course be absurd for this Court to treat the fact that *Tucker* asserted the existence of the request as proof that it actually occurred. Cf. *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 72–73 (1938) ("But it was the more recent research of a competent scholar, who examined the original document, which established that the construction given to [the Judiciary Act of 1789] by the Court was erroneous; and that the purpose of the section was merely to make certain that, in all matters except those in which some federal law is controlling, the federal courts exercising jurisdiction in diversity of citizenship cases would apply as their rules of decision the law of the State, unwritten as well as written").

Moreover, in this case, there is ample evidence contradicting the "shock of surprise" thesis. Contrary to *Monaco*'s suggestion, the Eleventh Amendment was not "at once proposed and adopted." Congress was in session when *Chisholm* was decided, and a constitutional amendment in response was proposed two days later, but Congress never acted on it, and in fact it was not until two years after *Chisholm* was handed down that

as well. The constitutional text on federal-question jurisdiction, after all, was just as devoid of immunity language as it was on citizen-state diversity, and at the time of *Chisholm* any influence that general common-law immunity might have had as an interpretive force in construing constitutional language would presumably have been no greater when addressing the federal-question language of Article III than its Diversity Clauses. See Sherry, The Eleventh Amendment and Stare Decisis: Overruling *Hans v Louisiana*, 57 U. Chi. L. Rev. 1260, 1270 (1990).

Although Justice Iredell's dissent in *Chisholm* seems at times to reserve judgment on what I have called the third question, whether Congress could authorize suits against the States, *Chisholm, supra*, at 434–435, his argument is largely devoted to stating the position taken by several federalists that state sovereign immunity was cognizable under the Citizen-State Diversity Clauses, not that state immunity was somehow invisibly codified as an independent constitutional defense. As JUSTICE STEVENS persuasively explains in greater detail, *ante*, at 78–81, Justice Iredell's dissent focused on the construction of the Judiciary Act of 1789, not Article III. See also Orth, The Truth About Justice Iredell's Dissent in *Chisholm v. Georgia* (1793), 73 N. C. L. Rev. 255 (1994). This would have been an odd focus, had he believed that Congress lacked the constitutional authority to impose liability. Instead, on Justice Iredell's view, States sued in diversity retained the common-law sovereignty "where no special act of Legislation controuls it, to be in force in each State, as it existed in England, (unaltered by any statute) at the time of the first settlement of the country." 2 Dall., at 435 (emphasis deleted). While in at least some circumstances States might be held liable to "the authority of the United States," *id.*, at 436, any such liability

---

an Amendment was ratified. See Gibbons, The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum. L. Rev. 1889, 1926–1927 (1983).

would depend upon "laws passed under the Constitution and in conformity to it," *ibid.*[6]   Finding no congressional action abrogating Georgia's common-law immunity, Justice Iredell concluded that the State should not be liable to suit.[7]

## C

The Eleventh Amendment, of course, repudiated *Chisholm* and clearly divested federal courts of some jurisdiction as to cases against state parties:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

There are two plausible readings of this provision's text. Under the first, it simply repeals the Citizen-State Diversity

---

[6] See also 2 Dall., at 435 ("[I]t is certain that in regard to any common law principle which can influence the question before us no alteration has been made by any statute"); *id.*, at 437 (if "no new remedy be provided . . . we have no other rule to govern us but the principles of the pre-existent laws, which must remain in force till superseded by others"); *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 283 (1985) (Brennan, J., dissenting).   But see Justice Iredell's dicta suggesting that the Constitution would not permit suits against a State.   *Chisholm, supra,* at 449 (dissenting opinion); *Atascadero, supra,* at 283, n. 34 (Brennan, J., dissenting).

[7] Of course, even if Justice Iredell had concluded that state sovereign immunity was not subject to abrogation, it would be inappropriate to assume (as it appears the Court does today, and *Hans* v. *Louisiana,* 134 U. S. 1 (1890), did as well) that the Eleventh Amendment (regardless of what it says) "constitutionalized" Justice Iredell's dissent, or that it simply adopted the opposite of the holding in *Chisholm.*   It is as odd to read the Eleventh Amendment's rejection of *Chisholm* (which held that States may be sued in diversity) to say that States may not be sued on a federal question as it would be to read the Twenty-Sixth Amendment's rejection of *Oregon* v. *Mitchell,* 400 U. S. 112 (1970) (which held that Congress could not require States to extend the suffrage to 18-year-olds) to permit Congress to require States to extend the suffrage to 12-year-olds.

Clauses of Article III for all cases in which the State appears as a defendant. Under the second, it strips the federal courts of jurisdiction in any case in which a state defendant is sued by a citizen not its own, even if jurisdiction might otherwise rest on the existence of a federal question in the suit. Neither reading of the Amendment, of course, furnishes authority for the Court's view in today's case, but we need to choose between the competing readings for the light that will be shed on the *Hans* doctrine and the legitimacy of inflating that doctrine to the point of constitutional immutability as the Court has chosen to do.

The history and structure of the Eleventh Amendment convincingly show that it reaches only to suits subject to federal jurisdiction exclusively under the Citizen-State Diversity Clauses.[8] In precisely tracking the language in Article III providing for citizen-state diversity jurisdiction, the text of the Amendment does, after all, suggest to common

---

[8] The great weight of scholarly commentary agrees. See, *e. g.*, Jackson, The Supreme Court, the Eleventh Amendment, and State Sovereign Immunity, 98 Yale L. J. 1 (1988); Amar, Of Sovereignty and Federalism, 96 Yale L. J. 1425 (1987); Fletcher, A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction, 35 Stan. L. Rev. 1033 (1983); Gibbons, The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum. L. Rev. 1889 (1983); Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines: Congressional Imposition of Suit Upon the States, 126 U. Pa. L. Rev. 1203 (1978). While a minority has adopted the second view set out above, see, *e. g.*, Marshall, Fighting the Words of the Eleventh Amendment, 102 Harv. L. Rev. 1342 (1989); Massey, State Sovereignty and the Tenth and Eleventh Amendments, 56 U. Chi. L. Rev. 61 (1989), and others have criticized the diversity theory, see, *e. g.*, Marshall, The Diversity Theory of the Eleventh Amendment: A Critical Evaluation, 102 Harv. L. Rev. 1372 (1989), I have discovered no commentator affirmatively advocating the position taken by the Court today. As one scholar has observed, the literature is "remarkably consistent in its evaluation of the historical evidence and text of the amendment as not supporting a broad rule of constitutional immunity for states." Jackson, *supra*, at 44, n. 179.

sense that only the Diversity Clauses are being addressed. If the Framers had meant the Amendment to bar federal-question suits as well, they could not only have made their intentions clearer very easily, but could simply have adopted the first post-*Chisholm* proposal, introduced in the House of Representatives by Theodore Sedgwick of Massachusetts on instructions from the Legislature of that Commonwealth. Its provisions would have had exactly that expansive effect:

> "[N]o state shall be liable to be made a party defendant, in any of the judicial courts, established, or which shall be established under the authority of the United States, at the suit of any person or persons, whether a citizen or citizens, or a foreigner or foreigners, or of any body politic or corporate, whether within or without the United States." Gazette of the United States 303 (Feb. 20, 1793).

With its references to suits by citizens as well as non-citizens, the Sedgwick amendment would necessarily have been applied beyond the Diversity Clauses, and for a reason that would have been wholly obvious to the people of the time. Sedgwick sought such a broad amendment because many of the States, including his own, owed debts subject to collection under the Treaty of Paris. Suits to collect such debts would "arise under" that Treaty and thus be subject to federal-question jurisdiction under Article III. Such a suit, indeed, was then already pending against Massachusetts, having been brought in this Court by Christopher Vassal, an erstwhile Bostonian whose move to England on the eve of revolutionary hostilities had presented his former neighbors with the irresistible temptation to confiscate his vacant mansion. 5 Documentary History of the Supreme Court of the United States, 1789–1800, pp. 352–449 (M. Marcus ed. 1994).[9]

---

[9] Vassall initiated a suit against Massachusetts, invoking the original jurisdiction of the Supreme Court. Although the marshal for the district of Massachusetts served a subpoena on Governor John Hancock and Attor-

Congress took no action on Sedgwick's proposal, however, and the Amendment as ultimately adopted two years later could hardly have been meant to limit federal-question jurisdiction, or it would never have left the States open to federal-question suits by their own citizens. To be sure, the majority of state creditors were not citizens, but nothing in the Treaty would have prevented foreign creditors from selling their debt instruments (thereby assigning their claims) to citizens of the debtor State. If the Framers of the Eleventh Amendment had meant it to immunize States from federal-question suits like those that might be brought to enforce the Treaty of Paris, they would surely have drafted the Amendment differently. See Fletcher, The Diversity Explanation of the Eleventh Amendment: A Reply to Critics, 56 U. Chi. L. Rev. 1261, 1280–1282 (1989).

It should accordingly come as no surprise that the weightiest commentary following the Amendment's adoption described it simply as constricting the scope of the Citizen-State Diversity Clauses. In *Cohens* v. *Virginia*, 6 Wheat. 264 (1821), for instance, Chief Justice Marshall, writing for the Court, emphasized that the Amendment had no effect on federal courts' jurisdiction grounded on the "arising under" provision of Article III and concluded that "a case arising under the constitution or laws of the United States, is cognizable in the Courts of the Union, whoever may be the parties to that case." *Id.*, at 383. The point of the Eleventh Amendment, according to *Cohens*, was to bar jurisdiction in suits at common law by Revolutionary War debt creditors,

---

ney General James Sullivan, the Commonwealth of Massachusetts did not appear by the original return date of August 1793, and the case was continued to the February 1794 Term. Massachusetts never did appear, and the case was "simply continued from term to term through 1796." 5 Documentary History of the Supreme Court of the United States, at 369. In February 1797 the suit was "dismissed with Costs, for reasons unknown," *ibid.* (internal quotation marks omitted), perhaps because "Vassall failed to prosecute it properly," *ibid.*

not "to strip the government of the means of protecting, by the instrumentality of its courts, the constitution and laws from active violation." *Id.*, at 407.

The treatment of the Amendment in *Osborn* v. *Bank of United States*, 9 Wheat. 738 (1824), was to the same effect. The Amendment was held there to be no bar to an action against the State seeking the return of an unconstitutional tax. "The eleventh amendment of the constitution has exempted a State from the suits of citizens of other States, or aliens," Marshall stated, omitting any reference to cases that arise under the Constitution or federal law. *Id.*, at 847.

The good sense of this early construction of the Amendment as affecting the diversity jurisdiction and no more has the further virtue of making sense of this Court's repeated exercise of appellate jurisdiction in federal-question suits brought against States in their own courts by out-of-staters. Exercising appellate jurisdiction in these cases would have been patent error if the Eleventh Amendment limited federal-question jurisdiction, for the Amendment's unconditional language ("shall not be construed") makes no distinction between trial and appellate jurisdiction.[10] And yet, again and again we have entertained such appellate cases, even when brought against the State in its own name by a

---

[10] We have generally rejected Eleventh Amendment challenges to our appellate jurisdiction on the specious ground that an appeal is not a "suit" for purposes of the Amendment. See, *e. g., McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation,* 496 U. S. 18, 27 (1990). Although *Cohens* v. *Virginia,* 6 Wheat. 264, 412 (1821), is cited for this proposition, that case involved a State as plaintiff. See generally Jackson, 98 Yale L. J., at 32–35 (rejecting the appeal/suit distinction). The appeal/suit distinction, in any case, makes no sense. Whether or not an appeal is a "suit" in its own right, it is certainly a means by which an appellate court exercises jurisdiction over a "suit" that began in the courts below. Cf. *Griggs* v. *Provident Consumer Discount Co.,* 459 U. S. 56, 58 (1982) *(per curiam)* ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal").

private plaintiff for money damages. See, *e. g.*, *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609 (1981); *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575 (1983). The best explanation for our practice belongs to Chief Justice Marshall: the Eleventh Amendment bars only those suits in which the sole basis for federal jurisdiction is diversity of citizenship. See *Atascadero State Hospital* v. *Scanlon*, 473 U. S., at 294 (Brennan, J., dissenting); Jackson, The Supreme Court, the Eleventh Amendment, and State Sovereign Immunity, 98 Yale L. J. 1, 44 (1988).

In sum, reading the Eleventh Amendment solely as a limit on citizen-state diversity jurisdiction has the virtue of coherence with this Court's practice, with the views of John Marshall, with the history of the Amendment's drafting, and with its allusive language. Today's majority does not appear to disagree, at least insofar as the constitutional text is concerned; the Court concedes, after all, that "the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts." *Ante*, at 54.[11]

Thus, regardless of which of the two plausible readings one adopts, the further point to note here is that there is no possible argument that the Eleventh Amendment, by its terms, deprives federal courts of jurisdiction over all citizen law-

---

[11] See also *Pennsylvania* v. *Union Gas Co.*, 491 U. S., at 31 (SCALIA, J., concurring in part and dissenting in part) ("If this text [of the Eleventh Amendment] were intended as a comprehensive description of state sovereign immunity in federal courts . . . then it would unquestionably be most reasonable to interpret it as providing immunity only when the *sole basis* of federal jurisdiction is the diversity of citizenship that it describes (which of course tracks some of the diversity jurisdictional grants in U. S. Const., Art. III, §2). For there is no plausible reason why one would wish to protect a State from being sued in federal court for violation of federal law . . . when the plaintiff is a citizen of another State or country, but to permit a State to be sued there when the plaintiff is citizen of the State itself").

suits against the States. Not even the Court advances that proposition, and there would be no textual basis for doing so.[12] Because the plaintiffs in today's case are citizens of the

---

[12] The Court does suggest that the drafters of the Eleventh Amendment may not have had federal-question jurisdiction in mind, in the apparent belief that this somehow supports its reading. *Ante,* at 69–70. The possibility, however, that those who drafted the Eleventh Amendment intended to deal "only with the problem presented by the decision in *Chisholm*" would demonstrate, if any demonstration beyond the clear language of the Eleventh Amendment were necessary, that the Eleventh Amendment was not intended to address the broader issue of federal-question suits brought by citizens.

Moreover, the Court's point is built on a faulty foundation. The Court is simply incorrect in asserting that "the federal courts did not have federal-question jurisdiction at the time the Amendment was passed." *Ibid.* Article III, of course, provided for such jurisdiction, and early Congresses exercised their authority pursuant to Article III to confer jurisdiction on the federal courts to resolve various matters of federal law. *E. g.,* Act of Apr. 10, 1790, § 5, 1 Stat. 111; Act of Feb. 21, 1793, § 6, 1 Stat. 322; Act of Mar. 23, 1792, §§ 2, 3, 1 Stat. 244; see also *Osborn* v. *Bank of United States,* 9 Wheat. 738 (1824) (holding that federal statute conferred federal-question jurisdiction in cases involving the Bank of the United States); see generally P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, Hart & Wechsler's The Federal Courts and the Federal System 960–982 (3d ed. 1988). In fact, only six years after the passage of the Eleventh Amendment, Congress enacted a statute providing for general federal-question jurisdiction. Act of Feb. 13, 1801, § 11, 2 Stat. 92 ("[T]he said circuit courts respectively shall have cognizance of . . . all cases in law or equity, arising under the constitution and laws of the United States, and treaties made, or which shall be made, under their authority"). It is, of course, true that this statute proved short lived (it was repealed by the Act of Mar. 8, 1802, 2 Stat. 132), and that Congress did not pass another statute conferring general federal jurisdiction until 1875, but the drafters of the Eleventh Amendment obviously could not have predicted such things. The real significance of the 1801 Act is that it demonstrates the awareness among the Members of the early Congresses of the potential scope of Article III. This, in combination with the pre-Eleventh Amendment statutes that conferred federal-question jurisdiction on the federal courts, cast considerable doubt on the Court's suggestion that the issue of federal-question jurisdiction never occurred to the drafters of the Elev-

State that they are suing, the Eleventh Amendment simply does not apply to them. We must therefore look elsewhere for the source of that immunity by which the Court says their suit is barred from a federal court.[13]

## II

The obvious place to look elsewhere, of course, is *Hans* v. *Louisiana,* 134 U. S. 1 (1890), and *Hans* was indeed a leap in the direction of today's holding, even though it does not take the Court all the way. The parties in *Hans* raised, and the Court in that case answered, only what I have called the second question, that is, whether the Constitution, without

---

enth Amendment; on the contrary, just because these early statutes underscore the early Congresses' recognition of the availability of federal-question jurisdiction, the silence of the Eleventh Amendment is all the more deafening.

[13] The majority chides me that the "lengthy analysis of the text of the Eleventh Amendment is directed at a straw man," *ante,* at 69. But plain text is the Man of Steel in a confrontation with "background principle[s]" and "'postulates which limit and control,'" *ante,* at 68, 72. An argument rooted in the text of a constitutional provision may not be guaranteed of carrying the day, but insubstantiality is not its failing. See, *e. g.,* Monaghan, Our Perfect Constitution, 56 N. Y. U. L. Rev. 353, 383–384 (1981) ("For the purposes of *legal* reasoning, the binding quality of the constitutional text is itself incapable of and not in need of further demonstration"); cf. *Bourjaily* v. *United States,* 483 U. S. 171, 178 (1987) (REHNQUIST, C. J.) ("It would be extraordinary to require legislative history to *confirm* the plain meaning of [Federal Rule of Evidence] 104"); *Garcia* v. *United States,* 469 U. S. 70, 75 (1984) (REHNQUIST, J.) ("[O]nly the most extraordinary showing of contrary intentions from [the legislative history] would justify a limitation on the 'plain meaning' of the statutory language"). This is particularly true in construing the jurisdictional provisions of Article III, which speak with a clarity not to be found in some of the more open-textured provisions of the Constitution. See *National Mut. Ins. Co.* v. *Tidewater Transfer Co.,* 337 U. S. 582, 646–647 (1949) (Frankfurter, J., dissenting); Schauer, Easy Cases, 58 S. Cal. L. Rev. 399, 424 (1985) (noting the "seemingly plain linguistic mandate" of the Eleventh Amendment). That the Court thinks otherwise is an indication of just how far it has strayed beyond the boundaries of traditional constitutional analysis.

more, permits a State to plead sovereign immunity to bar
the exercise of federal-question jurisdiction.  See *id.*, at 9.
Although the Court invoked a principle of sovereign immu-
nity to cure what it took to be the Eleventh Amendment's
anomaly of barring only those state suits brought by nonciti-
zen plaintiffs, the *Hans* Court had no occasion to consider
whether Congress could abrogate that background immunity
by statute.  Indeed (except in the special circumstance of
Congress's power to enforce the Civil War Amendments),
this question never came before our Court until *Union Gas,*
and any intimations of an answer in prior cases were mere
dicta.  In *Union Gas* the Court held that the immunity rec-
ognized in *Hans* had no constitutional status and was subject
to congressional abrogation.  Today the Court overrules
*Union Gas* and holds just the opposite.  In deciding how to
choose between these two positions, the place to begin is
with *Hans*'s holding that a principle of sovereign immu-
nity derived from the common law insulates a State from
federal-question jurisdiction at the suit of its own citizen.  A
critical examination of that case will show that it was
wrongly decided, as virtually every recent commentator has
concluded.[14]  It follows that the Court's further step today
of constitutionalizing *Hans*'s rule against abrogation by Con-
gress compounds and immensely magnifies the century-old
mistake of *Hans* itself and takes its place with other historic
examples of textually untethered elevations of judicially de-
rived rules to the status of inviolable constitutional law.

## A

The Louisiana plaintiff in *Hans* held bonds issued by that
State, which, like virtually all of the Southern States, had
issued them in substantial amounts during the Reconstruc-
tion era to finance public improvements aimed at stimulating

---

[14] Professor Jackson has noted the "remarkabl[e] consisten[cy]" of the
scholarship on this point, Jackson, 98 Yale L. J., at 44, n. 179.  See also
n. 8, *supra.*

industrial development. E. Foner, Reconstruction: America's Unfinished Revolution 1863–1877, pp. 383–384 (1988); Gibbons, 83 Colum. L. Rev., at 1976–1977. As Reconstruction governments collapsed, however, the post-Reconstruction regimes sought to repudiate these debts, and the *Hans* litigation arose out of Louisiana's attempt to renege on its bond obligations.

Hans sued the State in federal court, asserting that the State's default amounted to an impairment of the obligation of its contracts in violation of the Contract Clause. This Court affirmed the dismissal of the suit, despite the fact that the case fell within the federal court's "arising under," or federal-question, jurisdiction. Justice Bradley's opinion did not purport to hold that the terms either of Article III or of the Eleventh Amendment barred the suit, but that the ancient doctrine of sovereign immunity that had inspired adoption of the Eleventh Amendment applied to cases beyond the Amendment's scope and otherwise within the federal-question jurisdiction. Indeed, Bradley explicitly admitted that "[i]t is true, the amendment does so read [as to permit Hans's suit], and if there were no other reason or ground for abating his suit, it might be maintainable." *Hans*, 134 U. S., at 10. The Court elected, nonetheless, to recognize a broader immunity doctrine, despite the want of any textual manifestation, because of what the Court described as the anomaly that would have resulted otherwise: the Eleventh Amendment (according to the Court) would have barred a federal-question suit by a noncitizen, but the State would have been subject to federal jurisdiction at its own citizen's behest. *Id.*, at 10–11. The State was accordingly held to be free to resist suit without its consent, which it might grant or withhold as it pleased.

*Hans* thus addressed the issue implicated (though not directly raised) in the preratification debate about the Citizen-State Diversity Clauses and implicitly settled by *Chisholm:* whether state sovereign immunity was cognizable by federal

courts on the exercise of federal-question jurisdiction. According to *Hans*, and contrary to *Chisholm*, it was. But that is all that *Hans* held. Because no federal legislation purporting to pierce state immunity was at issue, it cannot fairly be said that *Hans* held state sovereign immunity to have attained some constitutional status immunizing it from abrogation.[15]

Taking *Hans* only as far as its holding, its vulnerability is apparent. The Court rested its opinion on avoiding the supposed anomaly of recognizing jurisdiction to entertain a citizen's federal-question suit, but not one brought by a noncitizen. See *Hans, supra,* at 10–11. There was, however, no such anomaly at all. As already explained, federal-question cases are not touched by the Eleventh Amendment, which leaves a State open to federal-question suits by citizens and noncitizens alike. If Hans had been from Massachusetts the Eleventh Amendment would not have barred his action against Louisiana.

Although there was thus no anomaly to be cured by *Hans*, the case certainly created its own anomaly in leaving federal courts entirely without jurisdiction to enforce paramount federal law at the behest of a citizen against a State that broke it. It destroyed the congruence of the judicial power under Article III with the substantive guarantees of the Constitution, and with the provisions of statutes passed by Congress in the exercise of its power under Article I: when a State injured an individual in violation of federal law no federal forum could provide direct relief. Absent an alternative process to vindicate federal law (see Part IV, *infra*) John Marshall saw just what the consequences of this anomaly would be in the early Republic, and he took that consequence as good evidence that the Framers could never have intended such a scheme.

---

[15] Indeed, as JUSTICE STEVENS suggests, there is language in *Hans* suggesting that the Court was really construing the Judiciary Act of 1875 rather than the Constitution. See *ante,* at 84–87.

"Different States may entertain different opinions on the true construction of the constitutional powers of congress. We know that, at one time, the assumption of the debts contracted by the several States, during the war of our Revolution, was deemed unconstitutional by some of them. . . . States may legislate in conformity to their opinions, and may enforce those opinions by penalties. It would be hazarding too much to assert that the judicatures of the States will be exempt from the prejudices by which the legislatures and people are influenced, and will constitute perfectly impartial tribunals. In many States the judges are dependent for office and for salary on the will of the legislature. The constitution of the United States furnishes no security against the universal adoption of this principle. When we observe the importance which that constitution attaches to the independence of judges, we are the less inclined to suppose that it can have intended to leave these constitutional questions to tribunals where this independence may not exist." *Cohens* v. *Virginia*, 6 Wheat., at 386–387.

And yet that is just what *Hans* threatened to do.

How such a result could have been threatened on the basis of a principle not so much as mentioned in the Constitution is difficult to understand. But history provides the explanation. As I have already said, *Hans* was one episode in a long story of debt repudiation by the States of the former Confederacy after the end of Reconstruction. The turning point in the States' favor came with the Compromise of 1877, when the Republican Party agreed effectively to end Reconstruction and to withdraw federal troops from the South in return for Southern acquiescence in the decision of the Electoral Commission that awarded the disputed 1876 presidential election to Rutherford B. Hayes. See J. Orth, Judicial Power of the United States: The Eleventh Amendment in American History 53–57 (1987); Gibbons, *supra*, at 1978–

1982; see generally Foner, Reconstruction, at 575–587 (describing the events of 1877 and their aftermath). The troop withdrawal, of course, left the federal judiciary "effectively without power to resist the rapidly coalescing repudiation movement." Gibbons, 83 Colum. L. Rev., at 1981. Contract Clause suits like the one brought by Hans thus presented this Court with "a draconian choice between repudiation of some of its most inviolable constitutional doctrines and the humiliation of seeing its political authority compromised as its judgments met the resistance of hostile state governments." *Id.*, at 1974. Indeed, Louisiana's brief in *Hans* unmistakably bore witness to this Court's inability to enforce a judgment against a recalcitrant State: "The solemn obligation of a government arising on its own acknowledged bond would not be enhanced by a judgment rendered on such bond. If it either could not or would not make provision for paying the bond, it is probable that it could not or would not make provision for satisfying the judgment." Brief for Respondent in No. 4, O. T. 1889, p. 25. Given the likelihood that a judgment against the State could not be enforced, it is not wholly surprising that the *Hans* Court found a way to avoid the certainty of the State's contempt.[16]

---

[16] See Gibbons, 83 Colum. L. Rev., at 2000 ("Without weakening the contract clause, which over the next two decades the Fuller Court might need both in its fight against government regulation of business and as a weapon against defaulting local governments, the justices needed a way to let the South win the repudiation war. The means Bradley chose was to rewrite the eleventh amendment and the history of its adoption"). The commentators' contention that this Court's inability to enforce the obligation of Southern States to pay their debts influenced the result in *Hans v. Louisiana*, 134 U. S. 1 (1890), is substantiated by three anomalies of this Court's sovereign immunity jurisprudence during that period. First, this Court held in 1885 that Virginia's sovereign immunity did not allow it to abrogate its bonds. *Virginia Coupon Cases*, 114 U. S. 269. The difference from the situation in other States, however, was that Virginia had made its bond coupons receivable in payment of state taxes; "[u]nder these circumstances federal courts did not need to rely on the political branches of government to enforce their orders but could protect creditors by a

So it is that history explains, but does not honor, *Hans.* The ultimate demerit of the case centers, however, not on its politics but on the legal errors on which it rested.[17]   Before

judgment that their taxes had in fact been paid.   In these cases the Eleventh Amendment faded into the background."   J. Orth, Judicial Power of the United States: The Eleventh Amendment in American History 9 (1987); see generally *id.*, at 90–109.   Second, at the same time that this Court was articulating broad principles of immunity for States, we refused to recognize similar immunity for municipalities and similar state political subdivisions.   See, *e. g., Lincoln County* v. *Luning,* 133 U. S. 529 (1890). Professor Orth suggests that this seeming inconsistency is traceable to the enforcement difficulties arising from the withdrawal of federal troops from the South.   "It just so happened," he points out, "that counties had tended to issue bonds in the West, while in the South, states had usually done the job.   Property in the form of bonds could be defended in the mid-West and West, but similar property in the South had to be sacrificed to the higher politics of the Compromise of 1877."   Orth, *supra,* at 111. Finally, Professor Orth attributes this Court's recognition (or revival) of the *Ex parte Young,* 209 U. S. 123 (1908), action as a way around state sovereign immunity to the fact that, by 1908, "the problem of repudiated Southern bonds was clearly a specter from an increasingly distant past." Orth, *supra,* at 128.   See also Gibbons, *supra,* at 2002 (arguing that the Court's unanimous revival of its power to grant equitable relief against state officers in *Pennoyer* v. *McConnaughy,* 140 U. S. 1 (1891), was made possible by the fact that the case "did not involve Southern State bonds"). I am reluctant, to be sure, to ascribe these legal developments to a single, extralegal cause, and at least one commentator has suggested that the Southern debt crisis may not have been the only factor driving the Court's Eleventh Amendment jurisprudence during this period.   See generally Collins, The Conspiracy Theory of the Eleventh Amendment, 88 Colum. L. Rev. 212 (1988) (reviewing Orth).   But neither would I ignore the pattern of the cases, which tends to show that the presence or absence of enforcement difficulties significantly influenced the path of the law in this area.   See *id.*, at 243 (acknowledging that "[i]t is perfectly conceivable that Compromise-related politics exerted their influence at the margin— in doubtful cases in which the Court might have gone either way").

[17] Today's majority condemns my attention to *Hans'*s historical circumstances as "a disservice to the Court's traditional method of adjudication." *Ante,* at 69.   The point, however, is not that historical circumstance may undermine an otherwise defensible decision; on the contrary, it is just because *Hans* is so utterly indefensible on the merits of its legal analysis

considering those errors, it is necessary to address the Court's contention that subsequent cases have read into *Hans* what was not there to begin with, that is, a background principle of sovereign immunity that is constitutional in stature and therefore unalterable by Congress.

## B

The majority does not dispute the point that *Hans* v. *Louisiana,* 134 U. S. 1 (1890), had no occasion to decide whether Congress could abrogate a State's immunity from federal-question suits. The Court insists, however, that the negative answer to that question that it finds in *Hans* and subsequent opinions is not "mere *obiter dicta,* but rather . . . the well-established rationale upon which the Court based the results of its earlier decisions." *Ante,* at 66–67. The exact rationale to which the majority refers, unfortunately, is not easy to discern. The Court's opinion says, immediately after its discussion of *stare decisis,* that "[f]or over a century, we have grounded our decisions in the oft-repeated understanding of state sovereign immunity as an essential part of the Eleventh Amendment." *Ante,* at 67. This cannot be the "rationale," though, because this Court has repeatedly acknowledged that the Eleventh Amendment standing alone

that one is forced to look elsewhere in order to understand how the Court could have gone so far wrong. Nor is there anything new or remarkable in taking such a look, for we have sought similar explanations in other cases. In *Puerto Rico* v. *Branstad,* 483 U. S. 219 (1987), for example, we suggested that the Court's holding in *Kentucky* v. *Dennison,* 24 How. 66 (1861), that "the Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it," *id.,* at 107, was influenced by "the looming shadow of a Civil War," *Branstad, supra,* at 227, and we ultimately determined that *Dennison* should be overruled, 483 U. S., at 230. The author of the Court's opinion today joined that analysis, as did the other Members of today's majority who were then on the Court. See *ibid.* (O'CONNOR, J., concurring in part and concurring in judgment) (joining the relevant portion of the majority opinion); *id.,* at 231 (SCALIA, J., concurring in part and concurring in judgment) (same).

cannot bar a federal-question suit against a State brought by a state citizen. See, *e. g.*, *Edelman* v. *Jordan*, 415 U. S. 651, 662 (1974) (acknowledging that "the Amendment by its terms does not bar suits against a State by its own citizens").[18] Indeed, as I have noted, Justice Bradley's opinion in *Hans* conceded that Hans might successfully have pursued his claim "if there were no other reason or ground [other than the Amendment itself] for abating his suit." 134 U. S., at 10. The *Hans* Court, rather, held the suit barred by a non-constitutional common-law immunity. See *supra*, at 116–117.

The "rationale" which the majority seeks to invoke is, I think, more nearly stated in its quotation from *Principality of Monaco* v. *Mississippi*, 292 U. S. 313, 321–323 (1934). There, the Court said that "we cannot rest with a mere literal application of the words of § 2 of Article III, or assume that the letter of the Eleventh Amendment exhausts the restrictions upon suits against non-consenting States." *Id.*, at 322.[19] This statement certainly is true to *Hans*, which

---

[18] See also *Georgia Railroad & Banking Co.* v. *Redwine*, 342 U. S. 299, 304 (1952) (same); *Fitts* v. *McGhee*, 172 U. S. 516, 524 (1899) (same). Even JUSTICE SCALIA's dissent in *Union Gas*, the reasoning of which the majority adopts today, acknowledged that its view of sovereign immunity depended upon "some other constitutional principle beyond the immediate text of the Eleventh Amendment." 491 U. S., at 31 (opinion concurring in part and dissenting in part). To the extent that our prior cases do refer to *Hans* immunity as part of the Eleventh Amendment, they can only be referring to JUSTICE STEVENS's "other" Eleventh Amendment. *Hess* v. *Port Authority Trans-Hudson Corporation*, 513 U. S. 30, 53 (1994) (STEVENS, J., concurring); see also *Pennsylvania* v. *Union Gas Co.*, *supra*, at 23–29 (STEVENS, J., concurring) (same).

[19] See also *Union Gas*, 491 U. S., at 31–32 (SCALIA, J., concurring in part and dissenting in part) ("What we said in *Hans* was, essentially, that the Eleventh Amendment was important not merely for what it said but for what it reflected: a consensus that the doctrine of sovereign immunity, for States as well as for the Federal Government, was part of the understood background against which the Constitution was adopted, and which its jurisdictional provisions did not mean to sweep away"); *Nevada* v. *Hall*, 440 U. S., at 440 (REHNQUIST, J., dissenting) (interpreting *Monaco* as

clearly recognized a pre-existing principle of sovereign immunity, broader than the Eleventh Amendment itself, that will ordinarily bar federal-question suits against a nonconsenting State. That was the "rationale" which was sufficient to decide *Hans* and all of its progeny prior to *Union Gas.* But leaving aside the indefensibility of that rationale, which I will address further below, that was as far as it went.

The majority, however, would read the "rationale" of *Hans* and its line of subsequent cases as answering the further question whether the "postulate" of sovereign immunity that "limit[s] and control[s]" the exercise of Article III jurisdiction, *Monaco, supra,* at 322, is constitutional in stature and therefore unalterable by Congress. It is true that there are statements in the cases that point toward just this conclusion. See, *e. g., Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89, 98 (1984) ("In short, the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III"); *Ex parte New York,* 256 U. S. 490, 497 (1921) ("[T]he entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given . . ."). These statements, however, are dicta in the classic sense, that is, sheer speculation about what would happen in cases not before the court.[20] But this

_____

"rel[ying] on precepts underlying but not explicit in Art. III and the Eleventh Amendment").

[20] There are good reasons not to take many of these statements too seriously. Some are plainly exaggerated; for example, the suggestion in *Great Northern Life Ins. Co.* v. *Read,* 322 U. S. 47, 51 (1944), that "[a] state's freedom from litigation was established as a constitutional right through the Eleventh Amendment" obviously ignores a State's liability to suit by other States, see, *e. g., South Dakota* v. *North Carolina,* 192 U. S. 286 (1904), and by the National Government, see, *e. g., United States* v. *Texas,* 143 U. S. 621 (1892). See also *Nevada* v. *Hall, supra,* at 420, n. 19 (noting that "the Eleventh Amendment has not accorded the States absolute sovereign immunity in federal-court actions"). Similarly, statements such as in *Ex parte New York,* 256 U. S., at 497, that "the entire judicial

is not the only weakness of these statements, which are counterbalanced by many other opinions that have either stated the immunity principle without more, see, *e. g., Dellmuth* v. *Muth*, 491 U. S. 223, 229, n. 2 (1989) (noting that "an unconsenting State is immune from liability for damages in a suit brought in federal court by one of its own citizens," without suggesting that the immunity was unalterable by Congress),[21] or have suggested that the *Hans* immunity is not of constitutional stature. The very language quoted by the majority from *Monaco*, for example, likens state sovereign immunity to other "essential postulates" such as the rules of justiciability. 292 U. S., at 322. Many of those rules, as JUSTICE STEVENS points out, are prudential in nature and therefore not unalterable by Congress. See *ante*, at 88–90.[22] More generally, the proponents of the Court's theory have repeatedly referred to state sovereign immunity as a "background principle," *ante*, at 72, "postulate," *Nevada* v. *Hall*, 440 U. S., at 437 (REHNQUIST, J., dissenting), or "implicit limitation," *Welch* v. *Texas Dept. of Highways and Public Transp.*, 483 U. S. 468, 496 (1987) (SCALIA, J., concurring in part and concurring in judgment), and as resting on the "inherent nature of sovereignty," *Great Northern Life Ins. Co.* v. *Read*, 322 U. S. 47, 51 (1944), rather than any explicit con-

---

power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given" should not necessarily be taken as affirming that Article III itself incorporated a constitutional immunity doctrine. How else to explain Justice Harlan's concurring opinion in *Hans*, which stated, practically in the same breath, that "a suit directly against a State by one of its own citizens is not one to which the judicial power of the United States extends," and that *Chisholm* "was based upon a sound interpretation of the Constitution as that instrument then was"? 134 U. S., at 21.

[21] See also *Georgia Railroad & Banking Co.* v. *Redwine, supra*, at 304; *Fitts* v. *McGhee, supra*, at 524–525.

[22] See also *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975) ("Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules"); E. Chemerinsky, Federal Jurisdiction § 2.1, pp. 42–43 (2d ed. 1994).

stitutional provision.[23]   But whatever set of quotations one may prefer, taking heed of such jurisprudential creations in assessing the contents of federal common law is a very different thing from reading them into the Founding Document itself.

The most damning evidence for the Court's theory that *Hans* rests on a broad rationale of immunity unalterable by Congress, however, is the Court's proven tendency to disregard the post-*Hans* dicta in cases where that dicta would have mattered.[24]   If it is indeed true that "private suits against States [are] not permitted under Article III (by virtue of the understanding represented by the Eleventh Amendment)," *Union Gas,* 491 U. S., at 40 (SCALIA, J., concurring in part and dissenting in part), then it is hard to see how a State's sovereign immunity may be waived any more than it may be abrogated by Congress.   See, *e. g., Atascadero State Hospital* v. *Scanlon,* 473 U. S., at 238 (recognizing that immunity may be waived).   After all, consent of a party is in all other instances wholly insufficient to create subject-

---

[23] Indeed, THE CHIEF JUSTICE could hardly have been clearer in *Fry* v. *United States,* 421 U. S. 542 (1975), where he explained that "[t]he Court's decision in *Hans* v. *Louisiana,* 134 U. S. 1 (1890), offers impressive authority for the principle that the States as such were regarded by the Framers of the Constitution as partaking of many attributes of sovereignty quite apart from the provisions of the Tenth Amendment. . . .

"As it was not the Eleventh Amendment by its terms which justified the result in *Hans,* it is not the Tenth Amendment by its terms that prohibits congressional action which sets a mandatory ceiling on the wages of all state employees.   Both Amendments are simply examples of the understanding of those who drafted and ratified the Constitution that the States were sovereign in many respects, and that although their legislative authority could be superseded by Congress in many areas where Congress was competent to act, Congress was nonetheless not free to deal with a State as if it were just another individual or business enterprise subject to regulation." *Id.,* at 556–557 (dissenting opinion).

[24] Indeed, in *Nevada* v. *Hall, supra,* at 439, THE CHIEF JUSTICE complained in dissent that the same statements upon which he relies today had been "dismiss[ed] . . . as dicta."

matter jurisdiction where it would not otherwise exist. See, *e. g., Sosna* v. *Iowa,* 419 U. S. 393, 398 (1975); see also E. Chemerinsky, Federal Jurisdiction § 7.6, p. 405 (2d ed. 1994) (noting that "allowing such waivers seems inconsistent with viewing the Eleventh Amendment as a restriction on the federal courts' subject matter jurisdiction"). Likewise, the Court's broad theory of immunity runs doubly afoul of the appellate jurisdiction problem that I noted earlier in rejecting an interpretation of the Eleventh Amendment's text that would bar federal-question suits. See *supra,* at 109–116. If "the whole sum of the judicial power granted by the Constitution to the United States does not embrace the authority to entertain a suit brought by a citizen against his own State without its consent," *Duhne* v. *New Jersey,* 251 U. S. 311, 313 (1920), and if consent to suit in state court is not sufficient to show consent in federal court, see *Atascadero, supra,* at 241, then Article III would hardly permit this Court to exercise appellate jurisdiction over issues of federal law arising in lawsuits brought against the States in their own courts. We have, however, quite rightly ignored any post-*Hans* dicta in that sort of case and exercised the jurisdiction that the plain text of Article III provides. See, *e. g., Fulton Corp.* v. *Faulkner,* 516 U. S. 325 (1996); see also *supra,* at 113–114.

If these examples were not enough to distinguish *Hans*'s rationale of a pre-existing doctrine of sovereign immunity from the post-*Hans* dicta indicating that this immunity is constitutional, one would need only to consider a final set of cases: those in which we have assumed, without deciding, that congressional power to abrogate state sovereign immunity exists even when § 5 of the Fourteenth Amendment has no application. A majority of this Court was willing to make that assumption in *Hoffman* v. *Connecticut Dept. of Income Maintenance,* 492 U. S. 96, 101 (1989) (plurality opinion), in *Welch* v. *Texas Dept. of Highways and Public Transp., supra,* at 475 (plurality opinion), and in *County of Oneida* v. *Oneida Indian Nation of N. Y.,* 470 U. S. 226, 252

(1985).[25] Although the Court in each of these cases failed to find abrogation for lack of a clear statement of congressional intent, the assumption that such power was available would hardly have been permissible if, at that time, today's majority's view of the law had been firmly established. It is one thing, after all, to avoid an open constitutional question by assuming an answer and rejecting the claim on another ground; it is quite another to avoid a settled rationale (an emphatically settled one if the majority is to be taken seriously) only to reach an issue of statutory construction that the Court would otherwise not have to decide. Even worse, the Court could not have been unaware that its decision of cases like *Hoffman* and *Welch,* on the ground that the statutes at issue lacked a plain statement of intent to abrogate, would invite Congress to attempt abrogation in statutes like the Indian Gaming Regulatory Act, 25 U. S. C. § 2701 *et seq.* (IGRA). Such a course would have been wholly irresponsible if, as the majority now claims, the constitutionally unalterable nature of *Hans* immunity had been well established for a hundred years.

*Hans* itself recognized that an "observation [in a prior case that] was unnecessary to the decision, and in that sense *extra judicial* . . . ought not to outweigh" present reasoning that points to a different conclusion. 134 U. S., at 20. That is good advice, which Members of today's majority have been willing to heed on other occasions. See, *e. g., Kokkonen* v. *Guardian Life Ins. Co.,* 511 U. S. 375, 379 (1994) ("It is to the holdings of our cases, rather than their dicta, that we

---

[25] In *Hoffman,* one Member of the four-Justice plurality expressly disavowed the plurality's assumption that Congress could abrogate the States' immunity by making its intent to do so clear. See 492 U. S., at 105 (O'CONNOR, J., concurring). The four dissenters, however, not only assumed that Congress had the power to abrogate but found that it had done so. See *id.,* at 106 (Marshall, J., dissenting). Likewise, in *Welch,* the four-Justice plurality was joined by four dissenters who insisted upon a congressional power of abrogation. See 483 U. S., at 519 (Brennan, J., dissenting).

must attend"); *Bennis* v. *Michigan,* 516 U. S. 442, 450 (1996). But because the Court disregards this norm today, I must consider the soundness of *Hans's* original recognition of a background principle of sovereign immunity that applies even in federal-question suits, and the reasons that counsel against the Court's extension of *Hans's* holding to the point of rendering its immunity unalterable by Congress.

## III

Three critical errors in *Hans* weigh against constitutionalizing its holding as the majority does today. The first we have already seen: the *Hans* Court misread the Eleventh Amendment, see *supra,* at 118–123. It also misunderstood the conditions under which common-law doctrines were received or rejected at the time of the founding, and it fundamentally mistook the very nature of sovereignty in the young Republic that was supposed to entail a State's immunity to federal-question jurisdiction in a federal court. While I would not, as a matter of *stare decisis,* overrule *Hans* today, an understanding of its failings on these points will show how the Court today simply compounds already serious error in taking *Hans* the further step of investing its rule with constitutional inviolability against the considered judgment of Congress to abrogate it.

## A

There is and could be no dispute that the doctrine of sovereign immunity that *Hans* purported to apply had its origins in the "familiar doctrine of the common law," *The Siren,* 7 Wall. 152, 153 (1869), "derived from the laws and practices of our English ancestors," *United States* v. *Lee,* 106 U. S. 196, 205 (1882).[26] Although statutes came to affect its impor-

---

[26] The Court seeks to disparage the common-law roots of the doctrine, and the consequences of those roots which I outline *infra,* at 132–142 and 159–164, by asserting that *Hans* "found its roots not solely in the common law of England, but in the much more fundamental ' "jurisprudence in all

tance in the succeeding centuries, the doctrine was never reduced to codification, and Americans took their understanding of immunity doctrine from Blackstone, see 3 W. Blackstone, Commentaries on the Laws of England, ch. 17 (1768). Here, as in the mother country, it remained a common-law rule. See generally Jaffe, 77 Harv. L. Rev., at 2–19; Borchard, Governmental Responsibility in Tort, VI, 36 Yale L. J. 1, 17–41 (1926).

This fact of the doctrine's common-law status in the period covering the founding and the later adoption of the Eleventh Amendment should have raised a warning flag to the *Hans* Court and it should do the same for the Court today. For although the Court has persistently assumed that the common law's presence in the minds of the early Framers must

---

civilized nations.""" *Ante*, at 69 (quoting *Hans*, 134 U. S., at 17). The *Hans* Court, however, relied explicitly on the ground that a suit against the State by its own citizen was "not known . . . at the common law" and was not among the departures from the common law recognized by the Constitution. *Id.*, at 15. Moreover, *Hans* explicitly adopted the reasoning of Justice Iredell's dissent in *Chisholm*, see 134 U. S., at 18–19, and that opinion could hardly have been clearer in relying exclusively on the common law. "The only principles of law . . . which can affect this case," Justice Iredell wrote, "[are] those that are derived from what is properly termed 'the common law,' a law which I presume is the ground-work of the laws in every State in the Union, and which I consider, so far as it is applicable to the peculiar circumstances of the country, and where no special act of Legislation controuls it, to be in force in each State, as it existed in England, (unaltered by any statute) at the time of the first settlement of the country." 2 Dall., at 435 (emphasis deleted). See also *Employees of Dept. of Public Health and Welfare of Mo.* v. *Department of Public Health and Welfare of Mo.*, 411 U. S. 279, 288 (1973) (Marshall, J., concurring in result) ("Sovereign immunity is a common-law doctrine that long predates our Constitution and the Eleventh Amendment, although it has, of course, been carried forward in our jurisprudence"); R. Watkins, The State as a Party Litigant 51–52 (1927) ("It thus seems probable that the doctrine of state immunity was accepted rather as an existing fact by the people of the states, than adopted as a theory. It was a matter of universal practice, and was accepted from the mother country along with the rest of the common law of England applicable to our changed state and condition").

have functioned as a limitation on their understanding of the new Nation's constitutional powers, this turns out not to be so at all. One of the characteristics of the founding generation, on the contrary, was its joinder of an appreciation of its immediate and powerful common-law heritage with caution in settling that inheritance on the political systems of the new Republic. It is not that the Framers failed to see themselves to be children of the common law; as one of their contemporaries put it, "[w]e live in the midst of the common law, we inhale it at every breath, imbibe it at every pore . . . [and] cannot learn another system of laws without learning at the same time another language." P. Du Ponceau, A Dissertation on the Nature and Extent of Jurisdiction of Courts of the United States 91 (1824). But still it is clear that the adoption of English common law in America was not taken for granted, and that the exact manner and extent of the common law's reception were subject to careful consideration by courts and legislatures in each of the new States.[27] An examination of the States' experience with common-law reception will shed light on subsequent theory and practice at the national level, and demonstrate that our history is entirely at odds with *Hans*'s resort to a common-law principle to limit the Constitution's contrary text.

1

This American reluctance to import English common law wholesale into the New World is traceable to the early colonial period. One scholar of that time has written that "[t]he

---

[27] See, *e. g.*, Hall, The Common Law: An Account of its Reception in the United States, 4 Vand. L. Rev. 791, 796 (1951) ("Whether we emphasize the imitation by the colonists of the practices of English local courts or whether we say the early colonial judges were really applying their own common-sense ideas of justice, the fact remains that there was an incomplete acceptance in America of English legal principles, and this indigenous law which developed in America remained as a significant source of law after the Revolution").

process which we may call the reception of the English common law by the colonies was not so simple as the legal theory would lead us to assume. While their general legal conceptions were conditioned by, and their terminology derived from, the common law, the early colonists were far from applying it as a technical system, they often ignored it or denied its subsidiary force, and they consciously departed from many of its most essential principles." P. Reinsch, English Common Law in the Early American Colonies 58 (1899).[28] For a variety of reasons, including the absence of trained lawyers and judges, the dearth of law books, the religious and ideological commitments of the early settlers, and the novel conditions of the New World, the colonists turned to a variety of other sources in addition to principles of common law.[29]

It is true that, with the development of colonial society and the increasing sophistication of the colonial bar, English common law gained increasing acceptance in colonial practice. See *id.*, at 7–8; Hall, The Common Law: An Account of its Reception in the United States, 4 Vand. L. Rev. 791,

---

[28] See also Jones, The Common Law in the United States: English Themes and American Variations, in Political Separation and Legal Continuity 95–98 (H. Jones ed. 1976) (Jones) (acknowledging that a true common-law system had not yet developed in the early colonial period); Stoebuck, Reception of English Common Law in the American Colonies, 10 Wm. & Mary L. Rev. 393, 406–407 (1968) (same).

[29] See, *e. g.*, Reinsch, English Common Law in the Early American Colonies, at 7 (finding that the colonists developed their own "rude, popular, summary" system of justice despite professed adhesion to the common law); C. Hilkey, Legal Development in Colonial Massachusetts, 1630–1686, p. 69 (1967) (emphasizing Biblical and indigenous sources); Radin, The Rivalry of Common-Law and Civil Law Ideas in the American Colonies, in 2 Law: A Century of Progress 404, 407–411 (1937) (emphasizing natural law and Roman law); Goebel, King's Law and Local Custom in Seventeenth Century New England, 31 Colum. L. Rev. 416 (1931) (finding that the early settlers imported the law and procedure of the borough and manor courts with which they had been familiar in England).

797 (1951).[30]  But even in the late colonial period, Americans insisted that

> "the whole body of the common law . . . was not transplanted, but only so much as was applicable to the colonists in their new relations and conditions. Much of the common law related to matters which were purely local, which existed under the English political organization, or was based upon the triple relation of king, lords and commons, or those peculiar social conditions, habits and customs which have no counterpart in the New World. Such portions of the common law, not being applicable to the new conditions of the colonists, were never recognised as part of their jurisprudence." Dale, The Adoption of the Common Law by the American Colonies, 30 Am. L. Reg. 553, 554 (1882).[31]

The result was that "the increasing influx of common-law principles by no means obliterated the indigenous systems which had developed during the colonial era and that there existed important differences in law in action on the two sides of the Atlantic." Hall, *supra*, at 797.

---

[30] See also Stoebuck, *supra*, at 411–412 (indicating that the Colonies became significantly more receptive to the common law after 1700, in part because of a British desire to regularize colonial legal systems).

[31] See also Jones 98 ("The selective nature of the reception is evident in any examination of the state of law in the colonies in the years immediately preceding the Revolution"). An example is Trott's law, adopted by South Carolina in 1712, which declared which English statutes were in force in the Colony. Many laws of England, Trott conceded, were "altogether useless" in South Carolina "by reason of the different way of agriculture and the differing productions of the earth of this Province from that of England"; others were "impracticable" because of differences in institutions. L. Friedman, A History of American Law 90–93 (2d ed. 1985); see also C. Warren, History of the American Bar 122–123 (1911) (quoting North Carolina statute, passed in 1715, providing that the common law would be in force "'so far as shall be compatible with our way of living and trade'").

Understandably, even the trend toward acceptance of the common law that had developed in the late colonial period was imperiled by the Revolution and the ultimate break between the Colonies and the old country. Dean Pound has observed that, "[f]or a generation after the Revolution, . . . political conditions gave rise to a general distrust of English law. . . . The books are full of illustrations of the hostility toward English law simply because it was English which prevailed at the end of the eighteenth and in the earlier years of the nineteenth century." R. Pound, The Formative Era of American Law 7 (1938); see also C. Warren, A History of the American Bar 224–225 (1911) (noting a "prejudice against the system of English Common Law" in the years following the Revolution). James Monroe went so far as to write in 1802 that "'the application of the principles of the English common law to our constitution'" should be considered "'good cause for impeachment.'" Letter from James Monroe to John Breckenridge, Jan. 15, 1802 (quoted in 3 A. Beveridge, The Life of John Marshall: Conflict and Construction 1800–1815, p. 59 (1919)).[32]  Nor was anti-English senti-

---

[32] American hostility to things English was so pronounced for a time that Pennsylvania, New Jersey, and Kentucky proscribed by statute the citation of English decisions in their courts, and the New Hampshire courts promulgated a rule of court to the same effect. See Hall, 4 Vand. L. Rev., at 806; Warren, *supra*, at 227. This hostility may appear somewhat paradoxical in view of the colonists' frequent insistence during the revolutionary crisis that they were entitled to common-law rights. See, *e. g.*, First Continental Congress Declaration and Resolves (1774), in Documents Illustrative of the Formation of the Union of the American States, H. R. Doc. No. 398, 69th Cong., 1st Sess., 1, 3 (C. Tansill ed. 1927) ("That the respective colonies are entitled to the common law of England"). In this context, however, the colonists were referring "not to the corpus of English case-law doctrine but to such profoundly valued common law procedures as trial by jury and the subjection of governmental power to what John Locke had called the 'standing laws,'" such as Magna Carta, the Petition of Right, the Bill of Rights of 1689, and the Act of Settlement of 1701. Jones 110; see also Jay, Origins of Federal Common Law: Part Two, 133 U. Pa. L. Rev. 1231, 1256 (1985) (Jay II) (noting that "Antifederalists

ment the only difficulty; according to Dean Pound, "[s]ocial and geographical conditions contributed also to make the work of receiving and reshaping the common law exceptionally difficult." Pound, *supra*, at 7.

The consequence of this anti-English hostility and awareness of changed circumstances was that the independent States continued the colonists' practice of adopting only so much of the common law as they thought applicable to their local conditions.[33] As Justice Story explained, "[t]he com-

---

used the term common law to mean the great rights associated with due process"). The cardinal principles of this common-law vision were parliamentary supremacy and the rule of law, conceived as the axiom that "all members of society, government officials as well as private persons, are equally responsible to the law and . . . 'equally amenable to the jurisdiction of ordinary tribunals.'" Jones 128–129 (quoting A. Dicey, Introduction to Study of the Law of Constitution 192 (9th ed. 1939)). It is hard to imagine that the doctrine of sovereign immunity, so profoundly at odds with both these cardinal principles, could have been imported to America as part of this more generalized common-law vision.

[33] See, *e. g.*, *Conner* v. *Shepherd*, 15 Mass. 164 (1818) (rejecting English common-law rule regarding assignment of dower rights as inapplicable to the state and condition of land in Massachusetts); *Parker & Edgarton* v. *Foote*, 19 Wend. 309, 318 (N. Y. 1838) (rejecting English rule entitling a landowner to damages for the stopping of his lights; the court noted that "[i]t cannot be necessary to cite cases to prove that those portions of the common law of England which are hostile to the spirit of our institutions, or which are not adapted to the existing state of things in this country, form no part of our law"); *Fitch* v. *Brainerd*, 2 Conn. 163, 189 (1805) (accepting English common-law rule barring married woman from disposing of her real estate by will, and observing that "it long since became necessary . . . to make [the English common law] our own, by practical *adoption*—with such exceptions as a diversity of circumstances, and the incipient customs of our own country, required") (emphasis in original); *Martin* v. *Bigelow*, 2 Aiken 184 (Vt. 1827) (declaring English common law as to stream rights inappropriate for conditions of Vermont waterways); *Hall* v. *Smith*, 1 Bay 330, 331 (S. C. Sup. Ct. 1793) (refusing to apply strict English rules regarding promissory notes as unsuited to the "local situation of *Carolina*"). See also Hall, *supra*, at 805 ("[A] review of the cases shows that no matter what the wording of the reception statute or constitutional provision of the particular state, the rule developed, which was

mon law of England is not to be taken in all respects to be that of America. Our ancestors brought with them its general principles, and claimed it as their birthright; but they brought with them and adopted only that portion which was applicable to their situation." *Van Ness* v. *Pacard,* 2 Pet. 137, 144 (1829). In 1800, John Marshall had expressed the similar view that "our ancestors brought with them the laws of England, both statute & common law as existing at the settlement of each colony, so far as they were applicable to our situation." Letter from John Marshall to St. George Tucker, Nov. 27, 1800, reprinted in Jay II, App. A, at 1326, 1327. Accordingly, in the period following independence, "[l]egislatures and courts and doctrinal writers had to test the common law at every point with respect to its applicability to America." Pound, *supra,* at 20; see also Jones 103 (observing that "suitab[ility] to local institutions and conditions" was "incomparably the most important" principle of reception in the new States).

2

While the States had limited their reception of English common law to principles appropriate to American conditions, the 1787 draft Constitution contained no provision for adopting the common law at all. This omission stood in sharp contrast to the state constitutions then extant, virtually all of which contained explicit provisions dealing with common-law reception. See n. 55, *infra.* Since the experience in the States set the stage for thinking at the national level, see generally G. Wood, Creation of the American Republic, 1776–1787, p. 467 (1969) (Wood), this failure to address the notion of common-law reception could not have been inadvertent. Instead, the Framers chose to recognize only particular common-law concepts, such as the writ of ha-

---

sooner or later to be repeated in practically every American jurisdiction, that only those principles of the common law were received which were applicable to the local situation").

beas corpus, U. S. Const., Art. I, § 9, cl. 2, and the distinction between law and equity, U. S. Const., Amdt. 7, by specific reference in the constitutional text. See 1 J. Goebel, Oliver Wendell Holmes Devise History of the Supreme Court of the United States, Antecedents and Beginnings to 1801, pp. 229–230 (1971).[34] This approach reflected widespread agreement that ratification would not itself entail a general reception of the common law of England. See Letter from John Marshall to St. George Tucker, Nov. 27, 1800, reprinted in Jay II, App. A, at 1326 ("I do not believe one man can be found" who maintains "that the common law of England has . . . been adopted as the common law of America by the Constitution of the United States"); Jay II, at 1255 (noting that the use of the term "laws" in Article III "could not have been meant to accomplish a general reception of British common law").

Records of the ratification debates support Marshall's understanding that everyone had to know that the new Constitution would not draw the common law in its train. Antifederalists like George Mason went so far as to object that

---

[34] See also Jones 123–124 (noting that the common-law institutions of habeas corpus and jury trial were "not merely received as ordinary law," but rather "received by [specific textual provisions] of the Constitution itself, as part of the supreme law of the land"). Sovereign immunity, of course, was not elevated to constitutional status in this way; such immunity thus stands on the same footing as any other common-law principle which the Framers refused to place beyond the reach of legislative change. That such principles were and are subject to legislative alteration is confirmed by our treatment of other forms of common-law immunities, such as the immunity enjoyed under certain circumstances by public officials. *Butz* v. *Economou*, 438 U. S. 478, 508 (1978) (officer immunity is derived from the common law); *Imbler* v. *Pachtman*, 424 U. S. 409, 421 (1976) (same). In this context, "our immunity decisions have been informed by the common law" only "in the absence of explicit . . . congressional guidance." *Nixon* v. *Fitzgerald*, 457 U. S. 731, 747 (1982). See generally *ante*, at 87–88 (STEVENS, J., dissenting); Jackson, 98 Yale L. J., at 75–104. Surely no one would deny Congress the power to abrogate those immunities if it should so choose.

under the proposed Constitution the people would not be "secured even in the enjoyment of the benefit of the common law." Mason, Objections to This Constitution of Government, in 2 Records of the Federal Convention of 1787, p. 637 (M. Farrand ed. 1911) (Farrand); see also 3 Elliot's Debates 446–449 (Patrick Henry, Virginia Convention). In particular, the Antifederalists worried about the failure of the proposed Constitution to provide for a reception of "the great rights associated with due process" such as the right to a jury trial, Jay II, at 1256, and they argued that "Congress's powers to regulate the proceedings of federal courts made the fate of these common-law procedural protections uncertain," id., at 1257.[35] While Federalists met this objection by arguing that nothing in the Constitution necessarily excluded the fundamental common-law protections associated with due process, see, e. g., 3 Elliot's Debates 451 (George Nicholas, Virginia Convention), they defended the decision against any general constitutional reception of the common law on the ground that constitutionalizing it would render it "immutable," see id., at 469–470 (Edmund Randolph, Virginia Convention), and not subject to revision by Congress, id., at 550 (Edmund Pendleton, Virginia Convention); see also infra, at 163–164.

The Framers also recognized that the diverse development of the common law in the several States made a general federal reception impossible. "The common law was not the same in any two of the Colonies," Madison observed; "in some the modifications were materially and extensively different." Report on the Virginia Resolutions, House of Delegates, Session of 1799–1800, Concerning Alien and Sedition Laws, in 6 Writings of James Madison 373 (G. Hunt ed. 1906)

---

[35] See, e. g., 2 Elliot's Debates 400 (Thomas Tredwell, New York Convention) ("[W]e are ignorant whether [federal proceedings] shall be according to the common, civil, the Jewish, or Turkish law . . .").

(Alien and Sedition Laws).[36] In particular, although there is little evidence regarding the immunity enjoyed by the various colonial governments prior to the Revolution, the profound differences as to the source of colonial authority between chartered colonies, royal colonies, and so on seems unlikely, wholly apart from other differences in circumstance, to have given rise to a uniform body of immunity law. There was not, then, any unified "Common Law" in America that the Federal Constitution could adopt, Jay I, at 1056; Stoebuck, Reception of English Common Law in the American Colonies, 10 Wm. & Mary L. Rev. 393, 401 (1968) ("The assumption that colonial law was essentially the same in all colonies is wholly without foundation"), and, in particular, probably no common principle of sovereign immunity, cf. Alien and Sedition Laws 376. The Framers may, as Madison, Hamilton, and Marshall argued, have contemplated that federal courts would respect state immunity law in diversity cases, but the generalized principle of immunity that today's majority would graft onto the Constitution itself may well never have developed with any common clarity and, in any event, has not been shown to have existed.

Finally, the Framers' aversion to a general federal reception of the common law is evident from the Federalists' re-

---

[36] See also Justice Jay's Charge to the Grand Jury for the District of New York (Apr. 4, 1790) (observing that at the time the Nation was formed, "[o]ur jurisprudence varied in almost every State, and was accommodated to local, not general convenience—to partial, not national policy") (quoted in Jay, Origins of Federal Common Law: Part One, 133 U. Pa. L. Rev. 1003, 1056, n. 261 (1985) (Jay I)); *United States* v. *Worrall*, 28 F. Cas. 774, 779 (No. 16,766) (CC Pa. 1798) (Chase, J.) (noting that "[t]he common law . . . of one state, is not the common law of another"); 8 Annals of Cong. 2137 (1798) (statement of Rep. Albert Gallatin) (asserting that there could be no national common law because "[t]he common law of Great Britain received in each colony, had in every one received modifications arising from their situation . . . and now each State had a common law, in its general principles the same, but in many particulars differing from each other").

sponse to the Antifederalist claim that Article III granted an unduly broad jurisdiction to the federal courts. That response was to emphasize the limited powers of the National Government. See, *e. g.,* 3 Elliot's Debates 553 (John Marshall, Virginia Convention) ("Has the government of the United States power to make laws on every subject? . . . Can they make laws affecting the mode of transferring property, or contracts, or claims, between citizens of the same state? Can they go beyond the delegated powers?"); Jay II, at 1260.[37] That answer assumes, of course, no generalized reception of English common law as federal law; otherwise, "arising under" jurisdiction would have extended to any subject comprehended by the general common law.

Madison made this assumption absolutely clear during the subsequent debates over the Alien and Sedition Acts, which raised the issue of whether the Framers intended to recognize a general federal jurisdiction to try common-law crimes. Rejecting the idea of any federal reception, Madison insisted that

> "the consequence of admitting the common law as the law of the United States, on the authority of the individual States, is as obvious as it would be fatal. As this law relates to every subject of legislation, and would be paramount to the Constitutions and laws of the States, the admission of it would overwhelm the residuary sovereignty of the States, and by one constructive operation new model the whole political fabric of the country." Alien and Sedition Laws 381.

See also 1 Goebel, Oliver Wendell Holmes Devise History of the Supreme Court of the United States, at 651–655 (discuss-

---

[37] See also Jay II, at 1241–1250 (arguing that Jeffersonian Republicans resisted the idea of a general federal reception of the common law as an incursion on States' rights); Jay I, at 1111 (same). Given the roots of the Framers' resistance, the Court's reception of the English common law into the Constitution itself in the very name of state sovereignty goes beyond the limits of irony.

ing the lack of evidence to support the proposition that the Framers intended a general reception of the English common law through the Constitution); Jay II, at 1254 (arguing that "[i]t would have been untenable to maintain that the body of British common law had been adopted by the Constitution . . . "). Madison concluded that

> "[i]t is . . . distressing to reflect that it ever should have been made a question, whether the Constitution, on the whole face of which is seen so much labor to enumerate and define the several objects of Federal power, could intend to introduce in the lump, in an indirect manner, and by a forced construction of a few phrases, the vast and multifarious jurisdiction involved in the common law—a law filling so many ample volumes; a law overspreading the entire field of legislation; and a law that would sap the foundation of the Constitution as a system of limited and specified powers." Alien and Sedition Laws 382.

## B

Given the refusal to entertain any wholesale reception of common law, given the failure of the new Constitution to make any provision for adoption of common law as such, and given the protests already quoted that no general reception had occurred, the *Hans* Court and the Court today cannot reasonably argue that something like the old immunity doctrine somehow slipped in as a tacit but enforceable background principle. But see *ante*, at 72. The evidence is even more specific, however, that there was no pervasive understanding that sovereign immunity had limited federal-question jurisdiction.

### 1

As I have already noted briefly, see *supra*, at 105–106, the Framers and their contemporaries did not agree about the

place of common-law state sovereign immunity even as to federal jurisdiction resting on the Citizen-State Diversity Clauses. Edmund Randolph argued in favor of ratification on the ground that the immunity would not be recognized, leaving the States subject to jurisdiction.[38] Patrick Henry opposed ratification on the basis of exactly the same reading. See 3 Elliot's Debates 543. On the other hand, James Madison, John Marshall, and Alexander Hamilton all appear to have believed that the common-law immunity from suit would survive the ratification of Article III, so as to be at a State's disposal when jurisdiction would depend on diversity. This would have left the States free to enjoy a traditional immunity as defendants without barring the exercise of judicial power over them if they chose to enter the federal courts as diversity plaintiffs or to waive their immunity as diversity defendants. See id., at 533 (Madison: the Constitution "give[s] a citizen a right to be heard in the federal courts; and if a state should condescend to be a party, this court may take cognizance of it");[39] id., at 556 (Marshall: "I see a diffi-

---

[38] See 3 Elliot's Debates 573 (the Constitution would "render valid and effective existing claims" against the States). See also 2 id., at 491 (James Wilson, in the Pennsylvania ratification debate: "When a citizen has a controversy with another state, there ought to be a tribunal where both parties may stand on a just and equal footing"). Wilson, as I noted above, took a similar position in addressing the federal question, or arising under, clause, remarking that the effect of the clause would be to require States to honor pre-Revolutionary debt owed to English merchants, as had been promised in the Treaty of 1783. See n. 4, supra.

[39] The Court accuses me of quoting this statement out of context, ante, at 70, n. 12, but the additional material included by the Court makes no difference. I am conceding that Madison, Hamilton, and Marshall all agreed that Article III did not of its own force abrogate the States' preexisting common-law immunity, at least with respect to diversity suits. None of the statements offered by the Court, however, purports to deal with federal-question jurisdiction or with the question whether Congress, acting pursuant to its Article I powers, could create a cause of action against a State. As I explain further below, the views of Madison and his

culty in making a state defendant, which does not prevent its being plaintiff"). As Hamilton stated in The Federalist No. 81:

> "It is inherent in the nature of sovereignty, not to be amenable to the suit of an individual *without its consent.* This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every state in the Union. Unless therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the states, and the danger intimated must be merely ideal." The Federalist No. 81, pp. 548–549 (J. Cooke ed. 1961).

See generally Fletcher, A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction, 35 Stan. L. Rev. 1033, 1045–1054 (1983) (discussing the adoption of the Citizen-State Diversity Clauses); Gibbons, 83 Colum. L. Rev., at 1902–1914. The majority sees in these statements, and chiefly in Hamilton's discussion of sovereign immunity in The Federalist No. 81, an unequivocal mandate "which would preclude all federal jurisdiction over an unconsenting State." *Ante,* at 70. But there is no such mandate to be found.

As I have already said, the immediate context of Hamilton's discussion in Federalist No. 81 has nothing to do with federal-question cases. It addresses a suggestion "that an assignment of the public securities of one state to the citizens of another, would enable them to prosecute that state in the federal courts for the amount of those securities." The Federalist No. 81, at 548. Hamilton is plainly talking about a

---

allies on this more difficult question can be divined, if at all, only by reference to the more extended discussions by Hamilton in The Federalist No. 32, and by Justice Iredell in his *Chisholm* dissent. Both those discussions, I submit, tend to support a congressional power of abrogation.

suit subject to a federal court's jurisdiction under the Citizen-State Diversity Clauses of Article III.

The general statement on sovereign immunity emphasized by the majority then follows, along with a reference back to The Federalist No. 32. The Federalist No. 81, at 548. What Hamilton draws from that prior paper, however, is not a general conclusion about state sovereignty but a particular point about state contracts:

> "A recurrence to the principles there established will satisfy us, that there is no colour to pretend that the state governments, would by the adoption of that plan, be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith. The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force. They confer no right of action independent of the sovereign will." *Id.*, at 549.

The most that can be inferred from this is, as noted above, that in diversity cases applying state contract law the immunity that a State would have enjoyed in its own courts is carried into the federal court. When, therefore, the *Hans* Court relied in part upon Hamilton's statement, see 134 U. S., at 20, its reliance was misplaced; Hamilton was addressing diversity jurisdiction, whereas *Hans* involved federal-question jurisdiction under the Contracts Clause. No general theory of federal-question immunity can be inferred from Hamilton's discussion of immunity in contract suits. But that is only the beginning of the difficulties that accrue to the majority from reliance on The Federalist No. 81.

Hamilton says that a State is "not . . . amenable to the suit of an individual without its consent . . . . [u]nless . . . there is a surrender of this immunity in the plan of the convention." The Federalist No. 81, at 548–549 (emphasis deleted). He

immediately adds, however, that "[t]he circumstances which are necessary to produce an alienation of state sovereignty, were discussed in considering the article of taxation, and need not be repeated here." *Id.*, at 549. The reference is to The Federalist No. 32, also by Hamilton, which has this to say about the alienation of state sovereignty:

> "[A]s the plan of the Convention aims only at a partial Union or consolidation, the State Governments would clearly retain all the rights of sovereignty which they before had and which were not by that act *exclusively* delegated to the United States. This exclusive delegation or rather this alienation of State sovereignty would only exist in three cases; where the Constitution in express terms granted an exclusive authority to the Union; where it granted in one instance an authority to the Union and in another prohibited the States from exercising the like authority; and where it granted an authority to the Union, to which a similar authority in the States would be absolutely and totally *contradictory* and *repugnant.* I use these terms to distinguish this last case from another which might appear to resemble it; but which would in fact be essentially different; I mean where the exercise of a concurrent jurisdiction might be productive of occasional interferences in the *policy* of any branch of administration, but would not imply any direct contradiction or repugnancy in point of constitutional authority." *Id.*, at 200 (emphasis in original).

As an instance of the last case, in which exercising concurrent jurisdiction may produce interferences in "policy," Hamilton gives the example of concurrent power to tax the same subjects:

> "It is indeed possible that a tax might be laid on a particular article by a State which might render it *inexpedient* that thus a further tax should be laid on the same article

by the Union; but it would not imply a constitutional inability to impose a further tax. The quantity of the imposition, the expediency or inexpediency of an increase on either side, would be mutually questions of prudence; but there would be involved no direct contradiction of power. The particular policy of the national and of the State systems of finance might now and then not exactly coincide, and might require reciprocal forbearances. It is not however a mere possibility of inconvenience in the exercise of powers, but an immediate constitutional repugnancy, that can by implication alienate and extinguish a pre-existing right of sovereignty." *Id.*, at 202 (emphasis in original).

The first embarrassment Hamilton's discussion creates for the majority turns on the fact that the power to regulate commerce with Indian tribes has been interpreted as making "Indian relations . . . the exclusive province of federal law." *County of Oneida* v. *Oneida Indian Nation of N. Y.*, 470 U. S., at 234.[40] We have accordingly recognized that "[s]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply." *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 170–171 (1973) (internal quotation marks omitted); see also *Rice* v. *Olson*, 324 U. S. 786, 789 (1945) ("The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's

---

[40] See also *Worcester* v. *Georgia*, 6 Pet. 515, 560–561 (1832) ("The Cherokee nation . . . is a distinct community . . . in which the laws of Georgia can have no force. . . . The whole intercourse between the United States and this nation, is, by our Constitution and laws, vested in the government of the United States"). This Court has repeatedly rejected state attempts to assert sovereignty over Indian lands. See, *e. g., The New York Indians*, 5 Wall. 761, 769 (1867) (rejecting state attempt to tax reservation lands); *Worcester, supra*, at 561–563 (nullifying an attempted prosecution by the State of Georgia of a person who resided on Indian lands in violation of state law).

history").[41] We have specifically held, moreover, that the States have no power to regulate gambling on Indian lands. *California* v. *Cabazon Band of Mission Indians*, 480 U. S. 202, 221–222 (1987). In sum, since the States have no sovereignty in the regulation of commerce with the tribes, on Hamilton's view there is no source of sovereign immunity to assert in a suit based on congressional regulation of that commerce. If Hamilton is good authority, the majority of the Court today is wrong.

Quite apart, however, from its application to this particular Act of Congress exercising the Indian commerce power, Hamilton's sovereignty discussion quoted above places the Court in an embarrassing dilemma. Hamilton posited four categories: congressional legislation on (a) subjects committed expressly and exclusively to Congress, (b) subjects over which state authority is expressly negated, (c) subjects over which concurrent authority would be impossible (as "contradictory and repugnant"), and (d) subjects over which concurrent authority is not only possible, but its exercise by both is limited only by considerations of policy (as when one taxing authority is politically deterred from adding too much to the exaction the other authority is already making). But what of those situations involving concurrent powers, like the power over interstate commerce, see, *e. g.*, *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299 (1852) (recognizing power of States to engage in some regulation of interstate commerce), when a congressional statute not only binds the States but even creates an affirmative obligation on the State

---

[41] Although we have rejected a *per se* bar to state jurisdiction, it is clear that such jurisdiction remains the exception and not the rule. See *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324, 331–332 (1983) (footnotes omitted) ("[U]nder certain circumstances a State may validly assert authority over the activities of nonmembers on a reservation, and . . . in exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members").

as such, as in this case? Hamilton's discussion does not seem to cover this (quite possibly because, as a good political polemicist, he did not wish to raise it). If in fact it is fair to say that Hamilton does not cover this situation, then the Court cannot claim him as authority for the preservation of state sovereignty and consequent immunity. If, however, on what I think is an implausible reading, one were to try to shoehorn this situation into Hamilton's category (c) (on the theory that concurrent authority is impossible after passage of the congressional legislation), then any claim of sovereignty and consequent immunity is gone entirely.

In sum, either the majority reads Hamilton as I do, to say nothing about sovereignty or immunity in such a case, or it will have to read him to say something about it that bars any state immunity claim. That is the dilemma of the majority's reliance on Hamilton's The Federalist No. 81, with its reference to No. 32. Either way, he is no authority for the Court's position.

Thus, the Court's attempt to convert isolated statements by the Framers into answers to questions not before them is fundamentally misguided.[42] The Court's difficulty is far more fundamental, however, than inconsistency with a particular quotation, for the Court's position runs afoul of the general theory of sovereignty that gave shape to the Framers' enterprise. An enquiry into the development of that concept demonstrates that American political thought had so revolutionized the concept of sovereignty itself that calling

---

[42] See The Federalist No. 82, p. 553 (J. Cooke ed. 1961) (A. Hamilton) (disclaiming any intent to answer all the "questions of intricacy and nicety" arising in a judicial system that must accommodate "the total or partial incorporation of a number of distinct sovereignties"); S. Elkins & E. McKitrick, The Age of Federalism 64 (1993) (suggesting that "[t]he amount of attention and discussion given to the judiciary in the Constitutional Convention was only a fraction of that devoted to the executive and legislative branches," and that the Framers deliberately left many questions open for later resolution).

for the immunity of a State as against the jurisdiction of the national courts would have been sheer illogic.

## 2

We said in *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 779 (1991), that "the States entered the federal system with their sovereignty intact," but we surely did not mean that they entered that system with the sovereignty they would have claimed if each State had assumed independent existence in the community of nations, for even the Articles of Confederation allowed for less than that. See Articles of Confederation, Art. VI, § 1 ("No State without the consent of the United States in Congress assembled, shall send any embassy to, or receive any embassy from, or enter into any conference, agreement, alliance or treaty with any king, prince or state . . ."). While there is no need here to calculate exactly how close the American States came to sovereignty in the classic sense prior to ratification of the Constitution, it is clear that the act of ratification affected their sovereignty in a way different from any previous political event in America or anywhere else. For the adoption of the Constitution made them members of a novel federal system that sought to balance the States' exercise of some sovereign prerogatives delegated from their own people with the principle of a limited but centralizing federal supremacy.

As a matter of political theory, this federal arrangement of dual delegated sovereign powers truly was a more revolutionary turn than the late war had been. See, *e. g.*, *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 838 (1995) (KENNEDY, J., concurring) ("Federalism was our Nation's own discovery. The Framers split the atom of sovereignty").[43] Before the new federal scheme appeared, 18th-

---

[43] Regardless of its other faults, Chief Justice Taney's opinion in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), recognized as a structural matter that "[t]he new Government was not a mere change in a dynasty, or in a form of government, leaving the nation or sovereignty the same, and

century political theorists had assumed that "there must reside somewhere in every political unit a single, undivided, final power, higher in legal authority than any other power, subject to no law, a law unto itself." B. Bailyn, The Ideological Origins of the American Revolution 198 (1967); see also Wood 345.[44] The American development of divided sovereign powers, which "shatter[ed] . . . the categories of government that had dominated Western thinking for centuries," id., at 385, was made possible only by a recognition that the ultimate sovereignty rests in the people themselves. See id., at 530 (noting that because "none of these arguments about 'joint jurisdictions' and 'coequal sovereignties' convincingly refuted the Antifederalist doctrine of a supreme and indivisible sovereignty," the Federalists could succeed only by emphasizing that the supreme power "'*resides* in the PEOPLE, as the fountain of government'" (citing 1 Pennsylvania and the Federal Constitution, 1787–1788, p. 302 (J. McMaster & F. Stone eds. 1888) (quoting James Wilson)).[45] The People possessing this plenary bundle of specific powers

---

clothed with all the rights, and bound by all the obligations of the preceding one." *Id.*, at 441. See also F. McDonald, Novus Ordo Seclorum: The Intellectual Origins of the Constitution 276 (1985) ("The constitutional reallocation of powers created a new form of government, unprecedented under the sun . . ."); S. Beer, To Make a Nation: The Rediscovery of American Federalism 150–151 (1993) (American view of sovereignty was "radically different" from that of British tradition).

[44] Cf., *e. g.*, 1 W. Blackstone, Commentaries 49, 160–162 (Cooper ed. 1803). This modern notion of sovereignty is traceable to the writings of Jean Bodin in the late 16th century. See J. Bodin, Six Books of the Commonwealth, bk. 2, ch. I, pp. 52–53 (M. Tooley, abr. & transl. 1967) (1576); see also T. Hobbes, Leviathan, Part II, ch. 29, pp. 150–151 (N. Fuller ed. 1952) (1651).

[45] See Wood 530 (noting that James Wilson "[m]ore boldly and fully than anyone else . . . developed the argument that would eventually become the basis of all Federalist thinking" about sovereignty); see also The Federalist No. 22, at 146 (A. Hamilton) (acknowledging the People as "that pure original fountain of all legitimate authority"); *id.*, No. 49, at 339 (J. Madison) ("[T]he people are the only legitimate fountain of power").

were free to parcel them out to different governments and different branches of the same government as they saw fit. See F. McDonald, Novus Ordo Seclorum: The Intellectual Origins of the Constitution 278 (1985). As James Wilson emphasized, the location of ultimate sovereignty in the People meant that "[t]hey can distribute one portion of power to the more contracted circle called State governments; they can also furnish another proportion to the government of the United States." 1 Pennsylvania and the Federal Constitution, 1787–1788, *supra*, at 302.[46]

Under such a scheme, Alexander Hamilton explained, "[i]t does not follow . . . that each of the *portions* of powers delegated to [the national or state government] is not sovereign *with regard to its proper objects.*" Hamilton, Opinion on the Constitutionality of an Act to Establish a Bank, in 8 Papers of Alexander Hamilton 98 (Syrett ed. 1965) (emphasis in original).[47] A necessary consequence of this view was that "the Government of the United States has sovereign power as to its declared purposes & trusts." *Ibid.* Justice Iredell was to make the same observation in his *Chisholm* dissent, commenting that "[t]he *United States* are sovereign as to all the powers of Government actually surrendered: Each State in the *Union* is sovereign as to all the powers reserved." 2 Dall., at 435. And to the same point was Chief Justice Mar-

---

[46] See also *U. S. Term Limits, Inc.* v. *Thornton,* 514 U. S. 779, 838 (1995) (KENNEDY, J., concurring) (the Constitution "created a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it").

[47] See Amar, 96 Yale L. J., at 1434–1435 ("The ultimate American answer [to the British notion that the sovereign was by definition above the law], in part, lay in a radical redefinition of *governmental* 'sovereignty.' Just as a corporation could be delegated limited sovereign privileges by the King-in-Parliament, so governments could be delegated limited powers to govern. Within the limitations of their charters, governments could be sovereign, but that sovereignty could be bounded by the terms of the delegation itself" (footnote omitted)).

shall's description of the National and State Governments as "each sovereign, with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other." *McCulloch* v. *Maryland*, 4 Wheat. 316, 410 (1819).

Given this metamorphosis of the idea of sovereignty in the years leading up to 1789, the question whether the old immunity doctrine might have been received as something suitable for the new world of federal-question jurisdiction is a crucial one.[48]  The answer is that sovereign immunity as it would have been known to the Framers before ratification thereafter became inapplicable as a matter of logic in a federal suit raising a federal question.  The old doctrine, after all, barred the involuntary subjection of a sovereign to the system of justice and law of which it was itself the font, since to do otherwise would have struck the common-law mind from the Middle Ages onward as both impractical and absurd.  See, *e. g., Kawananakoa* v. *Polyblank*, 205 U. S. 349, 353 (1907) (Holmes, J.) ("A sovereign is exempt from suit . . . on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the. right depends").[49]  But the ratification demonstrated

---

[48] See, *e. g.,* Amar, *supra,* at 1436 ("By thus relocating true sovereignty in the People themselves . . . Americans domesticated government power and decisively repudiated British notions of 'sovereign' governmental omnipotence" (footnote omitted)).  That this repudiation extended to traditional principles of sovereign immunity is clear from Justice Wilson's opinion in *Chisholm,* in which he blasted "the haughty notions of state independence, state sovereignty and state supremacy" as allowing "the state [to] assum[e] a supercilious pre-eminence above the people who have formed it."  2 Dall., at 461.

[49] See also Hobbes, *supra,* at 130 ("The sovereign of a Commonwealth, be it an assembly or one man, is not subject to the civil laws. . . . For he is free that can be free when he will: nor is it possible for any person to be bound to himself, because he that can bind can release; and therefore he that is bound to himself only is not bound"); Bodin, *supra,* at 28–29 ("One may be subject to laws made by another, but it is impossible to bind oneself in any matter which is the subject of one's own free exercise of

that state governments were subject to a superior regime of law in a judicial system established, not by the State, but by the people through a specific delegation of their sovereign power to a National Government that was paramount within its delegated sphere. When individuals sued States to enforce federal rights, the Government that corresponded to the "sovereign" in the traditional common-law sense was not the State but the National Government, and any state immunity from the jurisdiction of the Nation's courts would have required a grant from the true sovereign, the people, in their Constitution, or from the Congress that the Constitution had empowered. We made a similar point in *Nevada* v. *Hall*, 440 U. S., at 416, where we considered a suit against a State in another State's courts:

> "This [traditional] explanation [of sovereign immunity] adequately supports the conclusion that no sovereign may be sued in its own courts without its consent, but it affords no support for a claim of immunity in another sovereign's courts. Such a claim necessarily implicates the power and authority of a second sovereign; its source must be found either in an agreement, express or implied, between the two sovereigns, or in the voluntary decision of the second to respect the dignity of the first as a matter of comity."

Cf. *United States* v. *Texas*, 143 U. S. 621, 646 (1892) (recognizing that a suit by the National Government against a State "does no violence to the inherent nature of sovereignty"). Subjecting States to federal jurisdiction in federal-question cases brought by individuals thus reflected nothing more than Professor Amar's apt summary that "[w]here governments are acting within the bounds of their delegated 'sovereign' power, they may partake of sovereign immunity; where

---

will. . . . It follows of necessity that the king cannot be subject to his own laws").

not, not." Amar, Of Sovereignty and Federalism, 96 Yale L. J. 1425, 1490–1491, n. 261 (1987).

State immunity to federal-question jurisdiction would, moreover, have run up against the common understanding of the practical necessity for the new federal relationship. According to Madison, the "multiplicity," "mutability," and "injustice" of then-extant state laws were prime factors requiring the formation of a new government. 1 Farrand 318–319 (remarks of J. Madison).[50] These factors, Madison wrote to Jefferson, "contributed more to that uneasiness which produced the Convention, and prepared the Public mind for a general reform, than those which accrued to our national character and interest from the inadequacy of the Confederation to its immediate objects." 5 Writings of James Madison 27 (G. Hunt ed. 1904). These concerns ultimately found concrete expression in a number of specific limitations on state power, including provisions barring the States from enacting bills of attainder or *ex post facto* laws, coining money or emitting bills of credit, denying the privileges and immunities of out-of-staters, or impairing the obligation of contracts. But the proposed Constitution also dealt with the old problems affirmatively by granting the powers to Congress enumerated in Article I, §8, and by providing through the Supremacy Clause that Congress could pre-empt state action in areas of concurrent state and federal authority.

Given the Framers' general concern with curbing abuses by state governments, it would be amazing if the scheme of delegated powers embodied in the Constitution had left the National Government powerless to render the States judicially accountable for violations of federal rights. And of course the Framers did not understand the scheme to leave

---

[50] See also Wood 466 ("[O]nce men grasped, as they increasingly did in the middle [1780's], that reform of the national government was the best means of remedying the evils caused by the state governments, then the revision of the Articles of Confederation assumed an impetus and an importance that it had not had a few years earlier").

the Government powerless. In The Federalist No. 80, at 535, Hamilton observed that "[n]o man of sense will believe that such prohibitions [running against the States] would be scrupulously regarded, without some effectual power in the government to restrain or correct the infractions of them," and that "an authority in the federal courts, to over-rule such as might be in manifest contravention of the articles of union" was the Convention's preferred remedy. By speaking in the plural of an authority in the federal "courts," Hamilton made it clear that he envisioned more than this Court's exercise of appellate jurisdiction to review federal questions decided by state courts. Nor is it plausible that he was thinking merely of suits brought against States by the National Government itself, which The Federalist's authors did not describe in the paternalistic terms that would pass without an eyebrow raised today. Hamilton's power of the Government to restrain violations of citizens' rights was a power to be exercised by the federal courts at the citizens' behest. See also Marshall, Fighting the Words of the Eleventh Amendment, 102 Harv. L. Rev. 1342, 1367–1371 (1989) (discussing the Framers' concern with preserving as much state accountability as possible even in the course of enacting the Eleventh Amendment).

This sketch of the logic and objectives of the new federal order is confirmed by what we have previously seen of the preratification debate on state sovereign immunity, which in turn becomes entirely intelligible both in what it addressed and what it ignored. It is understandable that reasonable minds differed on the applicability of the immunity doctrine in suits that made it to federal court only under the original Diversity Clauses, for their features were not wholly novel. While they were, of course, in the courts of the new and, for some purposes, paramount National Government, the law that they implicated was largely the old common law (and in any case was not federal law). It was not foolish, therefore,

to ask whether the old law brought the old defenses with it. But it is equally understandable that questions seem not to have been raised about state sovereign immunity in federal-question cases. The very idea of a federal question depended on the rejection of the simple concept of sovereignty from which the immunity doctrine had developed; under the English common law, the question of immunity in a system of layered sovereignty simply could not have arisen. Cf., *e. g.*, Jay II, at 1282–1284; Du Ponceau, A Dissertation on the Nature and Extent of Jurisdiction of Courts of the United States, at 6–7.[51] The Framers' principal objectives in rejecting English theories of unitary sovereignty, moreover, would have been impeded if a new concept of sovereign immunity had taken its place in federal-question cases, and would have been substantially thwarted if that new immunity had been held to be untouchable by any congressional effort to abrogate it.[52]

---

[51] Cf. Jay I, at 1033–1034 ("English common law might afford clues to the meaning of some terms in the Constitution, but the absence of any close federal model was recognized even at the Convention"); F. Coker, Commentary, in R. Pound, C. McIlwain, & R. Nichols, Federalism as a Democratic Process 81–82 (1942).

[52] See, *e. g.*, *Prout* v. *Starr*, 188 U. S. 537, 543 (1903) (acknowledging the immunity recognized in *Hans* and other cases, but observing that "[i]t would, indeed, be most unfortunate if the immunity of the individual States from suits by citizens of other States, provided for in the Eleventh Amendment, were to be interpreted as nullifying those other provisions which confer power on Congress . . . all of which provisions existed before the adoption of the Eleventh Amendment, which still exist, and which would be nullified and made of no effect, if the judicial power of the United States could not be invoked to protect citizens affected by the passage of state laws disregarding these constitutional limitations"). The majority contends that state compliance with federal law may be enforced by other means, *ante*, at 71, n. 14, but its suggestions are all pretty cold comfort: the enforcement resources of the Federal Government itself are limited; appellate review of state court decisions is contingent upon state consent to suit in state court, and is also called into question by the majority's rationale, see *supra*, at 114; and the Court's decision today illustrates

Today's majority discounts this concern. Without citing a single source to the contrary, the Court dismisses the historical evidence regarding the Framers' vision of the relationship between national and state sovereignty, and reassures us that "the Nation survived for nearly two centuries without the question of the existence of [the abrogation] power ever being presented to this Court." *Ante*, at 71.[53] But we are concerned here not with the survival of the Nation but the opportunity of its citizens to enforce federal rights in a way that Congress provides. The absence of any general federal-question statute for nearly a century following ratification of Article III (with a brief exception in 1800) hardly counts against the importance of that jurisdiction either in the Framers' conception or in current reality; likewise, the fact that Congress has not often seen fit to use its power of abrogation (outside the Fourteenth Amendment context, at least) does not compel a conclusion that the power is not important to the federal scheme. In the end, is it plausible

---

the uncertainty that the Court will always permit enforcement of federal law by suits for prospective relief against state officers. Moreover, the majority's position ignores the importance of citizen suits to enforcement of federal law. See, *e. g.*, *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 263 (1975) (acknowledging that, in many instances, "Congress has opted to rely heavily on private enforcement to implement public policy"); see also S. Rep. No. 94–1011, p. 2 (Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988) (recognizing that "[a]ll of these civil rights laws depend heavily upon private enforcement"); *Pennsylvania* v. *Delaware Valley Citizens' Council for Clean Air*, 483 U. S. 711, 737 (1987) (Blackmun, J., dissenting) (noting importance of citizens' suits under federal environmental laws).

[53] The Court's further assertion, that "Congress itself waited nearly a century before even conferring federal-question jurisdiction on the lower federal courts," *ante*, at 71, is simply incorrect. As I have noted, numerous early statutes conferred federal-question jurisdiction on the federal courts operating under the original Judiciary Act in particular kinds of cases, and the Judiciary Act of 1800 provided for general federal-question jurisdiction in the brief period before its repeal in 1801. See n. 12, *supra*.

to contend that the plan of the convention was meant to leave the National Government without any way to render individuals capable of enforcing their federal rights directly against an intransigent State?

## C

The considerations expressed so far, based on text, *Chisholm*, caution in common-law reception, and sovereignty theory, have pointed both to the mistakes inherent in *Hans* and, even more strongly, to the error of today's holding. Although for reasons of *stare decisis* I would not today disturb the century-old precedent, I surely would not extend its error by placing the common-law immunity it mistakenly recognized beyond the power of Congress to abrogate. In doing just that, however, today's decision declaring state sovereign immunity itself immune from abrogation in federal-question cases is open to a further set of objections peculiar to itself. For today's decision stands condemned alike by the Framers' abhorrence of any notion that such common-law rules as might be received into the new legal systems would be beyond the legislative power to alter or repeal, and by its resonance with this Court's previous essays in constitutionalizing common-law rules at the expense of legislative authority.

### 1

I have already pointed out how the views of the Framers reflected the caution of state constitutionalists and legislators over reception of common-law rules, a caution that the Framers exalted to the point of vigorous resistance to any idea that English common-law rules might be imported wholesale through the new Constitution. The state politicians also took pains to guarantee that once a common-law rule had been received, it would always be subject to legislative alteration, and again the state experience was reflected in the Framers' thought. Indeed, the Framers' very insist-

ence that no common-law doctrine would be received by virtue of ratification was focused in their fear that elements of the common law might thereby have been placed beyond the power of Congress to alter by legislation.

The imperative of legislative control grew directly out of the Framers' revolutionary idea of popular sovereignty. According to one historian, "[s]hared ideas about the sovereignty of the people and the accountability of government to the people resulted at an early date in a new understanding of the role of legislation in the legal system. . . . Whereas a constitution had been seen in the colonial period as a body of vague and unidentifiable precedents and principles of common law origin that imposed ambiguous restrictions on the power of men to make or change law, after independence it came to be seen as a written charter by which the people delegated powers to various institutions of government and imposed limitations on the exercise of those powers. . . . [T]he power to modify or even entirely to repeal the common law . . . now fell explicitly within the jurisdiction of the legislature." W. Nelson, Americanization of the Common Law 90 (1975).[54]

Virtually every state reception provision, be it constitutional or statutory, explicitly provided that the common law was subject to alteration by statute. See Wood 299–300; Jones 99. The New Jersey Constitution of 1776, for instance, provided that "the common law of England, as well as so much of the statute law, as have been heretofore practised in this Colony, shall still remain in force, until they shall

---

[54] Considering the example of Massachusetts, Professor Nelson observes that "the clearest illustration that legislation was coming to rest on the arbitrary power of a majoritarian legislature rather than on its conformity with past law and principle was the ease with which statutes altering common law rights were enacted and repealed in the 1780s in response to changing election results." Nelson, Americanization of the Common Law, at 91–92.

be altered by a future law . . . ." N. J. Const., Art. XXII (1776), in 6 W. Swindler, Sources and Documents of United States Constitutions 452 (1976).[55]  Just as the early state

---

[55] See also Del. Const., Art. 25 (1776), in 2 Swindler, Sources and Documents of United States Constitutions, at 203 ("The common law of England, as well as so much of the statute law as has been heretofore adopted in practice in this State, shall remain in force, unless they shall be altered by a future law of the legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution . . ."); Act of Feb. 25, 1784, in 1 First Laws of the State of Georgia 290 (1981) (declaring "the common laws of .England" to be "in full force" "so far as they are not contrary to the constitution, laws and form of government now established in this State"); Mass. Const., Ch. VI, Art. VI (1780), in 5 Swindler, *supra,* at 108 ("All the laws which have heretofore been adopted, used, and approved in the province, colony, or State of Massachusetts Bay . . . shall still remain and be in full force, until altered or repealed by the legislature . . ."); *Commonwealth* v. *Churchill,* 2 Met. 118, 123–124 (Mass. 1840) (Shaw, C. J.) (construing "laws" in this provision to include common law); N. H. Const., Part II (1784), in 6 Swindler, *supra,* at 356 ("All the laws which have heretofore been adopted, used and approved, in the province, colony, or state of New-Hampshire . . . shall remain and be in full force, until altered and repealed by the legislature . . ."); N. C. Laws 1778, Ch. V, in 1 First Laws of the State of North Carolina 353 (1984) ("[A]ll . . . such Parts of the Common Law, as were heretofore in Force and Use within this Territory . . . as are not destructive of, repugnant to, or incon-. sistent with the Freedom and Independence of this State, and the Form of Government therein established, and which have not been otherwise provided for, . . . not abrogated, repealed, expired, or become obsolete, are hereby declared to be in full Force within this State"); N. Y. Const., Art. XXXV (1777), in 7 Swindler, *supra,* at 177–178 ("[S]uch parts of the common law of England . . . as together did form the law of the said colony [of New York] on [April 19, 1775], shall be and continue the law of this State, subject to such alterations and provisions as the legislature of this State shall, from time to time, make concerning the same"); R. I. Digest of 1766, quoted in 1 R. Powell & P. Rohan, Powell On Real Property ¶ 62, p. 212 (1995) ("'[I]n all actions, causes, matters and things whatsoever, where there is no particular law of this colony, or act of parliament . . . then and in such cases the laws of England shall be in force for the decision and determination of the same'"); 2 T. Cooper, Statutes at Large of South Carolina 413 (1837) (Act of Dec. 12, 1712, § V) (receiving "the Common Law of England, where the same is not . . . inconsistent with the particular

governments did not leave reception of the common law to implication, then, neither did they receive it as law immune to legislative alteration.[56]

---

constitutions, customs and laws of this Province"); S. C. Const., Art. VII (1790), in 8 Swindler, *supra*, at 480 ("All laws of force in this State at the passing of this constitution shall so continue, until altered or repealed by the legislature . . ."); W. Slade, Vermont State Papers 450 (1823) (Act of June 1782) (adopting "so much of the common law of England, as is not repugnant to the constitution or to any act of the legislature of this State"); Act of May 6, 1776, Ch. V, § VI, in First Laws of the State of Virginia 37 (1982) ("the common law of *England* . . . shall be the rule of decision, and shall be considered as in full force, until the same shall be altered by the Legislative power of this colony").

Connecticut, which did not enact any reception statute or constitutional provision, adopted the common law by judicial decision insofar as it was appropriate for local conditions. See 1 Powell & Rohan, *supra*, ¶ 52, at 140–141, and n. 77; Hall, 4 Vand. L. Rev., at 800; *Fitch* v. *Brainerd*, 2 Day 163 (Conn. 1805). Maryland's position appears to have been articulated in an oath prescribed by the Assembly in 1728 for justices of the Provincial Court. The oath required that the justices act "according to the Laws, Customs, and Directions of the Acts of Assembly of this Province; and where they are silent, according to the Laws, Statutes, and reasonable Customs of England, as have been used and practiced in this Province . . . ." M. Andrews, History of Maryland 227 (1929). Finally, although Pennsylvania's reception statute did not state that the common law could be altered by legislative enactment in so many words, it may be read as assuming the primacy of legislative enactments, see 9 Statutes at Large of Pennsylvania 29–30 (Mitchell & Flanders eds. 1903) (Act of Jan. 28, 1777) (declaring prior Acts of the general assembly to still be in force, as well as "the common law and such of the statute laws of England as have heretofore been in force in the said province . . ."), and the state assembly seems to have believed it had the power to depart from common law even prior to independence. See Warren, History of the American Bar, at 103; cf. *Kirk* v. *Dean*, 2 Binn. 341, 345 (Pa. 1810) (interpreting the state constitution as permitting departures from common-law rules where local circumstances required it).

[56] It bears emphasis that, in providing for statutory alteration of the common law, the new States were in no way departing from traditional understandings. It is true that the colonial charters had generally rendered colonial legislation void to the extent that it conflicted with English common law, but this principle was simply indicative of the Colonies' legal

I have already indicated that the Framers did not forget the state-law examples. When Antifederalists objected that the 1787 draft failed to make an explicit adoption of certain common-law protections of the individual, part of the Federalists' answer was that a general constitutional reception of the common law would bar congressional revision. Madison was particularly concerned with the necessity for legislative control, noting in a letter to George Washington that "every State has made great inroads & with great propriety on this *monarchical* code." Letter from James Madison to George Washington (Oct. 18, 1787), reprinted in 3 Farrand 130, App. A (emphasis in original).[57] Madison went on to insist that

---

subjugation to the mother country and, in any event, seldom enforced in practice. See Stoebuck, 10 Wm. & Mary L. Rev., at 396–398, 419–420. The traditional conception of the common law as it developed in England had always been that it was freely alterable by statute. T. Plucknett, A Concise History of the Common Law 336–337 (5th ed. 1956); see also T. Plucknett, Statutes and Their Interpretation in the First Half of the Fourteenth Century 26–31 (1922) (finding no historical support for the claim that common law was "fundamental" or otherwise superior to statutes). Coke appears to have attempted at one time to establish a paramount common law, see, *e. g., Dr. Bonham's Case,* 8 Co. Rep. 107a, 118a, 77 Eng. Rep. 638, 652 (C. P. 1610), but that attempt never took root in England. See Plucknett, Concise History of the Common Law, at 337; Jones 130; J. Gough, Fundamental Law in English Constitutional History 202 (1955) (observing that "[b]y the nineteenth century the overriding authority of statute-law had become the accepted principle in the courts"). And although Coke's dictum was to have a somewhat·greater influence in America, that influence took the form of providing an early foundation for the idea that courts might invalidate legislation that they found inconsistent with a *written* constitution. See Jones 130–132; Gough, *supra,* at 206–207 (noting that Coke's view of fundamental law came to be transformed and subsumed in American practice by treatment of the written constitution as fundamental law in the exercise of judicial review). As I demonstrate *infra,* the·idea that legislation may be struck down based on principles of common law or natural justice not located within the constitutional text has been squarely rejected in this country. See *infra,* at 165–168.

[57] See also 3 Elliot's Debates 469–470 (Edmund Randolph, Virginia Convention) (arguing that constitutional incorporation of the common law would be "destructive to republican principles"). Indeed, one reason for

"[t]he Common law is nothing more than the unwritten law, and is left by all the Constitutions equally liable to legislative alterations." *Ibid.*[58] Indeed, Madison anticipated, and rejected, the Court's approach today when he wrote that if "the common law be admitted as . . . of constitutional obligation, it would confer on the judicial department a discretion little short of a legislative power . . . [which] would be permanent and irremediable by the Legislature." Alien and Sedition Laws 380. "A discretion of this sort," he insisted, "has always been lamented as incongruous and dangerous . . . ." *Id.*, at 381.[59]

---

Madison's suspicion of the common law was that it included "a thousand heterogeneous & antirepublican doctrines." Letter from Madison to Washington (Oct. 18, 1787), reprinted in 3 Farrand 130, App. A. "[I]t will merit the most profound consideration," Madison was later to warn in his Report on the Virginia Resolutions Concerning the Alien and Sedition Laws, "how far an indefinite admission of the common law . . . might draw after it the various prerogatives making part of the unwritten law of England." Alien and Sedition Laws 380. Such an admission, Madison feared, would mean that "the whole code, with all its incongruities, barbarisms, and bloody maxims, would be inviolably saddled on the good people of the United States." *Ibid.* See also Amar, 96 Yale L. J., at 1490 ("[The] sole basis [of absolute government immunity from all suits] is the British idea that the sovereign government, as the source of all law, cannot itself be bound by any law absent its consent. . . . [L]iterally every article of the Federalist Constitution and every amendment in the Bill of Rights rests on the repudiation of the British view" (footnote omitted)).

[58] See Wood 304, n. 75 ("To Jefferson in 1785 judicial discretion in the administration of justice was still the great evil and codification the great remedy"); G. White, The Marshall Court and Cultural Change, 1815–1835, p. 130 (1991) ("[A]n assumption of the constitutional design was that if Congress exercised [its enumerated] powers through legislation, its laws would supersede any competing ones").

[59] The Court attempts to sidestep this history by distinguishing sovereign immunity as somehow different from other common-law principles. *Ante*, at 69. But see *Chisholm* v. *Georgia*, 2 Dall., at 435 (Iredell, J., dissenting) (arguing that the common law of England should control the case "so far as it is applicable to the peculiar circumstances of the country, and where no special act of Legislation controuls it"). The Court cannot find solace in any distinction between "substantive rules of law" and "ju-

2

History confirms the wisdom of Madison's abhorrence of constitutionalizing common-law rules to place them beyond the reach of congressional amendment. The Framers feared judicial power over substantive policy and the ossification of law that would result from transforming common law into constitutional law, and their fears have been borne out every time the Court has ignored Madison's counsel on subjects that we generally group under economic and social policy. It is, in fact, remarkable that as we near the end of this

risdiction," *ante*, at 69, however; it is abundantly clear that we have drawn both sorts of principles from the common law. See, *e. g., Burnham* v. *Superior Court of Cal., County of Marin*, 495 U. S. 604, 609 (1990) (plurality opinion of SCALIA, J.) (noting that American notion of personal jurisdiction is a "common-law principle" that predates the Fourteenth Amendment). Nothing in the history, moreover, suggests that common-law rules were more immutable when they were jurisdictional rather than substantive in nature. Nor is it true that "the principle of state sovereign immunity stands distinct from other principles of the common law in that only the former prompted a specific constitutional amendment." *Ante*, at 69. The Seventh Amendment, after all, was adopted to respond to Antifederalist concerns regarding the right to jury trial. See n. 34, *supra*. Indeed, that Amendment vividly illustrates the distinction between provisions intended to adopt the common law (the Amendment specifically mentions the "common law" and states that the common-law right "shall be preserved") and those provisions, like the Eleventh Amendment, that may have been inspired by a common-law right but include no language of adoption or specific reference. Finally, the Court's recourse to a vague "jurisprudence in all civilized nations," *ante*, at 69, rather than the common law of England is unavailing. When the Constitution has received such general principles into our law, for example, in the Admiralty Clause's adoption of the general "law of nations" or "law of the sea," those principles have always been subject to change by congressional enactment. See, *e. g., Panama R. Co.* v. *Johnson*, 264 U. S. 375, 386 (1924) (noting that although "the principles of the general maritime law, sometimes called the law of the sea," were "embodied" in Art. III, §2, of the Constitution, they remained "subject to power in Congress to alter, qualify or supplement"); *The Nereide*, 9 Cranch 388, 423 (1815) (Marshall, C. J.) (stating that the Court would be "bound by the law of nations" until Congress passed a contrary enactment).

century the Court should choose to open a new constitutional chapter in confining legislative judgments on these matters by resort to textually unwarranted common-law rules, for it was just this practice in the century's early decades that brought this Court to the nadir of competence that we identify with *Lochner* v. *New York*, 198 U. S. 45 (1905).[60]

It was the defining characteristic of the *Lochner* era, and its characteristic vice, that the Court treated the common-law background (in those days, common-law property rights and contractual autonomy) as paramount, while regarding congressional legislation to abrogate the common law on these economic matters as constitutionally suspect. See, *e. g., Adkins* v. *Childrens Hospital of D. C.*, 261 U. S. 525, 557 (1923) (finding abrogation of common-law freedom to contract for any wage an unconstitutional "compulsory exaction"); see generally Sunstein, Lochner's Legacy, 87 Colum. L. Rev. 873 (1987). And yet the superseding lesson that seemed clear after *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379 (1937), that action within the legislative power is not subject to greater scrutiny merely because it trenches upon the case law's ordering of economic and social relationships, seems to have been lost on the Court.

The majority today, indeed, seems to be going *Lochner* one better. When the Court has previously constrained the express Article I powers by resort to common-law or background principles, it has done so at least in an ostensible effort to give content to some other written provision of the Constitution, like the Due Process Clause, the very object of

---

[60] Cf. *United States* v. *Lopez*, 514 U. S. 549, 606 (1995) (SOUTER, J., dissenting) ("The fulcrums of judicial review in [the *Lochner* cases] were the notions of liberty and property characteristic of laissez-faire economics, whereas the Commerce Clause cases turned on what was ostensibly a structural limit of federal power, but under each conception of judicial review the Court's character for the first third of the century showed itself in exacting judicial scrutiny of a legislature's choice of economic ends and of the legislative means selected to reach them").

which is to limit the exercise of governmental power. See, *e. g.*, *Adair* v. *United States*, 208 U. S. 161 (1908). Some textual argument, at least, could be made that the Court was doing no more than defining one provision that happened to be at odds with another. Today, however, the Court is not struggling to fulfill a responsibility to reconcile two arguably conflicting and Delphic constitutional provisions, nor is it struggling with any Delphic text at all. For even the Court concedes that the Constitution's grant to Congress of plenary power over relations with Indian tribes at the expense of any state claim to the contrary is unmistakably clear, and this case does not even arguably implicate a textual trump to the grant of federal-question jurisdiction.

I know of only one other occasion on which the Court has spoken of extending its reach so far as to declare that the plain text of the Constitution is subordinate to judicially discoverable principles untethered to any written provision. Justice Chase once took such a position almost 200 years ago:

> "There are certain vital principles in our free Republican governments, which will determine and over-rule an apparent and flagrant abuse of legislative power. . . . An act of the Legislature (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority." *Calder* v. *Bull*, 3 Dall. 386, 388 (1798) (emphasis deleted).

This position was no less in conflict with American constitutionalism in 1798 than it is today, being inconsistent with the Framers' view of the Constitution as fundamental law. Justice Iredell understood this, and dissented (again) in an opinion that still answers the position that "vital" or "background" principles, without more, may be used to confine a clear constitutional provision:

> "[S]ome speculative jurists have held, that a legislative act against natural justice must, in itself, be void; but I

168

cannot think that, under such a government, any Court of Justice would possess a power to declare it so. . . .

". . . [I]t has been the policy of the American states, . . . and of the people of the United States . . . to define with precision the objects of the legislative power, and to restrain its exercise within marked and settled boundaries. If any act of Congress, or of the Legislature of a state, violates those constitutional provisions, it is unquestionably void. . . . If, on the other hand, the Legislature of the Union, or the Legislature of any member of the Union, shall pass a law, within the general scope of their constitutional power, the Court cannot pronounce it to be void, merely because it is, in their judgment, contrary to the principles of natural justice. The ideas of natural justice are regulated by no fixed standard: the ablest and the purest men have differed upon the subject; and all that the Court could properly say, in such an event, would be, that the Legislature (possessed of an equal right of opinion) had passed an act which, in the opinion of the judges, was inconsistent with the abstract principles of natural justice." *Id.,* at 398–399 (emphasis deleted) (opinion dissenting in part).

Later jurisprudence vindicated Justice Iredell's view, and the idea that "first principles" or concepts of "natural justice" might take precedence over the Constitution or other positive law "all but disappeared in American discourse." J. Ely, Democracy and Distrust 52 (1980). It should take more than references to "background principle[s]," *ante,* at 72, and "implicit limitation[s]," *Welch,* 483 U. S., at 496 (SCALIA, J., concurring in part and concurring in judgment), to revive the judicial power to overcome clear text unopposed to any other provision, when that clear text is in harmony with an almost equally clear intent on the part of the Framers and the constitutionalists of their generation.

## IV

The Court's holding that the States' *Hans* immunity may not be abrogated by Congress leads to the final question in this case, whether federal-question jurisdiction exists to order prospective relief enforcing IGRA against a state officer, respondent Chiles, who is said to be authorized to take the action required by the federal law. Just as with the issue about authority to order the State as such, this question is entirely jurisdictional, and we need not consider here whether petitioner Seminole Tribe would have a meritorious argument for relief, or how much practical relief the requested order (to bargain in good faith) would actually provide to the Tribe. Nor, of course, does the issue turn in any way on one's views about the scope of the Eleventh Amendment or *Hans* and its doctrine, for we ask whether the state officer is subject to jurisdiction only on the assumption that action directly against the State is barred. The answer to this question is an easy yes, the officer is subject to suit under the rule in *Ex parte Young*, 209 U. S. 123 (1908), and the case could, and should, readily be decided on this point alone.

### A

In *Ex parte Young*, this Court held that a federal court has jurisdiction in a suit against a state officer to enjoin official actions violating federal law, even though the State itself may be immune. Under *Young*, "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U. S. 332, 337 (1979); see also *Milliken v. Bradley*, 433 U. S. 267, 289 (1977).

The fact, without more, that such suits may have a significant impact on state governments does not count under *Young*. *Milliken*, for example, was a suit, under the authority of *Young*, brought against Michigan's Governor, Attorney General, Board of Education, Superintendent of Public In-

struction, and Treasurer, which resulted in an order obligating the State of Michigan to pay money from its treasury to fund an education plan. The relief requested (and obtained) by the plaintiffs effectively ran against the State: state moneys were to be removed from the state treasury, and they were to be spent to fund a remedial education program that it would be the State's obligation to implement. To take another example, *Quern* v. *Jordan* involved a court order requiring state officials to notify welfare beneficiaries of the availability of past benefits. Once again, the defendants were state officials, but it was the obligation of the State that was really at issue: the notices would be sent from the state welfare agency, to be returned to the state agency, and the state agency would pay for the notices and any ensuing awards of benefits. Indeed, in the years since *Young* was decided, the Court has recognized only one limitation on the scope of its doctrine: under *Edelman* v. *Jordan*, 415 U. S. 651 (1974), *Young* permits prospective relief only and may not be applied to authorize suits for retrospective monetary relief.

It should be no cause for surprise that *Young* itself appeared when it did in the national law. It followed as a matter of course after the *Hans* Court's broad recognition of immunity in federal-question cases, simply because "[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Green* v. *Mansour*, 474 U. S. 64, 68 (1985). *Young* provided, as it does today, a sensible way to reconcile the Court's expansive view of immunity expressed in *Hans* with the principles embodied in the Supremacy Clause and Article III.

If *Young* may be seen as merely the natural consequence of *Hans*, it is equally unsurprising as an event in the longer history of sovereign immunity doctrine, for the rule we speak of under the name of *Young* is so far inherent in the jurisdictional limitation imposed by sovereign immunity as to have been recognized since the Middle Ages. For that

long it has been settled doctrine that suit against an officer of the Crown permitted relief against the government despite the Crown's immunity from suit in its own courts and the maxim that the King could do no wrong. See Jaffe, 77 Harv. L. Rev., at 3, 18–19; Ehrlich, No. XII: Proceedings Against the Crown (1216–1377), pp. 28–29, in 6 Oxford Studies in Social and Legal History (P. Vinogradoff ed. 1921). An early example, from "time immemorial" of a claim "affecting the Crown [that] could be pursued in the regular courts [without consent since it] did not take the form of a suit against the Crown," Jaffe, *supra*, at 1, was recognized by the Statute of Westminster I, 1275, which established a writ of disseisin against a King's officers. When a King's officer disseised any person in the King's name, the wrongfully deprived party could seek the draconian writ of attaint against the officer, by which he would recover his land. Jaffe, 77 Harv. L. Rev., at 9. Following this example forward, we may see how the writ of attaint was ultimately overtaken by the more moderate common-law writs of certiorari and mandamus, "operat[ing] directly on the government; [and commanding] an officer not as an individual but as a functionary." *Id.*, at 16. Thus the Court of King's Bench made it clear in 1701 that "wherever any new jurisdiction is erected, be it by private or public Act of Parliament, they are subject to the inspections of this Court by writ of error, or by *certiorari* and *mandamus*." *The Case of Cardiffe Bridge*, 1 Salk. 146, 91 Eng. Rep. 135 (K. B.).

## B

This history teaches that it was only a matter of course that once the National Constitution had provided the opportunity for some recognition of state sovereign immunity, the necessity revealed through six centuries or more of history would show up in suits against state officers, just as *Hans* would later open the door to *Ex parte Young* itself. Once, then, the Eleventh Amendment was understood to forbid suit

against a State *eo nomine*, the question arose "which suits against officers will be allowed and which will not be." Jaffe, 77 Harv. L. Rev., at 20.

> "It early became clear that a suit against an officer was not forbidden simply because it raised a question as to the legality of his action as an agent of government or because it required him, as in mandamus, to perform an official duty. These as we know had been well established before the eleventh amendment as not necessarily requiring consent. To be sure the renewed emphasis on immunity given by the eleventh amendment might conceivably have been taken so to extend the doctrine as to exclude suits against state officers even in cases where the English tradition would have allowed them. There was a running battle as to where the line would be drawn. The amendment was appealed to as an argument for generous immunity. But there was the vastly powerful counterpressure for the enforcement of constitutional limits on the states. The upshot . . . was to confine the amendment's prohibition more or less to the occasion which gave it birth, to wit, the enforcement of contracts and to most (though not all) suits involving the title and disposition of a state's real and personal property." *Id.*, at 20–21.

The earliest cases, *United States* v. *Peters*, 5 Cranch 115 (1809), and *Osborn* v. *Bank of United States*, 9 Wheat. 738 (1824), embrace the English practice of permitting suits against officers, see Orth, Judicial Power of the United States, at 34–35, 40–41, 122, by focusing almost exclusively on whether the State had been named as a defendant. *Governor of Georgia* v. *Madrazo*, 1 Pet. 110, 123–124 (1828), shifted this analysis somewhat, finding that a Governor could not be sued because he was sued "not by his name, but by his title," which was thought the functional equivalent of suing the State itself. *Madrazo* did not, however, erase the

fundamental principle of *Osborn* that sovereign immunity would not bar a suit against a state officer. See, *e. g.*, *Davis v. Gray*, 16 Wall. 203 (1873) (applying *Osborn* by enjoining the Governor of Texas to interfere with the possession of land granted by the State); *United States* v. *Lee*, 106 U. S. 196 (1882) (applying *Osborn* in context of federal sovereign immunity).

This simple rule for recognizing sovereign immunity without gutting substantial rights was temporarily muddled in *Louisiana* v. *Jumel*, 107 U. S. 711 (1883), where the Court, although it "did not clearly say why," refused to hear a suit that would have required a state treasurer to levy taxes to pay interest on a bond. Currie, Sovereign Immunity and Suits Against Government Officers, 1984 S. Ct. Rev. 149, 152. (One recalls the circumstances of *Hans* itself, see *supra*, at 117–121.) The Court, however, again applied *Osborn* in the *Virginia Coupon Cases*, 114 U. S. 269 (1885) (permitting injunctions, restitution, and damages against state officers who seized property to collect taxes already paid with interest coupons the State had agreed to accept). *In re Ayers*, 123 U. S. 443, 502 (1887), sought to rationalize the competing strands of doctrine on the ground that an action may be "sustained only in those instances where the act complained of, considered apart from the official authority alleged as its justification, and as the personal act of the individual defendant, constituted a violation of right for which the plaintiff was entitled to a remedy at law or in equity against the wrongdoer in his individual character."

*Ex parte Young* restored the old simplicity by complementing *In re Ayers* with the principle that state officers never have authority to violate the Constitution or federal law, so that any illegal action is stripped of state character and rendered an illegal individual act. Suits against these officials are consequently barred by neither the Eleventh Amendment nor *Hans* immunity. The officer's action "is simply an illegal act upon the part of a state official in at-

tempting by the use of the name of the State to en-
force a legislative enactment which is void because un-
constitutional. . . . The State has no power to impart to him
any immunity from responsibility to the supreme author-
ity of the United States." *Ex parte Young,* 209 U. S., at
159–160.

The decision in *Ex parte Young,* and the historic doctrine
it embodies, thus plays a foundational role in American con-
stitutionalism, and while the doctrine is sometimes called a
"fiction," the long history of its felt necessity shows it to be
something much more estimable, as we may see by consider-
ing the facts of the case. "Young was really and truly about
to damage the interest of plaintiffs. Whether what he was
about to do amounted to a legal injury depended on the
authority of his employer, the state. If the state could con-
stitutionally authorize the act then the loss suffered by
plaintiffs was not a wrong for which the law provided
a remedy. . . . If the state could not constitutionally authorize
the act then Young was not acting by its authority." Orth,
Judicial Power of the United States, at 133. The doctrine
we call *Ex parte Young* is nothing short of "indispensable to
the establishment of constitutional government and the rule
of law." C. Wright, Law of Federal Courts 292 (4th ed.
1983). See also Chemerinsky, Federal Jurisdiction, at 393.

A rule of such lineage, engendered by such necessity,
should not be easily displaced, if indeed it is displaceable at
all, for it marks the frontier of the enforceability of federal
law against sometimes competing state policies. We have in
fact never before inferred a congressional intent to eliminate
this time-honored practice of enforcing federal law. That, of
course, does not mean that the intent may never be inferred,
and where, as here, the underlying right is one of statutory
rather than constitutional dimension, I do not in theory re-
ject the Court's assumption that Congress may bar enforce-
ment by suit even against a state official. But because in
practice, in the real world of congressional legislation, such

an intent would be exceedingly odd, it would be equally odd for this Court to recognize an intent to block the customary application of *Ex parte Young* without applying the rule recognized in our previous cases, which have insisted on a clear statement before assuming a congressional purpose to "affec[t] the federal balance," *United States* v. *Bass,* 404 U. S. 336, 349 (1971). See also *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58, 65 (1989) ("[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute' ") (quoting *Atascadero State Hospital* v. *Scanlon,* 473 U. S., at 242); *Gregory* v. *Ashcroft,* 501 U. S. 452, 460–461 (1991). Our habitual caution makes sense for just the reason we mentioned in *Dellmuth* v. *Muth,* 491 U. S., at 230–231: it is "difficult to believe that . . . Congress, taking careful stock of the state of Eleventh Amendment law, decided it would drop coy hints but stop short of making its intention manifest."

## C

There is no question that by its own terms *Young*'s indispensable rule authorizes the exercise of federal jurisdiction over respondent Chiles. Since this case does not, of course, involve retrospective relief, *Edelman*'s limit is irrelevant, and there is no other jurisdictional limitation. Obviously, for jurisdictional purposes it makes no difference in principle whether the injunction orders an official not to act, as in *Young,* or requires the official to take some positive step, as in *Milliken* or *Quern.* Nothing, then, in this case renders *Young* unsuitable as a jurisdictional basis for determining on the merits whether petitioner is entitled to an order against a state official under general equitable doctrine. The Court does not say otherwise, and yet it refuses to apply *Young.* There is no adequate reason for its refusal.

No clear statement of intent to displace the doctrine of *Ex parte Young* occurs in IGRA, and the Court is instead

constrained to rest its effort to skirt *Young* on a series of suggestions thought to be apparent in Congress's provision of "intricate procedures" for enforcing a State's obligation under the Act. The procedures are said to implicate a rule against judicial creativity in devising supplementary procedures; it is said that applying *Young* would nullify the statutory procedures; and finally the statutory provisions are said simply to reveal a congressional intent to preclude the application of *Young*.

1

The Court cites *Schweiker* v. *Chilicky*, 487 U. S. 412, 423 (1988), in support of refraining from what it seems to think would be judicial creativity in recognizing the applicability of *Young*. The Court quotes from *Chilicky* for the general proposition that when Congress has provided what it considers adequate remedial mechanisms for violations of federal law, this Court should not "creat[e]" additional remedies. *Ante*, at 74. The Court reasons that Congress's provision in IGRA of "intricate procedures" shows that it considers its remedial provisions to be adequate, with the implication that courts as a matter of prudence should provide no "additional" remedy under *Ex parte Young*. *Ante*, at 73–76.

*Chilicky*'s remoteness from the point of this case is, however, apparent from its facts. In *Chilicky*, Congress had addressed the problem of erroneous denials of certain government benefits by creating a scheme of appeals and awards that would make a successful claimant whole for all benefits wrongly denied. The question was whether this Court should create a further remedy on the model of *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), for such harms as emotional distress, when the erroneous denial of benefits had involved a violation of procedural due process. The issue, then, was whether to create a supplemental remedy, backward looking on the *Bivens* model, running against a federal official in his personal capacity, and requiring an

affirmative justification (as *Bivens* does). See *Bivens*, *supra; FDIC* v. *Meyer*, 510 U. S. 471, 484–486 (1994).

The *Bivens* issue in *Chilicky* (and in *Meyer*) is different from the *Young* issue here in every significant respect. *Young* is not an example of a novel rule that a proponent has a burden to justify affirmatively on policy grounds in every context in which it might arguably be recognized; it is a general principle of federal equity jurisdiction that has been recognized throughout our history and for centuries before our own history began. *Young* does not provide retrospective monetary relief but allows prospective enforcement of federal law that is entitled to prevail under the Supremacy Clause. It requires not money payments from a government employee's personal pocket, but lawful conduct by a public employee acting in his official capacity. *Young* would not function here to provide a merely supplementary regime of compensation to deter illegal action, but the sole jurisdictional basis for an Article III court's enforcement of a clear federal statutory obligation, without which a congressional act would be rendered a nullity in a federal court. One cannot intelligibly generalize from *Chilicky*'s standards for imposing the burden to justify a supplementary scheme of tort law to the displacement of *Young*'s traditional and indispensable jurisdictional basis for ensuring official compliance with federal law when a State itself is immune from suit.

### 2

Next, the Court suggests that it may be justified in displacing *Young* because *Young* would allow litigants to ignore the "intricate procedures" of IGRA in favor of a menu of streamlined equity rules from which any litigant could order as he saw fit. But there is no basis in law for this suggestion, and the strongest authority to reject it. *Young* did not establish a new cause of action and it does not impose any particular procedural regime in the suits it permits. It stands, instead, for a jurisdictional rule by which paramount

federal law may be enforced in a federal court by substituting a nonimmune party (the state officer) for an immune one (the State itself). *Young* does no more and furnishes no authority for the Court's assumption that it somehow pre-empts procedural rules devised by Congress for particular kinds of cases that may depend on *Young* for federal jurisdiction.[61]

If, indeed, the Court were correct in assuming that Congress may not regulate the procedure of a suit jurisdictionally dependent on *Young*, the consequences would be revolutionary, for example, in habeas law. It is well established that when a habeas corpus petitioner sues a state official alleging detention in violation of federal law and seeking the prospective remedy of release from custody, it is the doctrine identified in *Ex parte Young* that allows the petitioner to evade the jurisdictional bar of the Eleventh Amendment (or, more properly, the *Hans* doctrine). See *Young*, 209 U. S., at 167–168; *Larson* v. *Domestic and Foreign Commerce Corp.*, 337 U. S. 682, 689–690 (1949).[62] And yet Congress has im-

---

[61] The Court accuses me of misrepresenting its argument. *Ante*, at 75, n. 17. The Court's claim, as I read it, is not that Congress cannot authorize federal jurisdiction under *Ex parte Young* over a cause of action with a limited remedial scheme, but rather that remedial limitations on the underlying cause of action do not apply to a claim based on *Ex parte Young*. Otherwise, the existence of those remedial limitations would provide no reason for the Court to assume that Congress did not intend to permit an action under *Young;* rather, the limitations would apply regardless of whether the suit was brought against the State or a state officer.

[62] See also *Brennan* v. *Stewart*, 834 F. 2d 1248, 1252, n. 6 (CA5 1988) ("[A]lthough not usually conceptualized as *Ex parte Young* cases, most of the huge number of habeas claims in the federal courts under 28 U. S. C. § 2254 are effectively suits against the states. These suits pass muster under the Eleventh Amendment because the habeas theory of a civil suit against the bad jailer fits perfectly with the *Ex parte Young* fiction"); *United States ex rel. Elliott* v. *Hendricks*, 213 F. 2d 922, 926–928 (CA3) (exercising jurisdiction over a habeas suit despite an Eleventh Amendment challenge on the theory that the suit was against a state officer), cert. denied, 348 U. S. 851 (1954).

posed a number of restrictions upon the habeas remedy, see, e. g., 28 U. S. C. § 2254(b) (requiring exhaustion of state remedies prior to bringing a federal habeas petition), and this Court has articulated several more, see, e. g., *McCleskey* v. *Zant*, 499 U. S. 467 (1991) (abuse of the writ); *Teague* v. *Lane*, 489 U. S. 288 (1989) (limiting applicability of "new rules" on habeas); *Brecht* v. *Abrahamson*, 507 U. S. 619 (1993) (applying a more deferential harmless-error standard on habeas review). By suggesting that *Ex parte Young* provides a free-standing remedy not subject to the restrictions otherwise imposed on federal remedial schemes (such as habeas corpus), the Court suggests that a state prisoner may circumvent these restrictions by ostensibly bringing his suit under *Young* rather than 28 U. S. C. § 2254. The Court's view implies similar consequences under any number of similarly structured federal statutory schemes.[63]

This, of course, cannot be the law, and the plausible rationale for rejecting the Court's contrary assumption is that Congress has just as much authority to regulate suits when jurisdiction depends on *Young* as it has to regulate when *Young* is out of the jurisdictional picture. If *Young* does not preclude Congress from requiring state exhaustion in habeas cases (and it clearly does not), then *Young* does not bar the application of IGRA's procedures when effective relief is sought by suing a state officer.

### 3

The Court's third strand of reasoning for displacing *Ex parte Young* is a supposed inference that Congress so in-

---

[63] Many other federal statutes impose obligations on state officials, the enforcement of which is subject to "intricate provisions" also statutorily provided. See, e. g., Federal Water Pollution Control Act, 33 U. S. C. § 1365(a) (citizen-suit provision to enforce States' obligations under federal environmental law); Emergency Planning and Community Right-To-Know Act, 42 U. S. C. § 11001 (privately enforceable requirement that States form commissions, appointed by the Governor, to generate plans for addressing hazardous material emergencies).

tended. Since the Court rests this inference in large part on its erroneous assumption that the statute's procedural limitations would not be applied in a suit against an officer for which *Young* provided the jurisdictional basis, the error of that assumption is enough to show the unsoundness of any inference that Congress meant to exclude *Young*'s application. But there are further reasons pointing to the utter implausibility of the Court's reading of the congressional mind.

IGRA's jurisdictional provision reads as though it had been drafted with the specific intent to apply to officer liability under *Young.* It provides that "[t]he United States district courts shall have jurisdiction over . . . any cause of action . . . *arising from the failure of a State* to enter into negotiations . . . or to conduct such negotiations in good faith." 25 U. S. C. § 2710(d)(7)(A)(i) (emphasis added). This language does not limit the possible defendants to States and is quite literally consistent with the possibility that a tribe could sue an appropriate state official for a State's failure to negotiate.[64] The door is so obviously just as open to jurisdiction over an officer under *Young* as to jurisdiction over a State directly that it is difficult to see why the statute would have been drafted as it was unless it was done in anticipation that *Young* might well be the jurisdictional basis for enforcement action.

But even if the jurisdictional provision had spoken narrowly of an action against the State itself (as it subsequently speaks in terms of the State's obligation), that would be no indication that Congress had rejected the application of *Young.* An order requiring a "State" to comply with federal

---

[64] In order for any person (whether individual or entity) to be a proper defendant under § 2710(d)(7) (and in order for standing to exist, since one of its requirements is redressability), that person, of course, would need to have some connection to the State's negotiations. See *Young,* 209 U. S., at 157; *Franklin* v. *Massachusetts,* 505 U. S. 788, 803 (1992). The obvious candidates are the responsible state officials.

law can, of course, take the form of an order directed to the State in its sovereign capacity. But as *Ex parte Young* and innumerable other cases show, there is nothing incongruous about a duty imposed on a "State" that Congress intended to be effectuated by an order directed to an appropriate state official. The habeas corpus statute, again, comes to mind. It has long required "the State," by "order directed to an appropriate State official," to produce the state-court record where an indigent habeas petitioner argues that a state court's factual findings are not fairly supported in the record. See 28 U. S. C. § 2254(e) ("the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official"). If, then, IGRA's references to "a State's" duty were not enforceable by order to a state official, it would have to be for some other reason than the placement of the statutory duty on "the State."

It may be that even the Court agrees, for it falls back to the position, see *ante*, at 75, n. 17, that only a State, not a state officer, can enter into a compact. This is true but wholly beside the point. The issue is whether negotiation should take place as required by IGRA and an officer (indeed, only an officer) can negotiate. In fact, the only case cited by the Court, *State ex rel. Stephan* v. *Finney*, 251 Kan. 559, 836 P. 2d 1169 (1992), makes that distinction abundantly clear.

Finally, one must judge the Court's purported inference by stepping back to ask why Congress could possibly have intended to jeopardize the enforcement of the statute by excluding application of *Young*'s traditional jurisdictional rule, when that rule would make the difference between success or failure in the federal court if state sovereign immunity was recognized. Why would Congress have wanted to go for broke on the issue of state immunity in the event the State pleaded immunity as a jurisdictional bar? Why would Congress not have wanted IGRA to be enforced by means of

a traditional doctrine giving federal courts jurisdiction over state officers, in an effort to harmonize state sovereign immunity with federal law that is paramount under the Supremacy Clause? There are no plausible answers to these questions.

## D

There is, finally, a response to the Court's rejection of *Young* that ought to go without saying. Our longstanding practice is to read ambiguous statutes to avoid constitutional infirmity, *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988) ("'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality'") (quoting *Hooper* v. *California,* 155 U. S. 648, 657 (1895)). This practice alone (without any need for a clear statement to displace *Young*) would be enough to require *Young*'s application. So, too, would the application of another rule, requiring courts to choose any reasonable construction of a statute that would eliminate the need to confront a contested constitutional issue (in this case, the place of state sovereign immunity in federal-question cases and the status of *Union Gas*). *NLRB* v. *Catholic Bishop of Chicago,* 440 U. S. 490, 500–501 (1979). Construing the statute to harmonize with *Young*, as it readily does, would have saved an Act of Congress and rendered a discussion on constitutional grounds wholly unnecessary. This case should be decided on this basis alone.

## V

Absent the application of *Ex parte Young,* I would, of course, follow *Union Gas* in recognizing congressional power under Article I to abrogate *Hans* immunity. Since the reasons for this position, as explained in Parts II–III, *supra,* tend to unsettle *Hans* as well as support *Union Gas,* I should add a word about my reasons for continuing to accept *Hans*'s holding as a matter of *stare decisis.*

The *Hans* doctrine was erroneous, but it has not previously proven to be unworkable or to conflict with later doctrine or to suffer from the effects of facts developed since its decision (apart from those indicating its original errors). I would therefore treat *Hans* as it has always been treated in fact until today, as a doctrine of federal common law. For, as so understood, it has formed one of the strands of the federal relationship for over a century now, and the stability of that relationship is itself a value that *stare decisis* aims to respect.

In being ready to hold that the relationship may still be altered, not by the Court but by Congress, I would tread the course laid out elsewhere in our cases. The Court has repeatedly stated its assumption that insofar as the relative positions of States and Nation may be affected consistently with the Tenth Amendment,[65] they would not be modified without deliberately expressed intent. See *Gregory* v. *Ashcroft*, 501 U. S., at 460–461. The plain-statement rule, which "assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision," *United States* v. *Bass*, 404 U. S., at 349, is particularly appropriate in light of our primary reliance on "[t]he effectiveness of the federal political process in preserving the States' interests," *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 552 (1985).[66] Hence, we

---

[65] The scope of the Tenth Amendment's limitations of congressional power remains a subject of debate. *New York* v. *United States*, 505 U. S. 144 (1992), holds that principles of federalism are "violated by a formal command from the National Government directing the State to enact a certain policy." *United States* v. *Lopez*, 514 U. S., at 583 (KENNEDY, J., concurring). Some suggest that the prohibition extends further than barring the Federal Government from directing the creation of state law. The views I express today should not be understood to take a position on that disputed question.

[66] See also The Federalist No. 46, at 319 (J. Madison) (explaining that the Federal Government "will partake sufficiently of the spirit [of the States], to be disinclined to invade the rights of the individual States, or the pre-

have required such a plain statement when Congress preempts the historic powers of the States, *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947), imposes a condition on the grant of federal moneys, *South Dakota* v. *Dole,* 483 U. S. 203, 207 (1987), or seeks to regulate a State's ability to determine the qualifications of its own officials, *Gregory, supra,* at 464.

When judging legislation passed under unmistakable Article I powers, no further restriction could be required. Nor does the Court explain why more could be demanded. In the past, we have assumed that a plain-statement requirement is sufficient to protect the States from undue federal encroachments upon their traditional immunity from suit. See, *e. g., Welch* v. *Texas Dept. of Highways & Public Transp.,* 483 U. S., at 475; *Atascadero State Hospital* v. *Scanlon,* 473 U. S., at 239–240. It is hard to contend that this rule has set the bar too low, for (except in *Union Gas*) we have never found the requirement to be met outside the context of laws passed under § 5 of the Fourteenth Amendment. The exception I would recognize today proves the rule, moreover, because the federal abrogation of state immunity comes as part of a regulatory scheme which is itself designed to invest the States with regulatory powers that Congress need not extend to them. This fact suggests to me that the political safeguards of federalism are working, that a plain-statement rule is an adequate check on congressional overreaching, and that today's abandonment of that approach is wholly unwarranted.

There is an even more fundamental "clear statement" principle, however, that the Court abandons today. John Marshall recognized it over a century and a half ago in the very context of state sovereign immunity in federal-question cases:

---

rogatives of their governments"); Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Colum. L. Rev. 543 (1954).

"The jurisdiction of the court, then, being extended by the letter of the constitution to all cases arising under it, or under the laws of the United States, it follows that those who would withdraw any case of this description from that jurisdiction, must sustain the exemption they claim on the spirit and true meaning of the constitution, which spirit and true meaning must be so apparent as to overrule the words which its framers have employed." *Cohens* v. *Virginia*, 6 Wheat., at 379–380.

Because neither text, precedent, nor history supports the majority's abdication of our responsibility to exercise the jurisdiction entrusted to us in Article III, I would reverse the judgment of the Court of Appeals.